1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                      TAMPA DIVISION


3

     UNITED STATES OF AMERICA,    :
4                                 :
          Plaintiff,              :
5                                 :
                                  : CASE    8:17-cr-174
6    vs.                          : NO.:
                                  :
7                                 : DATE:   8/22/2017
     JASON JEROME SPRINGER,       :
8                                 : TIME:   9:00 a.m.
          Defendant.             :
9    -------------------------     PAGES:  1 - 227


10


11                  TRANSCRIPT OF TRIAL DAY 2
           BEFORE THE HONORABLE JAMES D. WHITTEMORE
12               UNITED STATES DISTRICT JUDGE


13

     For the Government:
14
               CARLTON C. GAMMONS, ESQ.
15             DANIEL GEORGE, ESQ.
               U.S. Attorney's Office
16             Suite 3200
               400 N. Tampa Street
17             Tampa, Florida 33602

18   For the Defendant:

19             DANIEL HERNANDEZ, ESQ.
               902 N. Armenia Avenue
20             Tampa, Florida 33607

21

     Court Reporter:  Lynann Nicely, RPR, RMR, CRR
22          Official Court Reporter
            801 N. Florida Avenue, 13B
23          Tampa, Florida 33602

24

25

1                          I N D E X
                 WITNESS                              PAGE
2    DEPUTY ZACH SELF (continued)

     Direct examination by Mr. George            6
3    Cross examination by Mr. Hernandez          8

4    GARRETT CROSS
     Direct examination by Mr. George            11
5    Cross examination by Mr. Hernandez          29

6    CHASTITY CROSS
     Direct examination by Mr. George            36
7    Cross examination by Mr. Hernandez          46

8    MICHAEL DONOVAN
     Direct examination by Mr. George            48
9    Cross examination by Mr. Hernandez          64

10   CHRISTINE MCCOY
     Direct examination by Mr. George            67
11

     MICHAEL TAYLOR
12   Direct examination by Mr. George            71, 94
     Cross examination by Mr. Hernandez          87

13

14   TRAVEOUS ANDERSON
     Direct examination by Mr. Gammons        96, 113
15   Cross examination by Mr. Hernandez          108

16   DANIEL WHITE
     Direct examination by Mr. Gammons        116, 133
17   Cross examination by Mr. Hernandez          127

18   MARC COGNETTI
     Direct examination by Mr. Gammons           134
19   Cross examination by Mr. Hernandez          143

20   PHILLIP ANTONIO
     Direct examination by Mr. Gammons           144
21   Cross examination by Mr. Hernandez          150

22   JUDGE ELIZABETH KOVACHEVICH
     Direct examination by Mr. George         186, 216
23   Cross examination by Mr. Hernandez          203

24   BRETT VELICOVICH
     Direct examination by Mr. George            217

25

1          **P R O C E E D I N G S**

2          **THE COURT:  I made a comment, Mr. Hernandez,**

3     **Mr. George, at sidebar that I understood there had**

4     **been a question for transcripts.  I am in error,**

5     **that was a misunderstanding of a conversation that**

6     **occurred between our court reporter and the clerk.**

7     **The court reporter made a comment something along**

8     **the lines 'I've got to get ready in case there is a**

9     **request for dailies' or something like that.  There**

10    **had not been, but she was thinking out loud.  And**

11    **I've instructed both my court reporters, no**

12    **transcripts of any portion of this trial without my**

13    **authority.  And I've also instructed the clerk that**

14    **there is no live streaming of this trial without my**

15    **authority.  The exception, of course, is in the**

16    **Marshals Office, they have a live feed for security**

17    **reasons.  I'm simply trying to protect the integrity**

18    **of the trial since the rule has been invoked.**

19         **MR. HERNANDEZ:  Absolutely, Your Honor.**

20    **Judge, I have one quick matter.**

21         **THE COURT:  Do you want to bring Mr. Springer**

22    **in?**

23         **(Defendant enters the courtroom. )**

24         **THE COURT:  We have several missing jurors, by**

25    **the way, there are apparently some traffic issues**

1      between New Port Richey and Tampa.  One of them

2      called about 20 to 9, she's still stuck.

3              MR. HERNANDEZ:  I apologize for being a few

4      minutes late.  I'm coming from Brandon/Riverview

5      area, but I ran into some -- I left with I thought

6      plenty to spare and I ended up being a few minutes

7      late.

8              THE COURT:  Tuesday is a traditional delivery

9      day.  A lot of trucks on the roads on Tuesdays and I

10     ran into that this morning.  There might be some

11     accidents out there, I don't know.  But anyway, as

12     soon as they're here -- we have four missing as of

13     just a couple minutes ago.

14             Good morning, Mr. Springer, we're just

15     announcing there is four jurors missing, they're

16     delayed in traffic.

17             Mr. Hernandez, you have a matter you wanted to

18     bring up?

19             MR. HERNANDEZ:  Judge, briefly.  My

20     understanding is that a witness by the name of

21     Garrett Cross is going to be testifying this

22     morning.  A few minutes ago I was handed his grand

23     jury testimony that's about 45 pages, 46 pages --

24     no, 50, it's actually 50 pages.  And what I'm asking

25     for is maybe a short break before he testifies so

1      that I can go into one of these rooms to the

2      conference room behind us and have a chance to read

3      it because without that opportunity, this document

4      is going to be of no use to me.

5              THE COURT:  When is he expected to be called,

6      Mr. George?

7              MR. GEORGE:  Your Honor, we expect to call him

8      after Deputy Self is finished testifying.

9              THE COURT:  In the future provide Jencks Act

10     material the day before so we don't have delays in

11     the trial.  You're certainly entitled to -- why

12     don't you go ahead and start reviewing that,

13     Mr. Hernandez, while we're waiting on jurors.  If

14     you don't finish, I'll certainly give you enough

15     time to do that.  Anything else, guys?

16     Housekeeping?

17             MR. HERNANDEZ:  No, sir, that's the only.

18             MR. GEORGE:  The only other thing is the

19     proposed limiting instruction.  Mr. Hernandez and I

20     did discuss it and I have a copy of a proposed

21     instruction.

22             THE COURT:  All right, you can hand it up to

23     the clerk, I'll take a look at it.  Thank you.

24             MR. HERNANDEZ:  Judge, for the record I do not

25     have -- I agree with the wording in the proposed

1      instruction, but I don't want that to be in any way

2      considered a waiver of my general objection that any

3      of this information about ISIS should have been

4      introduced.

5           THE COURT:  It would not be a waiver in my

6      view.  You objected, I overruled it, and this is

7      simply a cautionary instruction.  We'll be at ease.

8           (Recess was taken from 9:13 until 9:34 a.m.)

9           THE COURT:  All jurors are present.  Are we

10     ready to resume?

11          MR. GEORGE:  Yes, Your Honor.

12          MR. HERNANDEZ:  Yes, Your Honor.

13          THE COURT:  If the witness would take the

14     stand, please.  Bring the jury in, please.

15          (The jury returned to the courtroom.)

16          THE COURT:  Good morning.  Another wonderful

17     commute to downtown Tampa.  Thank you, I've

18     forgotten now who called in, but whoever that was we

19     appreciate you giving us a head's up.  We are ready

20     to resume direct examination.  Mr. George?

21               DIRECT EXAMINATION (continued)

22     BY MR. GEORGE:

23     Q     Good morning, Deputy Self.

24     A     Good morning.

25     Q     Just for context, can you relay back to the

1    jury where we left off yesterday with that phone

2    call?

3    A       I'm trying to remember myself here.  Was that

4    the fifth or the sixth?

5    Q       We left off on the second phone call.

6    A       On the second phone call.  Okay.  You're going

7    to have to refresh my memory.

8    Q       How about I ask you like this.  Did you

9    recognize the voices in the second phone call?

10   A       Yes, I did.

11   Q       Whose voices were those in that second phone

12   call we listened to?

13   A       Mr. Springer's and Tugba Tokatlioglu.

14   Q       Earlier yesterday you testified about your

15   experience with trial subpoenas.  Do you know what

16   can happen if a person doesn't comply with a trial

17   subpoena?

18   A       They can be arrested.

19   Q       Was there ever a need for Chastity and Garrett

20   Cross to come to testify to the trial in the

21   defendant's gun case?

22   A       Yes, there was.

23   Q       Did it actually happen?

24   A       It did not.

25   Q       Why not?

1    A       The defendant pled before the trial date.

2    Q       In your investigation did you interview anyone

3    by the name of Traveous Anderson?

4    A       Yes, I did.

5    Q       Did you interview anyone by the name of

6    Michael Taylor?

7    A       Yes, I did.

8    Q       Did you interview anyone by the name of Daniel

9    White?

10   A       Yes.

11   Q       And did you relay what you learned in those

12   interviews to Judge Kovachevich?

13   A       Yes, I did.

14           MR. GEORGE:  Nothing further at this time,

15   Your Honor.

16           THE COURT:  Cross-examination, Mr. Hernandez?

17                       CROSS EXAMINATION

18   BY MR. HERNANDEZ:

19   Q       Good morning, sir.

20   A       Good morning, Mr. Hernandez.

21   Q       From the video that we saw and from the

22   documentation, you would agree with me that

23   Mr. Springer did not make any effort to hide his

24   identity, correct?

25   A       That's correct.

1    Q    All the documents that we've seen in evidence

2    is his exact name and his exact address, correct?

3    A    I agree with that.

4    Q    And certainly from the video there did not

5    appear to be any attempt to hide his features or

6    anything about his identity, correct?

7    A    Correct.

8    Q    Now, you would agree with me that in some

9    cases eye witnesses are more vital than other cases,

10   correct?

11   A    Sure, I think that's fair.

12   Q    Of course if there is a case where the only

13   evidence in a case is the testimony of an eye

14   witness, then the whole case may revolve around the

15   testimony of that witness, correct?

16   A    I'm sure there are cases like that.

17   Q    Sure.  But in this case we had no effort by

18   the defendant to hide his identity, correct?

19   A    Correct.

20   Q    The government had not only the documents but

21   the video to show a jury if the defendant had

22   decided to go to trial.

23   A    Correct.

24   Q    And in addition, isn't it true that

25   Mr. Springer, post arrest, after being arrested,

1      made basically a full confession to the fact that

2      fired a gun at Shooters World, correct?

3      A      I wasn't present for that confession.

4      Q      Well, isn't it your understanding that he had

5      made admissions that he had fired a gun at Shooters

6      World and had not made any effort to deny what was

7      obvious on the video?

8      A      Yes, I've heard that.

9      Q      And you certainly -- in his statements to law

10     enforcement he never said that, well, somebody must

11     have forged my signature, correct?

12     A      Correct.

13     Q      So would you agree that in this particular

14     case -- certainly the government can call whatever

15     witnesses they want, but the testimony of an eye

16     witness would be minimized because of the fact that

17     there was overwhelming evidence that he had in fact

18     gone to Shooters World and fired a gun.

19     A      Not necessarily.

20     Q      That's all I have.  Thank you.

21            THE COURT:  Any redirect?

22            MR. GEORGE:  No, Your Honor.

23            THE COURT:  Thank you, sir, you may step down.

24     Please watch your step.

25            Are we ready to proceed with the next witness,

1       Mr. Hernandez?

2               MR. HERNANDEZ:  Yes, Your Honor.

3               THE COURT:  All right.

4               MR. GEORGE:  Your Honor, at this time the

5       United States calls Garrett Cross to the stand.

6               [Witness sworn]

7               COURTROOM DEPUTY CLERK:  Please be seated.

8       Please state your name and spell your last name for

9       the record.

10              THE WITNESS:  Garrett Cross, C-r-o-s-s.

11                       DIRECT EXAMINATION

12      BY MR. GEORGE:

13      Q       Good morning, Mr. Cross.

14      A       Good morning.

15      Q       Where do you live?

16      A       Where do I live?

17      Q       Right.  Where do you live?

18      A       Currently with my mom.

19      Q       Where is that?

20      A       407 Locust Street.

21      Q       What state do you live in?

22      A       Kentucky.

23      Q       How long have you lived in Kentucky?

24      A       Pretty much my whole life.

25      Q       Have you lived anywhere else?

1   A       Florida.

2   Q       Where did you live when you lived in Florida?

3   A       With my friend Jason.

4   Q       You said your friend Jason.  Do you see your

5   friend Jason in court today?

6   A       Yes.

7   Q       Can you point out where he's sitting and

8   something he's wearing?

9   A       Right there.

10  Q       And what's he wearing?

11  A       A throbe.

12  Q       What color is that?

13  A       Beige.

14          MR. GEORGE:  Your Honor, may the record

15  reflect that the witness has correctly identified

16  the defendant?

17          THE COURT:  Yes, sir, the record may so

18  reflect.

19  BY MR. GEORGE:

20  Q       Now, when you lived with the defendant when

21  was that?

22  A       I'm not really good with dates, but last

23  year --

24  Q       Was it 2016 when you say last year?

25  A       I think so, yeah.

    1    Q      How do you know the defendant?

    2    A      He's my friend.

    3    Q      How long have you known him?

    4    A      Probably four years, five years.

    5    Q      And what is your relationship like with him as

    6    a friend?

    7    A      Well, we share the same faith, we're brothers

    8    in faith.

    9    Q      Let me ask it this way.  Is he one of your

   10    closest friends?

   11    A      Yes.

   12    Q      When was the last time you spoke with

   13    Mr. Springer?

   14    A      I believe I was in Florida.

   15    Q      Do you remember the address you lived at when

   16    you lived with the defendant?

   17    A      Something Dragonview Court.  I don't know the

   18    numbers.

   19    Q      Who else lived with you and the defendant in

   20    Florida, if anyone?

   21    A      Me, my wife -- well, ex-wife, whatever, we're

   22    going through, and our two kids, and Jason and his

   23    wife and his son.

   24    Q      What is your wife's name?

   25    A      Chastity.

1    Q    Did she have a maiden name she goes by?

2    A    Hupp.  Chastity Hupp.

3    Q    And you said you left Florida to go back to

4    Kentucky.  Did you leave by yourself?

5    A    No, I left with my wife and kids.

6    Q    I want to ask you about someone named Tugba

7    Tokatlioglu.  Do you know who that is?

8    A    Yeah, that's his wife.

9    Q    When you say it's his wife, who are you

10    referring to?

11    A    Jason's.

12    Q    How did you first meet her?

13    A    Through Jason.

14    Q    When did you first meet her?

15    A    I think they came and visited me one time when

16    I was living in Kentucky and she came over to the

17    house.

18    Q    Are you close with her?

19    A    Yeah, I guess, yeah.

20    Q    Have you stayed in contact with her since you

21    left Florida?

22    A    A little bit.  Not really, but a little bit.

23    Q    And approximately how often would you speak

24    with her?

25    A    Maybe like once a week maybe.

1    Q      And how would you speak with her, what would

2    you use?

3    A      Text messages usually.

4    Q      Anything else?

5    A      No.  Well, maybe talked to her on the phone a

6    couple times, but it was mainly like text messages.

7    Q      What is your phone number, Mr. Cross?

8    A      The one I have now?

9    Q      Sure.

10   A      (859) 888-6212.

11   Q      And when did you get that number?

12   A      Probably March.

13   Q      March of what year?

14   A      2017.

15   Q      Do you remember your phone number before that

16   one?

17   A      No.  I had so many of them.

18   Q      Do you remember the area code of the phone

19   number you had before that one?

20   A      It might have been a 502 or a 270.

21   Q      And how long had you had that old number?

22   A      Well, me and my wife shared a phone.

23   Q      Did you share that number?

24   A      Yeah, we shared that number.  I don't know if

25   it was that phone, but I know we shared a phone.  We

1    had -- yeah, I think we did share a phone, the

2    phone, the phone -- hold on, let me think.

3    Q    Let me ask you this.  When you were living in

4    Florida did you ever go to a gun range?

5    A    Yeah.

6    Q    Do you remember where the gun range was?

7    A    Tampa.

8    Q    Do you remember what it was called?

9    A    No.

10   Q    Who else went with you to the gun range?

11   A    Everybody that lived there.

12   Q    Everybody that lived where?

13   A    At the house.

14   Q    Did you go with the defendant?

15   A    Yeah.

16   Q    And what did you do there?

17   A    Shot guns there.

18   Q    Did anybody else shoot guns there?

19   A    Well yeah.

20   Q    Who else?

21   A    Jason and my stepson.

22   Q    And did you see the defendant actually fire a

23   gun there?

24   A    Yeah.

25   Q    What kind of guns were you using, Mr. Cross?

1    A       Just the ones that they had there for -- to

2    use to rent.

3    Q       Rental guns?

4    A       Yeah.

5    Q       How many guns did you guys rent?

6    A       I think three maybe.

7    Q       And did you shoot all three guns?

8    A       I think so.

9    Q       Did the defendant shoot at least one of those

10   rental guns?

11   A       Yeah.

12   Q       I'm showing you what's been admitted as

13   Government Exhibit 4.  Do you recognize that?

14   A       Yeah.

15   Q       What is that?

16   A       That's me.

17   Q       When you say that's me, do you mean that's

18   your name?

19   A       Yeah.

20   Q       What is your name on?

21   A       The little sheet that you fill out before you

22   go shoot.

23   Q       Did you fill out that sheet when you went

24   shooting with the defendant down here in Florida?

25   A       Yeah.

1    Q      And do you recognize the name Shooters World,

2    looking at this sheet?

3    A      Yeah.

4    Q      Does that refresh your recollection about

5    where you went to shoot?

6    A      Yeah, yeah.

7    Q      Is that the place?

8    A      Yeah.

9    Q      Can you read what you put for the date?

10   A      11/11/2016.

11   Q      Is that the date you guys went?

12   A      More than likely, yeah.

13   Q      I'm showing you what has been admitted as

14   Government Exhibit Number 1.  Do you recognize what

15   this is?

16   A      Yeah.

17   Q      What is it?

18   A      I guess that's Tugba's form that she filled

19   out.

20   Q      I'm going to highlight the bottom portion

21   where it says "range office use only."  Do you

22   recognize the information that's in that box?

23   A      Yeah.

24   Q      What information is in that box, what does it

25   represent?

1    A        Those are the guns that we rented.

2    Q        And is at least one of those guns the guns

3    that you testified earlier that the defendant shot?

4    A        Yeah, one of them probably was.

5    Q        Probably or was?  Because earlier you

6    testified --

7    A        I don't know which one he exactly shot, but it

8    was probably one of those three, you know.

9    Q        Probably or was?

10   A        Well, that's the ones that we rented, so yeah,

11   you know.

12   Q        I'm showing you what has been admitted as

13   Government Exhibit 5F.  Without starting it, do you

14   recognize that first image that just came up?

15   A        Yeah.

16   Q        What's that show?

17   A        That shows me and Tugba watching Jason.

18   Q        If you could identify if there's a stall

19   number that you see where Mr. Springer was.

20   A        25.

21   Q        What are you wearing in that image from

22   Exhibit 5F?

23   A        Shoes and shorts and a T-shirt.

24   Q        Now, earlier you testified that you left

25   Florida.  Why did you leave Florida?

1    A      Well, because Jason went to jail.

2    Q      Do you know what ultimately happened with the

3    defendant's gun case?

4    A      Do what?

5    Q      Do you know what happened, how it was

6    resolved?  The defendant's case?

7    A      What do you mean the defense case?

8    Q      The defendant, Mr. Springer's case.

9    A      With the gun range thing?

10   Q      Correct.

11   A      Yeah, he ended up pleading guilty to it.

12   Q      And before he pled guilty were you ever

13   contacted about the trial?

14   A      Yeah.

15   Q      Who contacted you about the trial?

16   A      The FBI.

17   Q      And why were you contacted?

18   A      I don't know.

19   Q      Did you receive a subpoena?

20   A      Yeah.

21   Q      What was the subpoena for, what did you

22   understand it to be?

23   A      To go to court.

24   Q      And do what at court?

25   A      I guess testify that we was at the gun range

1    or something.

2    Q      So did you think you were going to be a

3    witness in the trial?

4    A      Yeah.

5    Q      Now, looking at Government Exhibit 8, I'm

6    blowing up the top portion, do you recognize that?

7    A      Yeah.

8    Q      Is that the subpoena you received for that

9    case?

10   A      Yeah.

11   Q      Looking at the subpoena, the date and time of

12   appearance, what date is in that field?

13   A      March 17, 2017.

14   Q      Can you just read the numbers?

15   A      Or April.  Yeah, my bad.

16   Q      So April 17th?

17   A      Yes.

18   Q      Is that when you remembered that you were

19   supposed to come testify?

20   A      Yeah, that was probably the day I was supposed

21   to be here.

22   Q      Now, after you received the subpoena did you

23   tell anybody that you had been subpoenaed?

24   A      Yeah, I told my wife.

25   Q      Did you tell anybody else?

```
 1    A       I told Tugba.

 2    Q       That's who you refer to as Mr. Springer's

 3    wife?

 4    A       Yeah.

 5    Q       We're going to get to that in just a second.

 6    Mr. Cross, do you recognize the phone number

 7    (270) 855-5817?

 8    A       No, not off the top of my head.

 9    Q       Do you remember it being your phone number at

10    one point?

11    A       A New York phone number, what did you say?

12    Q       Your.

13    A       No.

14    Q       A phone number you used?

15    A       No.  You say 85 what?

16    Q       855-5817.

17    A       No, I don't think so.

18    Q       Do you remember coming down to testify before

19    in this case?

20    A       Do I remember coming down?

21    Q       Yeah.  Do you remember coming down to Tampa to

22    testify?

23    A       What do you mean, for the --

24    Q       Do you remember meeting with me and testifying

25    in front --
```

1    A        Oh, yeah.

2    Q        You do?

3    A        Yeah.

4    Q        That was about a few weeks ago?

5    A        Last week, I think.

6    Q        And you remember that you were under oath

7    then, correct?

8    A        Right.

9    Q        And you were sworn to tell the truth?

10   A        Right.

11   Q        And do you remember that I asked you that

12   question, do you recognize the number 855-5817?

13   A        Yeah.  I don't -- yeah, I remember you asking

14   me a whole bunch of numbers.

15   Q        And do you remember in response to that

16   question that you said well, it's a 270 so it's

17   either mine or my wife's?

18           MR. HERNANDEZ:  Sorry, could I have page

19   number and line?

20   BY MR. GEORGE:

21   Q        Do you remember saying that it's either mine

22   or my wife's?

23   A        Well, because I was like well, it's a 270

24   number so it probably could have been either my

25   wife's or mine.

1    Q      Now, just a second ago you mentioned that you

2    told Ms. Tokatlioglu that you have been subpoenaed

3    to testify, correct?

4    A      Right.

5    Q      And when you spoke to her did you talk about

6    being a witness in the defendant's gun trial?

7    A      I just told her, I was like, yeah, I got

8    papers to come down here to go to court or whatever.

9    Q      Did you talk to her about the testimony that

10   you had provided the defendant's gun trial?

11   A      No.

12   Q      Never?

13   A      Never.

14   Q      And when you talked to her did she ever tell

15   you what to say when you were to testify at trial?

16   A      No.

17   Q      Did she ever tell you to say that you don't

18   know what type of gun the defendant used during your

19   testimony at Mr. Springer's gun trial?

20   A      No.  How would I not know what guns?

21   Q      That wasn't the question.  The question was

22   did she tell you that, to say something like that?

23   A      No, no.

24   Q      Did she ever tell you that you shouldn't come

25   testify?

1     A       No.

2     Q       Now, I'm going to play for you a very short

3     clip of what has been admitted as Government

4     Exhibit 14.  I'm going to start at approximately

5     four minutes and 42 seconds.

6             (Audio played)

7     Q       I'm stopping there right after the portion

8     that said "worried about it."

9             Do you recognize the voices in that call?

10    A       Yeah.

11    Q       Who are the voices in that call?

12    A       Jason and Tugba.

13    Q       And did you hear the part where

14    Ms. Tokatlioglu said that you told her they were

15    going to call back and set it up and they said no

16    one's called, so he goes if they don't call, I ain't

17    worried about it -- is that a conversation that you

18    had with Ms. Tokatlioglu?

19    A       Yeah.

20            MR. GEORGE:  Nothing further at this time,

21    Your Honor.

22            THE COURT:  Cross-examination, Mr. Hernandez?

23            MR. HERNANDEZ:  Yes, Your Honor, may we

24    briefly approach the bench before?

25            THE COURT:  Yes, sir.

1           (At which time the following sidebar

2      discussion was held:)

3           MR. HERNANDEZ:  Judge, my initial questions I

4      recognize would be outside the scope of

5      cross-examination because I was going to ask

6      questions about his knowledge, being close friends,

7      about his knowledge of whether or not he was -- the

8      defendant was an ISIS sympathizer.

9           I could have him stay and call him in my

10     case-in-chief, but just to avoid an objection I

11     wanted to bring it up now because I recognize my

12     initial questions would be in fact outside the scope

13     of cross.

14          MR. GEORGE:  Your Honor, I'd just note that it

15     is outside the scope of his cross.  Mr. Cross's

16     testimony is really limited to his knowledge of the

17     defendant at the gun range being an eye witness as

18     that relates to obstruction and then the

19     conversations that he had in furtherance of the

20     obstruction agreement really between Ms. Tokatlioglu

21     and the defendant in this case.

22          I think if Mr. Hernandez wants to go into that

23     with this defendant, that certainly opens the door

24     to a lot of the defendant's own evidence that we've

25     been discussing with he's present on his cell phone,

1    present on Facebook, for reasons other than not

2    merely the threat in this case which is the purpose

3    of why the government is trying to introduce it.

4         MR. HERNANDEZ:  Well, it certainly would

5    become relevant if the government is going to call a

6    bunch of jail informants --

7         THE COURT:  Is that an objection, Mr. George?

8    Is that an objection?

9         MR. GEORGE:  No, Your Honor, the government

10   would only seek to admit this evidence that is

11   referenced in the motion in limine about

12   Mr. Springer's sympathies; it's independent of the

13   jail testimony for this new independent reason that

14   this is now becoming an issue with this witness.

15        MR. HERNANDEZ:  Judge, as to --

16        THE COURT:  Quit going back and forth; this

17   isn't a free-for-all.

18        MR. HERNANDEZ:  Sorry.

19        THE COURT:  The extensive discussion yesterday

20   essentially mirrored the evidence concerning ISIS to

21   those statements which the government contends puts

22   the threats in context to be considered a true

23   threat.

24        I suspect that what you intend to do is bring

25   out character evidence or some other evidence of his

1        beliefs, his subjective beliefs, his religious

2        beliefs, what have you, or his affiliation or

3        sympathies for ISIS.  That's getting beyond the

4        scope of what I understood the government's proffer

5        to be.  So I'm just letting you know.

6            MR. HERNANDEZ:  Judge, what I would then ask

7        is that the witness not be excused after my

8        cross-examination, that depending on what the

9        government puts on in their case I may feel that

10       it's a path worth taking.

11           THE COURT:  Okay.  That's fine.  We'll just

12       hold the witness over then.

13           MR. GEORGE:  Your Honor, may I ask one

14       question?  Based on your ruling yesterday I believe

15       you mentioned that you were not -- my understanding

16       is that you mentioned you were not ruling on the

17       admissibility of other evidence but only saying that

18       the testimony of the inmates with respect to ISIS

19       would come in, kind of deferring on the ruling of

20       the other evidence based on what ultimately happens.

21           THE COURT:  You are correct, because we were

22       talking about the context in which these threats

23       were made and that was the limited discussion we

24       had.  But you are absolutely correct about the

25       Facebook and the other things.

1          MR. GEORGE:  Understood.  Thank you, Your

2     Honor.

3          MR. HERNANDEZ:  Judge, may I have a moment

4     just to explain to my client.

5          THE COURT:  Absolutely.

6          (At which time the sidebar discussion was

7     concluded and the proceedings resumed as follows:)

8                    CROSS EXAMINATION

9     BY MR. HERNANDEZ:

10    Q     Good morning, Mr. Cross.

11    A     Good morning.

12    Q     Mr. Cross, I believe your testimony was before

13    he got arrested on these charges you hung out quite

14    a bit with Mr. Springer and his wife, correct?

15    A     Correct.

16    Q     And because you were at Shooters World you get

17    subpoenaed by the government to be a potential

18    witness, correct?

19    A     Correct.

20    Q     Now, you were there the whole time, correct?

21    A     At Shooters World?

22    Q     Yes.  At the time that Mr. Springer was there,

23    you and your wife or girlfriend -- your wife, I

24    believe.

25    A     Yeah.

1    Q    And Mr. Springer and his wife, you were all

2    there together, correct?

3    A    Right, right.

4    Q    And would you agree with me that at no time to

5    your knowledge did Mr. Springer attempt to hide his

6    identity, correct?

7    A    I don't believe so.

8    Q    He wasn't wearing a disguise, correct?

9    A    No, no.

10   Q    And the documents that he signed that I think

11   you were shown a copy of, he signed his name,

12   correct?

13   A    Yeah.

14   Q    So he was not using a false name or in any way

15   trying to hide his identity from what you were

16   personally observing, correct?

17   A    Correct.

18   Q    And clearly that was him on the video that you

19   saw, correct?

20   A    Correct.

21   Q    Now, you were subpoenaed and you did testify I

22   believe a couple of weeks ago and you were

23   questioned under oath by Mr. George, the gentleman

24   who just asked you questions, correct?

25   A    Right.

1    Q       And you were -- would it be fair to say that

2    you were asked multiple times, many, many times

3    about whether anybody called you and tried to

4    influence your testimony, correct?

5    A       Correct.

6    Q       Now, you've had no contact with Mr. Springer

7    since he got arrested back in November, correct?

8    A       Correct.

9    Q       But you have had conversations,

10   telephonically, with his wife?

11   A       Correct.

12   Q       And would it be fair to say -- accurate to say

13   that at no time did she attempt to not -- that she

14   never attempted to get you not to come to court,

15   correct?

16   A       Yes, she never -- yeah.

17   Q       And isn't it true that she never said anything

18   to try to influence what your testimony would be,

19   correct?

20   A       Correct.

21   Q       In fact, she never said anything to you other

22   than come and tell the truth, correct?

23   A       Yeah.

24   Q       Now, was there a point in time where you were

25   played a portion of the tape, you may or may not

1    remember, where Mr. Springer -- this is a phone call

2    between Mr. Springer and his wife where -- "tell

3    them if they -- they come down here and support

4    these people they're going to prosecute me, then I'm

5    screwed and they screwed as well, but they are going

6    to be more fucked up, pardon my language, than I

7    am."

8          Now, is it correct that Mr. Springer's wife

9    never said anything like that to you?

10   A    Yeah, that's correct, she never said anything

11   like that.

12   Q    And isn't it a fact that -- let me ask you,

13   would you take that statement as possibly being

14   concerned about you being charged because you were

15   there and you had I believe some misdemeanor

16   charges, correct?

17   A    Correct.

18   Q    But never -- isn't it correct that there was

19   never any attempt to influence your testimony to say

20   something that was a lie, correct?

21   A    Right.

22   Q    And would you agree with me, I'm summarizing

23   the questions that were asked of you by Mr. George,

24   but isn't it a fact that you were asked basically

25   the same questions about 20 times in different ways

1    and your answer was the same, that you were never

2    told not to come and you were only told to tell the

3    truth?

4    A      Say that again?

5    Q      Even though I've summarized what Mr. George --

6    I've asked you in summary what Mr. George, the U.S.

7    attorney, asked you.  Isn't it a fact that you were

8    asked the same questions over and over again on many

9    occasions?

10   A      Yes.

11   Q      And your answer was always that you were never

12   told by Mr. Springer's wife to not come, correct?

13   A      Right.

14   Q      And your answer was always the same that the

15   only thing she told you was to tell the truth,

16   correct?

17   A      Right.

18   Q      And isn't it true that the government has

19   subpoenaed you and you're here -- while you're here

20   they have actually arranged for your transportation,

21   correct?

22   A      Right.

23   Q      They have paid for your hotel?

24   A      Yep.

25   Q      And also given you a per diem for expenses,

1      correct?

2      A      Correct.

3      Q      And the only time you were told not to come

4      was when the government told you that Mr. Springer

5      had pled guilty to the charge, correct?

6      A      Correct.

7              MR. HERNANDEZ:  That's all I have, Your Honor.

8              THE COURT:  Any redirect?

9              MR. GEORGE:  No, Your Honor.

10             THE COURT:  May this witness be excused or

11     does he need to stay?

12             MR. HERNANDEZ:  Stay.

13             THE COURT:  All right.  Mr. Garrett, you're

14     still under subpoena, you can return to your hotel,

15     but you may be called back.  Thank you, sir, you may

16     step down.  Watch your step, please.

17             MR. GEORGE:  Your Honor, before the government

18     calls its next witness may we approach?

19             THE COURT:  Yes, sir.  You can leave, but you

20     may be called back.

21             (At which time the following sidebar

22     discussion was held:)

23             THE COURT:  You know, when we're up here at

24     sidebar, things happen.  That's the note I got from

25     the clerk.

1          MR. HERNANDEZ:  I can't read it.

2          THE COURT:  There was communication between

3    the witness and defendant during the sidebar.

4          MR. GEORGE:  Your Honor, that's exactly why I

5    came up.  I wanted to bring it Mr. Hernandez and the

6    court's attention that the jury saw the action and

7    the U.S. Marshals had to twice tell Mr. Springer

8    twice not to.

9          MR. HERNANDEZ:  Judge, I did see it, obviously

10   I was up here.

11         THE COURT:  Of course, you were up here

12   talking.  Here's what I'm going to do.  You can

13   ponder this.  But at the next break I'm going to

14   explain to Mr. Springer that he's borderline

15   contempt for violating the rule of sequestration.

16   I'm sure that's the least of his worries, but he

17   needs to hear it from me.  And then we'll deal with

18   whatever other motions or requests that the parties

19   may have.

20         You know, sometimes they're their own worst

21   enemies, Mr. Hernandez, as you well know.  Have an

22   appropriate conversation with him.

23         MR. HERNANDEZ:  My gut feeling is that I don't

24   want any kind of instruction to -- it would just

25   further highlight the problem, so --

1          THE COURT:  It won't be in the presence of the

2     jury, so.  All right.  Are we ready to go?

3          (At which time the sidebar discussion was

4     concluded and the proceedings resumed as follows:)

5          THE COURT:  Call your next witness, please.

6          MR. GEORGE:  Your Honor, at this time the

7     United States calls Chastity Cross to the stand.

8          [Witness sworn]

9          COURTROOM DEPUTY CLERK:  Please be seated.

10    Please state your name and spell your last name for

11    the record.

12         THE WITNESS:  Chastity Cross, C-r-o-s-s.

13                    DIRECT EXAMINATION

14    BY MR. GEORGE:

15    Q     Good morning, Ms. Cross.

16    A     Good morning.

17    Q     Where do you live?

18    A     In Louisville, Kentucky.

19    Q     How long have you lived there?

20    A     Basically my whole life.

21    Q     Have you lived anywhere else?

22    A     Parts of Kentucky.  Other than that, just

23    Florida.

24    Q     Where did you live in Florida when you lived

25    in Florida?

1    A       Valrico.

2    Q       Did you live with anyone?

3    A       Yes, I did.

4    Q       Who did you live with?

5    A       Jason Springer.

6    Q       Do you recognize Mr. Springer in court today?

7    A       Yes, I do.

8    Q       Can you please point out where he's sitting

9    and an article of clothing he's wearing?

10   A       He's sitting to my left with his throbe on, a

11   brown throbe.

12           MR. GEORGE:  May the witness reflect the

13   witness has identified the defendant?

14           THE COURT:  Yes, sir.

15   BY MR. GEORGE:

16   Q       When did you live in Valrico with

17   Mr. Springer?

18   A       I moved down to Valrico in the end of July,

19   beginning of August, around 2016.

20   Q       And how long did you stay?

21   A       Until November.

22   Q       How long have you known the defendant?

23   A       Several years.

24   Q       How did you first meet him?

25   A       I worked with him at a hotel in Kentucky.

```
 1    Q       What is your relationship like with him?

 2    A       He was like my brother.

 3    Q       Were you guys friends?

 4    A       Yes.

 5    Q       Are you still friends?

 6    A       Um, I guess.  Do I love him?  Yeah, I love

 7    him, he's human, I love him, like, you know.

 8    Q       When was the last time you spoke with him?

 9    A       A couple days after he was incarcerated.

10    Q       When was that, approximately, if you remember?

11    A       In November, maybe around the 27th, 28th, it

12    was a few days afterwards.  Maybe the 25th.  I don't

13    know exactly what day.  A few days after he was

14    incarcerated I spoke with him on the phone before I

15    left Florida to go back to Kentucky.

16    Q       All right.  So you left Florida to go back

17    around the end of November?

18    A       Yes.

19    Q       Who else lived with you and the defendant in

20    Florida?

21    A       Mr. Springer, his wife Tugba, their child, me

22    and my husband and my two children.

23    Q       Who is your husband?

24    A       Garrett Cross.

25    Q       When you left did you leave by yourself?
```

1    A       No, I left with my family.

2    Q       Now, talking about the person you refer to as

3    Tugba, is her last name Tokatlioglu?

4    A       Yes.  I can't pronounce it right.

5    Q       But something like that?

6    A       Yes.

7    Q       How did you first meet her?

8    A       I met her through Jason.

9    Q       When was that?

10   A       They visited Kentucky and he brought her to

11   visit with him.

12   Q       Are you close with Ms. Tokatlioglu?

13   A       I was.

14   Q       Have you stayed in contact with her since you

15   left Florida?

16   A       Not really.

17   Q       Have you talked to her at all since you left

18   Florida?

19   A       Yes, I have.

20   Q       And how would you communicate with

21   Ms. Tokatlioglu?

22   A       Messenger through Facebook or by telephone.

23   Q       What is your phone number?

24   A       I don't have a phone.

25   Q       Have you had a phone before?

1    A       Yes.  It just recently broke.

2    Q       It just broke?

3    A       Yeah.

4    Q       When did it break, approximately?

5    A       A few weeks ago, two or three weeks ago.

6    Q       Do you know the number you were using before

7    that phone broke?

8    A       Not specifically, no.

9    Q       Do you recognize the phone number

10   (270) 855-5817?

11   A       That's my own number, I believe.  Me and

12   Garrett shared that phone.

13   Q       You shared it with Mr. Cross?

14   A       I believe so.  I mean, we shared phones, but

15   we went through several different numbers, so.

16   Q       And how long did you have that number, if you

17   remember?

18   A       A little while.

19   Q       Was that the last number you had before your

20   phone broke?

21   A       Yeah.  No, no, no, no.  It was the last one I

22   had living in Florida and then moving back to

23   Kentucky.

24   Q       Okay.  And you said you shared that or you may

25   have shared it with Mr. Cross?

1    A      No, we did share the phone.

2    Q      When did you stop sharing that phone?

3    A      When I left my husband.

4    Q      When was that?

5    A      In March of this year.

6    Q      Did he take the phone then?

7    A      No, I did.

8    Q      You took the phone?  When you were living here

9    in Florida did you ever go to a gun range?

10   A      Yes, I did.

11   Q      Do you remember where the gun range was?

12   A      Not specifically because I'm not from around

13   here, but it was here in Florida, I believe it was

14   in Tampa or -- I think -- I'm not specifically for

15   sure exactly where it is because I'm not from around

16   here, so.

17   Q      Okay.  Do you remember the name of it?

18   A      Shooters World.

19   Q      And who else went with you to that gun range?

20   A      Everyone that lived in the house with me.

21   Q      Did that include the defendant?

22   A      Yes.

23   Q      What did you guys do?

24   A      Me and my daughter attended to the baby as we

25   watched my husband, my son, and Mr. Springer and

1    Ms. Tugba shoot firearms.

2    Q      So did you actually see the defendant shoot a

3    firearm?

4    A      I mean, yeah.

5    Q      And did the defendant come with firearms when

6    he went to Shooters World?

7    A      Not that I know of, no.

8    Q      Do you know how he got a gun to shoot when he

9    was at Shooters World?

10   A      They rented the gun.

11   Q      And do you know if he shot those rental guns?

12   A      Excuse me?

13   Q      Do you know if he shot the rental guns?

14   A      Yes.

15   Q      Now, did you actually shoot the guns too?

16   A      No.

17   Q      Could you see what everyone was doing, though?

18   A      Yes.

19   Q      Can you explain how you saw it?  What was the

20   set up?

21   A      Of course there is -- when you walk in there

22   is countertops with chairs, like stainless steel.

23   And there is glass, thick glass but very clear

24   glass, you can see people shooting firearms, you

25   know, what they're aiming at, what they're shooting

1      -- the target.  And of course I'm excited, my son is

2      14 and he's learning to be safe with a gun, you

3      know, that's very important.  So yes, I could see

4      everything.

5      Q      So you were excited about it?

6      A      Well, I mean yeah, my son is around men

7      learning to be a man, to do something correctly, not

8      just go out on the street, pick up a gun and shoot

9      it, be somewhere you're not supposed to be.

10     Q      Now, you testified earlier that the defendant

11     had been arrested.

12     A      Yes.

13     Q      Do you know why?

14     A      Kind of and not exactly.  From what I've been

15     told -- I know what I've been told.

16     Q      Okay.  We don't need to get into what you've

17     been told.  But were you ever subpoenaed to testify

18     in a case involving the defendant?

19     A      Yes, I was.

20     Q      And what do you understand that subpoena to

21     mean, what were you required to do?

22     A      Witnessing that he shot a firearm at a gun

23     range here in Florida.

24     Q      So is it fair to say that you were subpoenaed

25     to be a witness?

1    A       Yes.

2    Q       And do you know what kind of proceeding you

3    were supposed to be a witness at?

4    A       Not really, I didn't, I mean, other than just

5    testifying saying that yeah, I seen it, you know.

6    Q       Who contacted you about that?

7    A       The FBI.

8    Q       I'm going to show you what's already been

9    admitted as Government Exhibit Number 9.  I'm

10   blowing up the top portion of that.  Take a look at

11   that.  Do you recognize that?

12   A       Yeah.

13   Q       What is that?

14   A       It's a subpoena to testify at a hearing or a

15   trial in a criminal case.

16   Q       Is that the subpoena that you received?

17   A       I mean, it looks like it.  I can't say yeah

18   because I'm --

19   Q       Let me show you in the middle of the page here

20   it says date and time.

21   A       Yeah.

22   Q       Can you just read what that says?

23   A       4/17/17, 9 a.m.

24   Q       Is that when you remember you were supposed to

25   come testify or subpoenaed to testify?

1    A        The first time.

2    Q        The first time.  Now, after you'd been

3    subpoenaed to testify, did you tell anybody about

4    that?

5    A        I did.

6    Q        Who did you tell about that?

7    A        Several different people.

8    Q        Who were they?

9    A        My grandmother, a friend of mine -- everyone

10   in my family, basically.

11   Q        Did you tell Ms. Tokatlioglu that you'd been

12   subpoenaed to testify?

13   A        Well yeah, of course.

14   Q        How did you tell her, was it on the phone --

15   A        We were on the phone.

16   Q        And when you spoke to her did you talk to her

17   about being a witness at the defendant's -- in the

18   defendant's gun case?

19   A        I mean, kind of and not -- it wasn't

20   elaborated on.

21   Q        Did you talk to her about the testimony that

22   you were going to give?

23   A        Not really, I mean, no.

24   Q        When you talked to her did she ever tell you

25   what to say when you were testifying?

1    A        No.

2    Q        Did she ever tell you you shouldn't come to

3    testify?

4    A        Yes.

5         MR. GEORGE:  Nothing further at this time,

6    Your Honor.

7         THE COURT:  Cross-examination?

8                    CROSS EXAMINATION

9    BY MR. HERNANDEZ:

10   Q        Good morning, ma'am.

11   A        Good morning.

12   Q        Going back to Shooters World or the gun range

13   that you went to, you don't remember the name of it,

14   correct?

15   A        Shooters World.

16   Q        Going back there, were you there when

17   Mr. Springer signed whatever paperwork needed to be

18   signed?

19   A        Yes, I was, I was the one that told them that

20   they needed to fill out the information before they

21   could even --

22   Q        And you saw him do that, correct?

23   A        Yes, I did.

24   Q        And he signed and provided his own name,

25   address, and so forth, correct?

1    A        Yes, I mean, I'm not him, I can't answer that,

2    but I seen him fill out the paperwork.

3    Q        Okay.  And Mr. Springer was not in any way

4    trying to hide his identity, to your knowledge?

5    A        No.

6    Q        And he certainly wasn't wearing any disguise

7    or anything like that, correct?

8    A        No.

9    Q        Okay.  And what you're saying is that you were

10   told -- you were never told what to say, correct?

11   A        No one has ever told me to say anything in

12   this.

13   Q        Okay.  By anyone.

14   A        No one.

15   Q        Okay.  And the only thing that you know about

16   this case is the fact that you were present at

17   Shooters World, correct?

18   A        Yes.

19   Q        With Mr. Springer, with your husband, and with

20   Mr. Springer's wife, correct?

21   A        Yes.

22   Q        Thank you.

23            THE COURT:  Any redirect?

24            MR. GEORGE:  No, Your Honor.

25            THE COURT:  Thank you, ma'am, you may step

1    down.  May this witness be excused, gentlemen?

2            MR. HERNANDEZ:  Yes, Your Honor.

3            THE COURT:  You're free to go.  Thank you.

4            Call your next witness, please.

5            MR. GEORGE:  Your Honor, the government calls

6    Michael Donovan to the stand.

7            [Witness sworn]

8            COURTROOM DEPUTY CLERK:  Please be seated.

9    Please state your name and spell your last name for

10   the record.

11           THE WITNESS:  Michael Donovan, D-o-n-o-v-a-n.

12                     DIRECT EXAMINATION

13   BY MR. GEORGE:

14   Q      Good morning, Mr. Donovan.

15   A      Good morning.

16   Q      Where do you work?

17   A      At the FBI in Tampa.

18   Q      How long have you worked at the FBI?

19   A      Approximately five years.

20   Q      What's your current position there?

21   A      I'm a special agent.

22   Q      What are your duties as an FBI special agent?

23   A      I currently am assigned to investigate

24   economic crimes including health care fraud.

25   Q      Were you in law enforcement before joining the

1    FBI?

2    A      Yes, I was a police officer in Massachusetts.

3    Q      How long did you do that for?

4    A      Approximately eight years.

5    Q      And are you familiar with Jason Springer?

6    A      Yes, I am.

7    Q      Do you see him in the courtroom today?

8    A      Yes, I do.

9    Q      Can you identify him by where he's sitting and

10   an article of clothing he's wearing?

11   A      He's sitting at the table wearing a brownish

12   color shirt.

13         MR. GEORGE:  Your Honor, may the record

14   reflect the witness has correctly identified the

15   defendant?

16         THE COURT:  Yes, sir.

17   BY MR. GEORGE:

18   Q      Taking you back to November 21st, 2016, were

19   you working that day?

20   A      Yes, I was.

21   Q      Did you see Mr. Springer that day?

22   A      Yes, I did.

23   Q      And what happened?

24   A      My assistance was requested by other case

25   agents at the bureau to assist in the processing of

1      Mr. Springer including booking and recording of an

2      interview.

3      Q      Was that the extent of your involvement?

4      A      Yes.

5      Q      Did you have any other involvement with

6      Mr. Springer?

7      A      We had a brief conversation during those

8      events, but that's it.

9      Q      Where did all this take place?

10     A      At the FBI Tampa office.

11     Q      Let's talk about interviews at the FBI and

12     specifically at the FBI's Tampa office.  Where are

13     people interviewed when they're brought there?

14     A      We have a room on the first floor of the

15     building that has access from the outside that

16     allows for traditional booking of prisoners that any

17     police department would do, and then we have

18     interview rooms attached.

19     Q      Are those rooms equipped with recording

20     equipment?

21     A      Yes.

22     Q      What type of recording equipment did the rooms

23     have in November 2016, just generally?

24     A      The rooms had multiple different types at that

25     time ranging from a video camera sitting in the

1      corner of a room or a fixed camera that would be in

2      the corner of the room or a ceiling.

3      Q      What type of equipment was in the room where

4      Mr. Springer was interviewed?

5      A      I believe it was a fixed camera on the

6      ceiling.

7      Q      And do you know how to use the equipment

8      that's associated with that camera?

9      A      I do, I received training on that.

10     Q      How does that equipment record?

11     A      It records to a DVR or a DVR with a Blu-ray

12     disk in a room outside the interview room.

13     Q      Where do you understand DVR to mean?

14     A      Digital video recorder.

15     Q      Does this system require that a person stay

16     near the recording equipment while it's operating?

17     A      It doesn't require it, but oftentimes that's

18     practice because if an error occurred you would

19     realize it faster if you're near it.

20     Q      And if you're near that equipment can you see

21     what's going on in the interview room?

22     A      Yes.

23     Q      Can you hear what's going on in the interview

24     room?

25     A      Yes.

1    Q      Now, will that system notify a user, meaning

2    the person who's operating the equipment, if an

3    error occurs while it's recording?

4    A      Yes.

5    Q      And where in relationship to the interview

6    room is this equipment located?

7    A      It's outside the room, it's on the same floor

8    maybe through two doorways.

9    Q      So going back then to the day you interacted

10   with the defendant at the FBI in Tampa, did you

11   actually record an interview that day?

12   A      I did.

13   Q      Did you see the defendant go into the

14   interview room that day?

15   A      Yes.

16   Q      Did you see him in the interview room that

17   day?

18   A      Yes.

19   Q      Did you stay near the recording equipment

20   throughout Mr. Springer's interview?

21   A      Yes.

22   Q      The whole thing?

23   A      I may have left the room for a brief period of

24   time or to go back towards the interview room to see

25   if they were done or not, but I was near the

1    recording equipment throughout most of the

2    interview.

3    Q      Did you turn the recording system on before

4    the defendant's interview began?

5    A      Yes.

6    Q      Did you turn the recording system off after

7    the interview was complete?

8    A      Yes.

9    Q      Did the recording system show any errors in

10   the recording of the defendant's interview?

11   A      No.

12   Q      What type of media or recording device in this

13   case was the interview recorded to?

14   A      On to a disk.

15          MR. GEORGE:  Your Honor, may I approach?

16          THE COURT:  Yes, sir.

17   BY MR. GEORGE:

18   Q      Handing you what has been premarked for

19   identification as Government Exhibit 24.1 and 24.1T.

20   Take a look at those and just let me know or look up

21   when you're finished.

22          Do you recognize what I just handed you?

23   A      Yes.

24   Q      What do you recognize Exhibit 24.1 to be?

25   A      These are two exhibits that I reviewed in

1    preparation for my testimony today.

2    Q       And specifically 24.1, do you recognize what

3    that is?

4    A       Yes.

5    Q       What is that?

6    A       24.1 is a disk that's not the entire interview

7    but a clip of the interview I recorded on that date.

8    Q       And how do you know a clip of the interview

9    you recorded that date is on the disk?

10   A       Because I reviewed the disk and I initialed

11   and dated the disk when I reviewed it.

12   Q       And is that a true and correct copy of a

13   portion of the recording you made on November 21st,

14   2016?

15   A       Yes, it is.

16   Q       Now, going to 24.1T, what is that?

17   A       24.1T is a transcript of the words spoken on

18   the clip.

19   Q       And does that transcript -- did you review

20   that transcript while watching the clip in 24.1?

21   A       Yes, I did.

22   Q       How do you know that's the transcript you

23   actually reviewed?

24   A       I initialed the transcript and dated it after

25   I finished reviewing it.

1    Q      Does that transcript correctly and accurately

2    transcribe the recording in 24.1?

3    A      Yes, it does.

4           MR. GEORGE:  Your Honor, at this time the

5    government moves to admit Government Exhibit 24.1

6    and 24.1T into evidence.

7           MR. HERNANDEZ:  No objection.

8           THE COURT:  Those exhibits are now received.

9    Thank you.

10          MR. GEORGE:  Permission to publish, Your

11   Honor.

12          THE COURT:  Yes, sir.  Well, lay a foundation

13   first, Mr. George, as to what occurred between the

14   booking and the interview.  Unless it's reflected in

15   the interview.  I don't know.

16   BY MR. GEORGE:

17   Q      You mentioned that you booked the defendant?

18   A      Yes.

19   Q      Can you just describe that process a little

20   bit?

21   A      So that process involves entering biographical

22   information, charged information.  It involves

23   taking a photograph of the defendant.  It involves

24   taking fingerprints of the defendant.  And that's

25   what I did with the defendant on that date.

1    Q      And after that process was done what happened?

2    A      So we did the booking first and then the

3    subject was taken to the interview room which is

4    adjacent to the booking room.

5    Q      Did that immediately happen?

6    A      Yes.

7    Q      And while you were watching the interview do

8    you know whether Mr. Springer was asked about

9    possessing a firearm?

10   A      Yes.

11   Q      Do you know whether he was asked about his

12   conduct at a shooting range?

13   A      Yes.

14   Q      Is all that reflected in the interview that

15   you recorded?

16   A      Yes.

17          MR. GEORGE:  Your Honor, permission to

18   publish?

19          THE COURT:  Right.

20   BY MR. GEORGE:

21   Q      Do you know whether Mr. Springer was read his

22   Miranda rights before he was interviewed?

23   A      I believe he was read his Miranda rights by

24   the special agent conducting the interview.

25          MR. GEORGE:  Permission to publish, Your

1    Honor?

2            THE COURT:  Is that demonstrated in the

3    interview on the disk?

4            MR. GEORGE:  Your Honor, may I approach on

5    that point?

6            THE COURT:  Yes, sir.  Why don't we take a

7    comfort break.  Let's take 15 minutes.

8            (The jury retired to the jury room.)

9            THE COURT:  I would prefer that you lay a

10   foundation for the administering of the rights,

11   Mr. George, before we have inculpatory statements

12   being introduced.  There is no objection, but I

13   think that's protocol, is it not?

14           MR. GEORGE:  Your Honor --

15           THE COURT:  Foundation-wise?

16           MR. GEORGE:  -- I'm happy to do that.

17           THE COURT:  I assume it's reflected in the

18   disk.

19           MR. GEORGE:  Can we have this conversation at

20   sidebar just outside of the hearing of the witness

21   on the stand?

22           THE COURT:  Well, sure.  You can step down if

23   you like, take a comfort break, Agent.  Thank you.

24           (At which time the following sidebar

25   discussion was held:)

1          THE COURT:  Was he read his rights?  If so, by

2     who and when?

3          MR. GEORGE:  It's not reflected in this clip,

4     Your Honor, it was done at the beginning of the

5     interview and this interview was over an hour long,

6     so these are just clips relevant to this case.

7          THE COURT:  Mr. Hernandez, what is your

8     position?

9          MR. HERNANDEZ:  Judge, I don't need the -- I'm

10    familiar with the fact that his rights were read and

11    I don't need an hour long tape played.

12         THE COURT:  So you know the rights were read?

13         MR. HERNANDEZ:  Yes.

14         THE COURT:  By virtue of discovery?

15         MR. HERNANDEZ:  Yes.

16         THE COURT:  Perhaps we should have a

17    stipulation to that, if you don't mind.  Jurors know

18    about Miranda and they may not appreciate all the

19    nuances, but my understanding is that's a necessary

20    foundation for the admission of informed and

21    voluntarily statements made by defendants.  So if we

22    can do a stipulation, that would take care of it.

23         (At which time the sidebar discussion was

24    concluded and the proceedings resumed as follows:)

25         THE COURT:  All right.  Thank you.

1          Mr. Springer, I want you to listen carefully.

2     You were observed communicating with Mr. Cross,

3     Garrett Cross, while we were up here at the sidebar.

4     It was witnessed by several people in the courtroom.

5          You are on the verge of being held in contempt

6     because the rule of sequestration has been invoked

7     by your counsel as well as the government.  That

8     means you cannot talk to witnesses.  Do you

9     understand that?

10          THE DEFENDANT:  Yes, sir.  I wasn't aware of

11     that.  I was just telling him that I loved him.

12          THE COURT:  Well, I understand, but you cannot

13     do that.  And I will explain to you that it's a rule

14     to protect the fairness of this trial and I will

15     suggest that even though it may have been an

16     innocent conversation, it's just like you and your

17     wife exchanging glances; the jury is more likely

18     than not to hold that against you.  It's not a

19     positive, it's not a good thing.

20          So be aware that you can't talk to witnesses

21     and that means any communication at all and be

22     careful about that.  All right?

23          THE DEFENDANT:  All right.

24          THE COURT:  Everybody needs a comfort break.

25          MR. GAMMONS:  Your Honor, after the comfort

1    break there will be one more short witness following

2    Special Agent Donovan, and then we have an

3    in-custody witness, Michael Taylor.  In My

4    experience it takes some getting --

5        THE COURT:  Well, they'll have to bring

6    Mr. Springer back in and retrieve that witness.  So

7    just let the marshals know what your schedule is.

8        Mr. George, you cited a case yesterday, 657

9    Fed.3d 107, pinpoint.  I can't find that case.  Do

10   you remember which one it is?

11       MR. GEORGE:  That was -- I think it was about

12   the relevance of the recipient of a threat.

13       THE COURT:  Is that in your memo?

14       MR. GEORGE:  It is.

15       THE COURT:  Never mind, I'll find it.  We'll

16   be in recess.

17        (Recess was taken from 10:41 until 10:59 a.m.)

18       THE COURT:  Bring the jury in, please.

19       (The jury returned to the courtroom.)

20       THE COURT:  You may resume direct examination,

21   Mr. Hernandez.

22       MR. GEORGE:  I believe, Your Honor, we were at

23   the point where the government was going to publish

24   Exhibit 24.1.

25       THE COURT:  All right, you may do so.

1          Again, members of the jury, it's the spoken

2     word which is the evidence, so if you discern a

3     discrepancy between the typewritten transcript and

4     what is said, you should rely on what's said.

5          MR. GEORGE:  I'm going to play this clip and

6     then I'm going to ask you a couple questions.

7          (Video played)

8     BY MR. GEORGE:

9     Q     Did you recognize the person in that video who

10    was being questioned?

11    A     Yes.

12    Q     Who is that?

13    A     The defendant.

14         MR. GEORGE:  Your Honor, may I approach?

15         THE COURT:  Yes, sir.

16    BY MR. GEORGE:

17    Q     I'm handing you what has been premarked as

18    Government Exhibit 24.2 and 24.3.  Ms. Black, is it

19    possible to turn up the volume on the audio?

20         Do you recognize what I've just handed you?

21    A     Yes, I do.

22    Q     What do you recognize what has been premarked

23    as 24.2 to be?

24    A     This is also a clip from the interview of the

25    defendant.

1    Q    It was at the November interview you testified

2    about earlier?

3    A    Yes, the same interview, but a separate clip.

4    Q    How do you know it's a clip on that disk?

5    A    I reviewed this disk in preparation for my

6    testimony, I initialed it and dated it.

7    Q    Is it a true and correct copy of a portion of

8    the recording you made on November 21st, 2016?

9    A    Yes, it is.

10   Q    In looking at 24.2T, what do you recognize

11   that to be?

12   A    24.2T is a transcript of the words spoken on

13   that clip, 24.2.

14   Q    And have you reviewed 24.2T while watching the

15   clip on 24.1?

16   A    Yes, I did.

17   Q    Does it accurately capture the clip what was

18   spoken in the clip in 24.1?

19   A    Yes, it does.

20        MR. GEORGE:  Your Honor, at this time the

21   government moves to admit Government Exhibits 24.2

22   and 24.2T into evidence.

23        MR. HERNANDEZ:  No objection.

24        THE COURT:  Those exhibits are now received.

25        MR. GEORGE:  Permission to publish, Your

1    Honor?

2         THE COURT:  Yes, sir.

3         (Video played.)

4         MR. GEORGE:  Your Honor, may I approach?

5         THE COURT:  Yes, sir.

6    BY MR. GEORGE:

7    Q    I'm handing you what has been marked as

8    Government Exhibit 24.3 and 24.3T.  Would you take a

9    look at those and look up when you're finished.

10        Do you recognize what I just handed you?

11   A    Yes, I do.

12   Q    What do you recognize Government Exhibit 24.3

13   to be?

14   A    This is another clip from the same interview

15   with the defendant.

16   Q    And how do you know it's a clip of the

17   interview with the defendant?

18   A    I watched it in preparation for my testimony

19   and I initialed and dated the disk.

20   Q    Is it a true and correct copy of a portion of

21   the recording you made on November 21st, 2016?

22   A    Yes, it is.

23   Q    Now looking at 24.3T, what do you recognize

24   that as?

25   A    It's a transcript of the clip 24.3.

1    Q       Have you reviewed that transcript while

2    watching the clip in 24.3?

3    A       Yes, I have, I dated it and initialed it.

4    Q       Does it accurately capture what was said on

5    the clip on Exhibit 24.3?

6    A       Yes, it does.

7            MR. GEORGE:  Your Honor, at this time the

8    government moves to admit Government's Exhibit 24.3

9    and 24.3T.

10           MR. HERNANDEZ:  No objection.

11           THE COURT:  Those exhibits are now received

12   and you may publish.

13           MR. GEORGE:  Thank you, Your Honor, we're

14   going to publish at a later time.  I have no further

15   questions for this witness.

16           THE COURT:  Any cross examination,

17   Mr. Hernandez?

18                   CROSS EXAMINATION

19   BY MR. HERNANDEZ:

20   Q       Good morning, sir.

21   A       Good morning.

22   Q       In this interview that you were monitoring,

23   you were not in the room, you were like watching it?

24   A       I was in the room for brief portions of it,

25   but I was watching from outside the room.

1    Q     Okay.  And obviously Mr. Springer was aware

2    that it was being recorded, correct?

3    A     Yes.

4    Q     And you would agree with me that he was

5    answering the questions that were being propounded

6    to him, correct?

7    A     Yes.

8    Q     And you would agree with me, sir, that he made

9    a clear admission that he was the person that had

10   gone to Shooters World and had fired those guns,

11   correct?

12   A     Yes.

13   Q     There was never any attempt to deny that by

14   Mr. Springer, would you agree?

15   A     We had some conversations about the issue, but

16   there was no outright denial.

17   Q     Well, if I'm summarizing it correctly, he made

18   some comment that he was apparently confused about

19   the law, correct?

20   A     Yes.

21   Q     That he thought it was asking whether he had

22   been arrested in Florida when in fact he had been

23   arrested in Tennessee, correct?

24   A     Yes.

25   Q     But he was certainly acknowledging that he was

1     a convicted felon, he acknowledged that to you,

2     correct, that he had a drug charge from Tennessee?

3     A     Yes.

4     Q     And he also appeared -- would you agree with

5     me that he appeared confused about the fact that he

6     thought that he could not own a gun or possess a gun

7     at home and things of that nature, correct?

8     A     I don't believe he seemed confused about that.

9     Q     Well, didn't we just see in this clip that we

10    just saw that he made some reference that he doesn't

11    go around firing guns, correct?

12    A     Yes.

13    Q     And you don't recall him saying something to

14    the effect -- I'm paraphrasing, but something to the

15    effect that he believed that as a convicted felon he

16    was restricted from owning a gun, correct?

17    A     Yes.

18    Q     And he also acknowledged that as a convicted

19    felon he couldn't keep one at home, correct?

20    A     Yes.

21    Q     Okay.  But obviously he acknowledged the fact

22    that he had fired guns at Shooters World?

23    A     Yes, he did.

24    Q     He wasn't denying that.

25    A     No.

1    Q        And would you agree with me that if a person

2    is trying to be devious about firing a gun, knowing

3    it was against the law, would you agree with me that

4    it wouldn't be wise to go to a gun range where he's

5    got to sign documents and he's being videotaped?

6         MR. GEORGE:  Objection, Your Honor, calls for

7    speculation and outside the scope.

8         THE COURT:  Sustained.

9         MR. HERNANDEZ:  That's all I have.

10        THE COURT:  Any redirect?

11        MR. GEORGE:  No, Your Honor.

12        THE COURT:  Thank you, sir, you may step down.

13   Watch your step.

14        Call your next witness.

15        MR. GEORGE:  Your Honor, at this time the

16   United States calls Christine McCoy.

17        [Witness sworn]

18        COURTROOM DEPUTY CLERK:  Please be seated.

19   Please state your name and spell your last name for

20   the record.

21        THE WITNESS:  Christine McCoy, M-c-C-o-y.

22                  DIRECT EXAMINATION

23   BY MR. GEORGE:

24   Q        Good morning.

25   A        Good morning.

1    Q       Where do you work?

2    A       The FBI.

3    Q       How long have you worked at the FBI?

4    A       15 years.

5    Q       What is your job title?

6    A       Special agent.

7    Q       And what are your roles and responsibilities

8    as a special agent at the FBI?

9    A       Investigate crimes.

10   Q       Have you been a special agent for your whole

11   career at the FBI?

12   A       Yes.

13   Q       Were you working on November 21st, 2016?

14   A       Yes, I was.

15   Q       And what if anything did you do that day?

16   A       I was asked to assist with an arrest.

17   Q       And who was being arrested?

18   A       Mr. Springer.

19   Q       Where was Mr. Springer arrested?

20   A       On the side of I-75.

21   Q       Were you there when Mr. Springer was arrested?

22   A       Yes, I was.

23   Q       Was anybody else there with Mr. Springer when

24   he was arrested?

25   A       Yes, there was state highway patrol officers.

1    Q      Was Mr. Springer with anybody himself?

2    A      Oh, I'm sorry, yes, his wife and his son.

3    Q      Do you remember his wife's name?

4    A      Tugba.

5    Q      Do you remember her last name by any chance?

6    A      I believe Tokatlioglu or something to that

7    effect.

8    Q      Now, when you assisted with the arrest did you

9    collect any evidence?

10   A      Yes, I did.

11   Q      What evidence did you collect?

12   A      I collected Tugba's cell phone and

13   Mr. Springer's cell phone.

14   Q      Why did you collect those?

15   A      Because we had a search warrant for those

16   phones.

17   Q      How did you collect those?

18   A      I asked her to turn them over to me and she

19   did.

20   Q      Did you specifically ask for Mr. Springer's

21   cell phone?

22   A      Yes, I did.

23   Q      In response what did Ms. Tokatlioglu do?

24   A      She took his phone out of the car and then

25   eventually unlocked it and handed it over to me.

1    Q      When you say unlocked it what do you mean?

2    A      Used a PIN code.

3    Q      What type of phone was that?

4    A      An iPhone.

5    Q      With respect to the PIN code did

6    Ms. Tokatlioglu give you that PIN code?

7    A      Yes, she did.

8    Q      What did you do with the phone after you

9    collected it?

10   A      I handed it to another agent who was on scene.

11   Q      What happened to it after that?

12   A      It was taken to Tampa and entered into

13   evidence.

14   Q      When you say it was taken to Tampa, where

15   specifically?

16   A      To the Tampa FBI office.

17          MR. GEORGE:  No further questions, Your Honor.

18          THE COURT:  Any cross?

19          MR. HERNANDEZ:  No, Your Honor, thank you.

20          THE COURT:  Thank you, ma'am, you may step

21   down, watch your step, please.

22          Call your next witness.

23          MR. GEORGE:  The United States calls Michael

24   Taylor who is an in-custody witness.  Your Honor,

25   may I retrieve the exhibits?

1          THE COURT:  Yes.

2          [Witness sworn]

3          COURTROOM DEPUTY CLERK:  Please be seated.

4     Please state your name and spell your last name for

5     the record.

6          THE WITNESS:  Michael Taylor, T-a-y-l-o-r.

7                    DIRECT EXAMINATION

8     BY MR. GAMMONS:

9     Q     Good morning.

10    A     Good morning.

11    Q     You mentioned your name is Michael Taylor.

12    Does anybody know you by any other names?

13    A     Yeah.

14    Q     And what is that?

15    A     Worm.  Big worm.

16    Q     Mr. Taylor, I want to talk to you about

17    criminal history.  Where are you currently being

18    housed right now?

19    A     Hillsborough County Jail.

20    Q     And why are you currently incarcerated?

21    A     Possession -- fentanyl.

22    Q     Possession with intent to distribute fentanyl?

23    A     Yeah.

24    Q     Have you pled guilty to that offense?

25    A     Yes.

1    Q        At the time you committed that crime, were you

2    in federal supervised release?

3    A        Yes.

4    Q        So in addition to your sentence for the drug

5    distribution charge, do you also have a violation of

6    supervised release charge?

7    A        Yes.

8    Q        Do you know the maximum term of imprisonment

9    you're facing on your drug distribution charge?

10   A        Yes.   Twenty years.

11   Q        And are you facing a separate sentence on your

12   violation of supervised release?

13   A        Yes.

14   Q        And is it your understanding that those have

15   to run consecutive, meaning one after the other?

16   A        Yes.

17   Q        Did you have a plea agreement with the United

18   States in reference to your drug distribution

19   charge?

20   A        A plea agreement?   No.

21   Q        But has the government agreed to consider the

22   cooperation you provide?

23   A        Yes.

24   Q        Other than that agreement, are there any other

25   promises that have been made between you and any

1     government entity?

2     A      No.

3     Q      Other than the charges that we've talked about

4     just now, have you ever been convicted of any other

5     felonies?

6     A      Yes.

7     Q      About how many do you think that is?

8     A      I don't know off the head.

9     Q      It's a lot?

10    A      I would say, yeah.

11    Q      Could it be 10?

12    A      Yeah.  I'm not for sure, but it might be.

13    Q      Prior to being housed in the Hillsborough

14    County Jail, were you previously housed at the

15    Pinellas County Jail?

16    A      Yes.

17           MR. GAMMONS:  Ms. Black, may I use the

18    projector.

19    Q      I'm showing you what has been admitted into

20    evidence as Government Exhibit 31.  Do you recognize

21    that person?

22    A      Looks like Chop.

23    Q      Who is Chop?

24    A      Dude who was in the cell with us, unit with

25    us.

1    Q      Where were you and Chop housed together?

2    A      6C2, Pinellas.

3    Q      What jail was that -- where was it?

4    A      It was in Pinellas, 6C2.

5    Q      And now I'm showing you Government Exhibit 32.

6    Do you recognize that person?

7    A      Yes.

8    Q      Who is that?

9    A      Call him Dub.

10   Q      And how do you know him?

11   A      From 6C2 in Pinellas -- yeah, Pinellas, 6C2.

12   Q      Now I'm showing you Government Exhibit 33.  Do

13   you recognize that person?

14   A      Yes.  That's my celly, who is my celly.

15   Q      And what's a celly first?

16   A      I call him Rio.

17   Q      And how do you know Rio?

18   A      From being in the cell with me, we stayed in

19   the same cell.

20   Q      I'm going to show you Government Exhibit 34.

21   Who is that?

22   A      That's me.

23   Q      Until recently you had longer hair?

24   A      Yes, sir.

25   Q      Did you know any of those individuals that I

1    just showed you prior to being incarcerated at the

2    Pinellas County Jail?

3    A     No, I pretty much met them at Pinellas pretty

4    much.  But a couple of them I know because they from

5    the same area where I'm from.

6    Q     Which one did you know that were from the same

7    area?

8    A     I didn't know them personally but I knew they

9    was -- when I came in the cell they was from Manatee

10   County.  Dub and Chop.

11   Q     You mentioned a second ago 6C2.  About how

12   many rooms are in 6C2?

13   A     It's eight on top, eight to the bottom.

14   Q     And how many inmates can stay in each

15   particular room?

16   A     You got some of them with four, some with

17   five, and some with even six bunks in each little

18   part.

19   Q     And you mentioned top and bottom; it's two

20   stories?

21   A     Yeah.

22   Q     Approximately how many inmates at a time, when

23   you were there, were in 6C2?

24   A     I wouldn't know exactly the count of it, but

25   it was probably full or something.

1    Q       Over 50?

2    A       Yeah.

3    Q       Other than the pods, were there other rooms in

4    6C2?

5    A       Yeah.  TV room, visitation room, upstairs --

6    Q       Sorry, I cut you off.  Go ahead?

7    A       Like two rooms, different rooms, TV room and

8    visitation room.

9    Q       I want to talk specifically about the TV room.

10   What's in that room?

11   A       You got TV and chairs that lined up.  And a

12   kiosk machine where you order commissary and stuff

13   like that.

14   Q       When you were housed at the Pinellas County

15   Jail what did you primarily do to pass the time?

16   A       Pretty much played poker.

17   Q       Did you spend any time in the TV room?

18   A       Yeah, in the mornings.

19   Q       While you were in 6C2 at the Pinellas County

20   Jail did you know Jason Jerome Springer?

21   A       Yes.

22   Q       Do you see Jason Jerome Springer in court

23   today?

24   A       Yes.

25   Q       Can you identify him by letting us know where

1    he is and an item of clothing that he's wearing?

2    A    He's right here with I guess light brown

3    shirt.

4         MR. GAMMONS:  Your Honor, may the record

5    reflect he's identified the defendant?

6         THE COURT:  It may so reflect.

7    BY MR. GAMMONS:

8    Q    How did you first meet Mr. Springer?

9    A    When he came to our cube, my and my celly cube

10   we were asking for a Bible.

11   Q    And after that initial meeting did you end up

12   having subsequent conversations with the defendant?

13   A    Yes.

14   Q    What did you primarily speak about with

15   Mr. Springer?

16   A    At that time he had came and he asked for the

17   Bible, he was talking about pretty much, you know, I

18   asked him about, you know, what religion he was and

19   he told me he was like a follower of ISIS.  And I

20   told him I follow Muslim before, the nation of

21   Muslim before, and he was talking about --

22   Q    Let me stop you right there.  Did you

23   understand Mr. Springer to be a Muslim?

24   A    Yes.

25   Q    Did you tell him that you had studied the

1    nation of Islam in the past?

2    A       Yeah, I told him.

3    Q       When he told you he was a follower of ISIS,

4    did that ring any bells with you?

5    A       Right at the moment it didn't, it didn't,

6    because I wasn't really caught on to what he really

7    was saying.

8    Q       Are you familiar in any way with ISIS?

9    A       Yes, I was, yes.  But when he said, you know

10   -- I always know Nation and Sunni, I never heard of

11   ISIS as a Muslim, you know, follower of ISIS.

12   Q       So as far as -- you're familiar with the

13   Nation of Islam and Sunni; you never heard of

14   someone being a follower of ISIS?

15   A       No.

16   Q       Did Mr. Springer talk to you about why he was

17   in jail at that time?

18   A       Yes, he had said he was in there for -- that

19   he was at the gun range shooting guns but he was --

20   Q       Sorry, let me ask you this.  Did he tell you

21   why he was at that gun range?

22   A       Yes.

23   Q       What did he say about that?

24   A       He said he was learning how to shoot assault

25   rifles and load clips because he was going to go on

1    a mission.

2    Q     Did he tell you anything in specific about

3    that mission?

4    A     No, he didn't say what mission he was going

5    on.

6    Q     Did he tell you that -- did he tell you about

7    who was at the gun range at the time he did this?

8    A     No, he really just said that's what he was in

9    jail for.

10   Q     Mr. Taylor, I want to talk to you about

11   another conversation.  Did you have a conversation

12   with Mr. Springer involving the president's travel

13   ban?

14   A     Yes.

15   Q     Where were you when that conversation

16   occurred?

17   A     We was in the TV room.

18   Q     Let me take a step back.  Did you have many

19   conversations in the TV room with Mr. Springer?

20   A     Yes.

21   Q     Why is that?

22   A     Well, I mean, why we was in the TV room?

23   Q     Yes.

24   A     One of them was the travel ban was going on,

25   like the president said that he would like

1      everywhere --

2      Q      Let me ask you this.  What time of day was

3      that?

4      A      In the morning.

5      Q      Were there -- did many inmates get up in the

6      morning in the TV room other than yourself?

7      A      It would pretty much be me, him, and another

8      guy.

9      Q      Would you consider yourself an early riser?

10     A      Yes.

11     Q      So back to the conversation involving the

12     travel ban, what was Mr. Springer's reaction to that

13     news, what did he say to you?

14     A      We everywhere, we already here, we already

15     here so it doesn't matter about you got a travel

16     ban, we already here.  That's what he kept saying.

17     Q      When he said this to you, what was his

18     demeanor?

19     A      I mean, he was like, you know, we already here

20     like, you know, I don't care what you do, we already

21     here.  Like not mad, but you know mostly like happy

22     that they already here, he was saying.

23     Q      And when he was making those statements did

24     you take him seriously?

25     A      Yes.

1    Q        I want to talk -- let me ask you this.  Was

2    there another conversation you had with Mr. Springer

3    regarding an incident in the Fort Lauderdale/Miami

4    area?

5    A        Yes.

6    Q        Where did that conversation occur?

7    A        It was in the TV room.

8    Q        Approximately what time of day did it occur?

9    A        It was always probably around 7:30, maybe

10   8:00, that was usually the times certain officers

11   turn the TVs on.

12   Q        Tell me about what happened during that

13   incident.

14   A        Well, he was -- when the dude shot up the

15   people at the airport, he was like --

16   Q        Sorry, let me ask you this.  What was

17   happening on the news, what was the news report?

18   A        They was talking about the airport, the dude

19   shot the people in the airport.

20   Q        And did Mr. Springer have a response to that

21   news report?

22   A        Yeah, he was like see we here, we already

23   here, we already here.

24   Q        And when he made those comments to you did you

25   think he was joking?

1   A       No.  Because --

2   Q       Did you take him seriously?

3   A       Yes.

4   Q       I'm showing you again Government Exhibit 32

5   which is the individual you identified as Dub.  Do

6   you remember when this individual was released from

7   prison?

8   A       Yes.

9   Q       When was that?

10  A       It was on the 25th he was released from the

11  jail.

12  Q       The 25th of what month?

13  A       January.

14  Q       Of 2017?

15  A       Yes.

16  Q       And how can you remember that specific day?

17  A       Because my birthday is on the 24th and he

18  cooked for me, made me a cake and stuff and we ate.

19  Q       So your birthday was on the 24th and Dub was

20  released on the 25th?

21  A       Uh-huh.

22  Q       Did you have a conversation at the Pinellas

23  County Jail involving the release of Dub?

24  A       Yes.

25  Q       What day did that occur?

1    A        That was the next morning.  He left on the

2    25th.  The next morning on the 26th and that morning

3    I came in the TV room and I was kind of happy for

4    him because he had got out because he had did like I

5    think 41 months in the jail.  And I was like, you

6    know, I'm glad he went home, you know.

7    Q        Let me ask you this.  Do you recall who was in

8    that room when you were having that conversation?

9    A        Me, another guy, an older guy, a little older

10   than me, and Springer.

11   Q        Do you know if anybody else was in that room?

12   A        It was somebody else in the back sitting in

13   the back row.  I want to say I think it was Chop --

14            MR. HERNANDEZ:  Objection, speculation.

15            THE COURT:  Overruled.

16   BY MR. GAMMONS:

17   Q        You can answer the question.

18   A        I want to say it was Chop in the back, back

19   there.  I was pretty much focused, you know, up

20   front.

21   Q        And what were you saying about Dub?

22   A        I was saying that Dub went home.  And then

23   another guy, he was like --

24            MR. HERNANDEZ:  Objection; hearsay.

25            THE COURT:  Sustained.  Don't tell us what

1    anybody else said.  Just answer the questions,

2    please.

3    BY MR. GAMMONS:

4    Q     Let me ask you a different question.  Are you

5    familiar with the case that Dub testified in?

6    A     Yes.

7    Q     Was that -- were a lot of people talking about

8    that case in the Pinellas County Jail?

9         MR. HERNANDEZ:  Objection; relevance.

10        THE COURT:  Overruled.

11   BY MR. GAMMONS:

12   Q     Were a lot of people talking about that case

13   in the Pinellas County Jail?

14   A     Yes.

15   Q     And we talked briefly about the conversation

16   that you were having.  Did Mr. Springer have any

17   response to that conversation?

18   A     Yes.

19   Q     What did he say?

20   A     Well, he said -- he had got mad, he got mad

21   because he said his judge, she too old, she

22   shouldn't be giving out all that time, he going to

23   kill her because she giving out all that time.

24   Q     Did you know who Mr. Springer's judge was?

25   A     No.

1    Q      Did he make any specific -- did he describe

2    how he was going to kill his judge?

3    A      Yes.

4    Q      What did he say about that?

5    A      I asked him, I said how are you going to kill

6    a federal judge.  And he said when he come back from

7    Jordan he was going to know how to make a bomb out

8    of drone and he was going to run it into the

9    courthouse where her office at.

10   Q      Before that point had you ever heard of making

11   drones out of bombs or anything like that?

12   A      No.

13   Q      What was your response when Mr. Springer said

14   that to you?

15   A      And I said what about if other inmates in

16   there.  And he said well that will be the sacrifice

17   he'll be making to Allah.

18   Q      Did he explain to you why he wanted his judge

19   to die?

20   A      Nothing really explained besides saying she

21   was too old, she giving out too much time.  That was

22   about it.

23   Q      Did you know who the presiding judge of the

24   trial that Dub testified in was?

25   A      No, I never know.

1    Q      When Mr. Springer was making these comments

2    about his judge, what was his demeanor?

3    A      Like he really wanted to do it, you know, like

4    he mad, like angry, you know what I mean, but he

5    really want to do it.

6    Q      And did you think he was joking about those

7    comments?

8    A      No, at that time I really took him serious

9    because at that time I kind of figured when he told

10   me -- got on to me that he was a follower of ISIS, I

11   know he was serious about what he wanted to do.

12   Q      After these conversations that we've discussed

13   with Mr. Springer did you continue spending time

14   with him in the TV room?

15   A      No.  Pretty much backed away from him.

16   Q      At any other time while you were in the

17   Pinellas County Jail did you hear Mr. Springer make

18   any comments about threatening the life of his

19   judge?

20   A      Repeat that again.

21   Q      At any other time that we haven't discussed

22   did you hear Mr. Springer threaten the life of his

23   judge?

24   A      Besides -- he said one time he prayed every

25   day that his judge would die.  Besides that.

1    Q      When -- these various comments that

2    Mr. Springer said to you, when he -- did you relay

3    them to your attorney?

4    A      Yes, that's when I realized, you know, I need

5    to contact somebody about this because he was going

6    too far with it.

7    Q      Why did you decide to talk to your attorney

8    about it?

9    A      Because I took it serious, you know, I took it

10   serious and I felt like it was the right thing to

11   do.

12         MR. GAMMONS:  May I have a moment, Your Honor?

13         THE COURT:  Yes, sir.

14         MR. GAMMONS:  I have no further questions,

15   Your Honor.

16         THE COURT:  Cross-examination, Mr. Hernandez?

17                   CROSS EXAMINATION

18   BY MR. HERNANDEZ:

19   Q      So Mr. Taylor, you're saying that the reason

20   you contacted law enforcement was because you felt

21   it was the right thing to do.

22   A      Yes.

23   Q      Isn't it true that you believed that it was

24   the right thing to do for yourself?

25   A      No, I believe it was the right thing to do

1    altogether.

2    Q       Well, you have indicated in your testimony

3    that you have been convicted previously of

4    approximately 10 convictions, felony convictions,

5    correct?

6    A       Well, I don't know exactly how many, but

7    maybe.

8    Q       Okay.  Rounding it off, about 10 prior

9    convictions.

10   A       I don't know.  Maybe you might be right.  I

11   don't know.

12   Q       And you have charges pending, correct?

13   A       Yes.

14   Q       And of course based on the fact that you have

15   10 prior convictions, this is not your first -- this

16   is not your first exposure to the criminal justice

17   system, correct?

18   A       No.

19   Q       You have had a chance to learn how the system

20   works, correct, based on the fact that you have

21   approximately 10 prior convictions, correct?

22   A       No.  I never did this.

23   Q       So in your mind you're a virgin to this

24   system?

25   A       Not virgin.  I say I've been locked up more

1      than one time, so I'm not a virgin.

2      Q      You indicated that you also have used a false

3      name, another name, and I missed it completely but I

4      think it was Werner?

5      A      Worm.  They call me Big Worm.

6      Q      That's a nickname?

7      A      That's a nickname.

8      Q      In this case that you have pending, I believe

9      that in response to the government's question you do

10     not have a plea agreement, correct?

11     A      Yes.

12     Q      However, you've been told by the prosecutor

13     that your cooperation will be considered and it

14     could be beneficial later on, correct?

15     A      Yes.

16     Q      And you've indicated that what you have

17     pending is a possession with intent to distribute,

18     correct?

19     A      Yes.

20     Q      And I believe you said your exposure is up to

21     20 years on that charge.

22     A      Yes.

23     Q      And you also know that in addition to that,

24     you would be facing a consecutive sentence for

25     violation of supervised release, correct?

1    A    Yes.

2    Q    Which means that that charge -- whatever you

3    get for that charge will be on top of whatever you

4    get for the possession charge, correct?

5    A    Yes.

6    Q    And do you know what your exposure is for the

7    violation of supervised release?

8    A    Three years.

9    Q    And so basically you're facing up to 23 years

10   in prison, correct?

11   A    You can say that, yeah.

12   Q    Well, I can say that because that's the truth,

13   correct?

14   A    Okay.

15   Q    And you've indicated, have you not, that --

16   well, let me ask you this.  Even if you don't have a

17   plea agreement, are you aware of what is called the

18   5K1.1 rule?

19   A    I heard of it, yes.

20   Q    It's basically -- what it means is substantial

21   assistance, correct?

22   A    Yes.

23   Q    And you would agree with me that the

24   government -- as the government already told you

25   they're the ones that will evaluate your

1      cooperation, correct?

2      A      Yes.

3      Q      And they will decide -- they are the only

4      people that can file this motion in your behalf,

5      correct?

6      A      Yes.

7      Q      It's not the judge, it's the prosecutor that

8      is the only agency that can look at your cooperation

9      and decide whether or not you should get the benefit

10     of a 5K1.1 motion for substantial assistance,

11     correct?

12     A      Yes.

13     Q      And so that means that you want to do -- I

14     would assume you're wanting to do anything you can

15     to get the benefit of that rule, correct?

16     A      No.

17     Q      Okay.  It's of no interest to you to get a

18     sentence reduction or a lesser sentence?

19     A      Hold on.  Come back.  What you say now?

20     Q      Are you telling this jury that the idea of

21     getting a lesser sentence has never crossed your

22     mind, is that your testimony?

23     A      It crossed my mind, but, I mean, what he was

24     talking about doing was bigger than that.

25     Q      Well, you understand of course that the more

1      embellished, the more exciting your testimony is,

2      the more likely that the government will decide to

3      give you the benefit of that testimony, correct?

4      A      Yeah.

5      Q      Okay.  Now, you mentioned some names, I

6      believe that one of the persons was Chop?

7      A      Yes.

8      Q      Do you know him to be Traveous Anderson?

9      A      That's his real name.

10     Q      That's his real name.  And I believe you

11     indicated that Chop or Mr. Anderson was there when

12     all this was going on with you and Mr. Springer?

13     A      I know for sure in the room he was there.

14     Q      Okay.

15     A      In the room.

16     Q      And you were with Mr. Anderson for -- in the

17     same area for how long?

18     A      Talking about in the same cell?

19     Q      Well, not necessarily the same cell, but just

20     generally -- let me ask you first, were you in the

21     same cell with him?

22     A      The same unit, yes.

23     Q      Okay, the same cell --

24     A      Unit, unit.  Not the same cell.

25     Q      How long were you with him in that same unit?

1      A      I couldn't tell you how long.  I know I got

2      there October 17th.

3      Q      Within days, weeks, months?

4      A      I would say probably months or something like

5      that, but I don't know how long exactly.

6      Q      So you've had plenty of time in that month to

7      discuss what your testimony would be against

8      Mr. Springer, you'd have plenty to time to discuss

9      that and compare notes with Mr. Anderson, correct?

10     A      No, I wouldn't say that because I end up

11     leaving, going to Citrus County Jail, so I left -- I

12     left all of them there.

13     Q      I'm sorry?

14     A      I left all of them there.

15     Q      But you were with him for about a month,

16     correct?

17     A      Yeah, I would say probably about a month.  Or

18     better probably.

19     Q      Now, when did you first tell law enforcement

20     or contacted your attorney, how much time had passed

21     when you did that?

22     A      Um, I would say maybe a week before they sent

23     me to Citrus County Jail.

24     Q      And they sent you because of the fact that now

25     you had offered this information, correct?

1    A      No.

2    Q      Well, were you ever asked to wear a monitor or

3    something to see if maybe some of what you and

4    Mr. Springer were talking about was actually

5    recorded?  Were you ever asked to do that?

6    A      Me wear a monitor?

7    Q      Yeah.

8    A      No.

9           MR. HERNANDEZ:  If I may have a moment, Your

10   Honor.

11          THE COURT:  Yes, sir.

12          MR. HERNANDEZ:  That's all I have.

13          THE COURT:  Any redirect, Mr. Gammons?

14          MR. GAMMONS:  Yes, Your Honor.

15                    REDIRECT EXAMINATION

16   BY MR. GAMMONS:

17   Q      Mr. Taylor, you were just asked about having

18   time to talk to other inmates about your testimony

19   in this case.  Did you do that in this case?

20   A      No.

21   Q      What do you understand could possibly happen

22   to you if you falsely implicate somebody in this

23   matter?

24   A      I know you get in more trouble.

25          MR. GAMMONS:  No further questions, Your

1     Honor.

2          THE COURT:  All right.  Thank you, sir.  You

3     may be excused.  Watch yourself when you leave.

4          Do you have a short witness, Mr. Gammons or

5     Mr. George?

6          MR. GAMMONS:  No, Your Honor, now would be a

7     good time for --

8          THE COURT:  Why don't we take a lunch break

9     and we'll return at 1:15 by the courtroom clock.

10    Please don't discuss the case among yourselves or

11    allow it to be discussed in your presence.  Have a

12    good lunch.

13          (The jury retired to the jury room.)

14          THE COURT:  We'll be in recess.

15          (Lunch break.)

16          THE COURT:  Bring the jury in, please.  Call

17    your next witness.

18          MR. GEORGE:  The United States calls Traveous

19    Anderson.

20          (The jury returned to the courtroom.)

21          THE COURT:  Be seated.  We are ready to

22    resume.  Call your next witness, please.

23          MR. GEORGE:  The United States calls Traveous

24    Anderson.

25          [Witness sworn]

1          COURTROOM DEPUTY CLERK:  Please be seated.

2    Please state your name and spell your last name for

3    the record.

4          THE WITNESS:  Traveous Anderson,

5    A-n-d-e-r-s-o-n.

6                     DIRECT EXAMINATION

7    BY MR. GAMMONS:

8    Q     Good afternoon, Mr. Anderson.

9    A     How are you doing, sir.

10   Q     Make sure you scoot a little closer to that

11   microphone so everybody can pick you up.

12         Do you have any other nicknames that other

13   people know you as?

14   A     Chop, C-H-O-C.

15   Q     I'm going to talk about your criminal history.

16   Where are you currently being housed?

17   A     At Hillsborough County Jail.

18   Q     And what charges are you currently

19   incarcerated for?

20   A     Possession of fentanyl.

21   Q     How many counts?

22   A     One count.

23   Q     Have you pled guilty to that drug distribution

24   count?

25   A     Yes, I did.

1    Q       What is the maximum amount of time you're

2    facing on that count?

3    A       It was 20 years.

4    Q       And did you plea with a plea agreement or

5    without a plea agreement in that case?

6    A       With a plea agreement.

7    Q       Is there a cooperation provision in your plea

8    agreement?

9    A       No, sir.

10   Q       Sorry, let me ask you this.  Have you agreed

11   to cooperate with the authorities?

12   A       Yes, sir.

13   Q       And as part of that plea agreement has the

14   government agreed to consider the information that

15   you provide?

16   A       Yes, sir.

17   Q       Up to this point has anybody from the

18   government or any law enforcement agency made you a

19   promise about what you will receive when you're

20   sentenced?

21   A       No, sir.

22   Q       I should ask this.  Have you been sentence d

23   on your drug distribution case yet?

24   A       No, sir.

25   Q       Other than the charges that we just spoke

1     about, have you ever been convicted of a prior

2     felony?

3     A     Yes, I did.

4     Q     How many times?

5     A     Three times.

6     Q     Mr. Anderson, prior to being moved to the

7     Hillsborough County Jail were you housed in the

8     Pinellas County Jail?

9     A     Yes, I was.

10    Q     How long ago was that?

11    A     About five months, five and a half months.

12    Q     Do you know the defendant in this case, Jason

13    Jerome Springer?

14    A     Yes.

15    Q     Do you see Mr. Springer in the courtroom

16    today?

17    A     Yes, I do.

18    Q     Can you identify him by where he's sitting and

19    an article of clothing?

20    A     Right there.

21    Q     And what is he wearing?

22    A     Brown.

23    Q     Brown what?

24    A     A brown shirt -- a brown button-up shirt.

25    Q     For the record, Mr. Anderson has identified

1     the defendant, Jason Springer.

2           THE COURT:  The record may so reflect.

3     BY MR. GAMMONS:

4     Q     Mr. Anderson, I'm going to show you Government

5     Exhibit 31.  Do you recognize that individual?

6     A     Yes, sir.

7     Q     Who is it?

8     A     Me.

9     Q     Now I'm going to show you Government

10    Exhibit 32.  Do you recognize the person depicted in

11    that photograph?

12    A     Yes, sir.

13    Q     Who is that?

14    A     Dub.  Last name Barton.

15    Q     What did you know as his nickname?

16    A     Penny.  Dub.

17    Q     How do you spell Dub?

18    A     D-U-D-E.

19    Q     And how do you know the person you identified

20    as Dub?

21    A     I know him from off the streets.

22    Q     And were you ever housed with him in jail?

23    A     Yes, sir.

24    Q     At what jail?

25    A     At Pinellas County Jail.

1    Q      Showing you Government Exhibit 33, do you

2    recognize that person?

3    A      Yes, sir.

4    Q      Who is that?

5    A      Rio.

6    Q      And how do you know Rio?

7    A      We was housed in the same pod.

8    Q      The same pod?

9    A      Yes, sir.

10   Q      I'm showing you Government Exhibit 34, do you

11   know that person?

12   A      Yes, sir.

13   Q      How do you know him?

14   A      We was housed in the same pod.

15   Q      Prior to going to jail did you know him?

16   A      I knew of him from the streets, we was from

17   the same.

18   Q      Repeat that for me?

19   A      I knew of him.

20   Q      How?

21   A      From -- we both from the same area.

22   Q      What area is that?

23   A      Manatee County.

24   Q      Now I'm showing you Government Exhibit 35.  Do

25   you recognize that person?

1    A        Yes, sir.

2    Q        Who is that?

3    A        White.

4    Q        White?

5    A        Yes.  We called him D.

6    Q        You called him D?

7    A        Yes, sir.

8    Q        How do you know him?

9    A        From the pod.

10   Q        The pod where?

11   A        Pinellas County Jail.

12   Q        Where did you first meet Mr. Springer?

13   A        At Pinellas County Jail.

14   Q        And tell me the circumstances of how you first

15   spoke to Mr. Springer.

16   A        Well, he asked me a question about his case.

17   Q        What was the question?

18   A        The question was he wanted to know what I

19   thought the judge was going to do about his case.

20   And then we went farther on about he wanted to know

21   if he was going to get a bond or not.

22   Q        Do you know why he asked you about whether he

23   was going to get a bond in his case?

24   A        No, I don't.

25   Q        Did Mr. Springer ever tell you where he was

1    from?

2    A      Yes, I think he was saying he was from

3    Tennessee.

4    Q      I'm going to talk more about Mr. Springer's

5    gun case.  Did he tell you the circumstances of how

6    he ended up getting arrested?

7    A      Yes, he was saying that he was going to the

8    gun range.

9    Q      Did he tell you why he was at the gun range?

10   A      Yes, he supposed to be going to the gun range

11   to be able to learn how to shoot so he can go back

12   to Jordan or Turkey to learn -- to teach the person

13   how to shoot.

14   Q      You say Jordan or Turkey.  Have you ever been

15   to either one of those places?

16   A      No, sir.

17   Q      And when you said to teach the people how to

18   shoot, did he ever elaborate on who the people were?

19   A      No, not at the time.

20   Q      Did he tell you why he needed to teach people

21   in Jordan or Turkey how to shoot?

22   A      Because he wanted to teach them techniques so

23   whatever mission they were supposed to be

24   completing, they were supposed to be doing.

25   Q      Did he ever talk to you more about this

1    mission?

2    A      Yes, he done spoke on it before.

3    Q      What did he tell you about the mission?

4    A      That they supposed to have been doing

5    something for 2021 and 2125.

6    Q      Years 2021 or 2025?

7    A      Yes, sir.

8    Q      And did he tell you where that mission was?

9    A      He said it was going to be somewhere at a big

10   event.

11   Q      Was it going to be in the United States or

12   elsewhere?

13   A      In the United States.

14   Q      Do you recall a conversation with Mr. Springer

15   regarding an incident at an airport?

16   A      Yes, sir.

17   Q      Tell me about that conversation.

18   A      Well, it was something -- an incident that

19   happened at the airport and we was in the day

20   room --

21   Q      Let me ask you this.  What was the coverage

22   that spurred this conversation?

23   A      He was excited about the situation what went

24   on, he said like it's only going to get worser, it's

25   only going to get worser, and he went on and on

1    about the situation.

2    Q      Mr. Anderson, I want to take a step back.

3    What was on the news that started the conversation

4    between you and Mr. Springer?

5    A      That the dude was -- I guess he had did an

6    attack or something or a bomb or something or

7    something happened at the airport, I want to say.

8    Q      And what was Mr. Springer's response to that

9    news report?

10   A      Like oh, it's only going to get worser, it's

11   only going to get worser.

12   Q      And when he was saying this was he joking?

13   A      No, he was serious.

14   Q      What was his demeanor when he was saying this

15   to you?

16   A      Like he knew what was really going on.

17   Q      When Mr. Springer said that it was going to

18   get worse, did you take his threat seriously?

19   A      Yes, I did.

20   Q      Did you ever hear Mr. Springer talk about the

21   judge in his case?

22   A      Yes, sir.

23   Q      What did he say about that person?

24   A      He said that he prayed every day for her to

25   die and --

1    Q        Let me stop you there.  Did he only tell you

2    that on one occasion, that he prayed for her to die?

3    A        He said numerous times, every other day he

4    talking about he pray for her to die.

5    Q        Did he ever have any other discussions with

6    you about his judge?

7    A        Yes, he was saying that even if he had to bomb

8    himself up and come in the courthouse and blow up or

9    he was saying that he wanted to --

10   Q        Let me stop you there.  Was that a separate

11   occasion?

12   A        Yes, this was a separate occasion.

13   Q        Where were you when he said that?

14   A        We was in the quads.

15   Q        What part of the jail is the quad?

16   A        The quad is like your living area where you

17   sleep at.

18   Q        It's like a room?

19   A        It's a room.

20   Q        It's called a quad because it has four beds?

21   A        Uh-huh.

22   Q        What specifically did he say on that occasion?

23   A        He basically was saying that he was going to

24   figure out -- because of the judge age he was going

25   to figure out her appointments, medical

1    appointments, doctor appointments and stuff where he

2    could get close to her to be able to do whatever he

3    was going to do.

4    Q    And you said the judge's age; did he ever tell

5    you anything about the judge's age?

6    A    He never said anything about her age, but he

7    said that I know that she was an older in her age

8    and she had to be up in that age.

9    Q    And when he told you that he was going to try

10   to find out what appointments that she had, did you

11   think he was joking about that?

12   A    No.

13   Q    Did you think he was serious?

14   A    Yes, sir.

15   Q    You mentioned a moment ago that he said even

16   if he had to I think you said bomb up.  Tell me

17   about that circumstance.

18   A    He was saying that even if he had to bomb

19   himself up or either have a drone rammed into her

20   office.

21   Q    And I want to talk a little bit more about --

22   you just mentioned drones.  Did he talk with more

23   specificity about using drones?

24   A    Yes, he was talking about the big event that

25   they supposed to be doing for 2021 to 2025, that

1       they was going to use drones.

2       Q       And before you had met Mr. Springer, had you

3       ever seen a drone before?

4       A       Never in my life.

5       Q       Had you heard of one?

6       A       Yes, I seen one on the news.

7       Q       Did Mr. Springer ever talk to you about drones

8       relating to his judge?

9       A       Yes.  He was saying that he wanted -- he was

10      going to use the drone, he was going to get it to

11      her office, run it into her office or something.

12      Q       Let me take a step back.  Where did that

13      conversation that you heard occur?

14      A       We was in the quad.

15      Q       And specifically what did he say on that

16      occasion?

17      A       He basically was just talking about how to --

18      ways that he can do things to get close to her and

19      what he would do, he'll use the drone if he got to

20      run it into her office and -- that was about it.

21      Q       Did he know where her office was?

22      A       No -- I don't know.

23      Q       You don't know if he knew where her office

24      was?

25      A       Yeah, I don't know.

1    Q       When he's saying these things, that he wants

2    to fly a drone into her office, did you think he was

3    serious?

4    A       Yes, sir.

5    Q       When he was talking about flying the drone

6    into the judge's office, what was his demeanor?

7    A       He was like he was really serious about it,

8    like he was like this is what he do, he's like, you

9    know, the way I look at it like he's just

10   believing -- the belief he believe in is to kill

11   whoever he can kill and he feel that he'll get saved

12   for it.

13          MR. GAMMONS:  I don't have any more questions

14   at this time.

15          THE COURT:  Cross?

16                    CROSS EXAMINATION

17   BY MR. HERNANDEZ:

18   Q       Mr. Anderson, you said you have a nickname,

19   Chop?

20   A       Yes, sir.

21   Q       And you have three prior felony convictions

22   before the pending case you have, correct?

23   A       Yes, sir.

24   Q       And obviously you know that when it comes to

25   sentencing, the courts -- whoever your judge is

1          would take into consideration the fact you have a

2          prior criminal history, correct?

3          A     Yes, sir.

4          Q     And you are charged with possession -- have

5          you pled guilty or are you still pending?

6          A     I pled guilty.

7          Q     Pursuant to a plea agreement, correct?

8          A     Yes, sir.

9          Q     And you've been -- your understanding is that

10         you can get up to 20 years in prison, correct?

11         A     Yes, sir.

12         Q     And part of your agreement is that you've

13         agreed to provide testimony for the government,

14         correct?

15         A     Yes, sir.

16         Q     And have you been informed that there is such

17         a thing as a rule called 5K1.1?

18         A     Yes, sir.

19         Q     And that is basically a way for somebody to

20         try to get a lesser sentence, correct?

21         A     Yes, sir.

22         Q     You don't get it for being a friendly guy,

23         correct?

24         A     Yes, sir.

25         Q     You don't get it for being anything other than

1    to provide testimony that the government decides is

2    worthy of a motion for substantial assistance,

3    correct?

4    A    Yes, sir.

5    Q    They are the ones -- the prosecutor is the

6    only person or the only agency that can decide

7    whether or not you get this motion, correct?

8    A    Yes, sir.

9    Q    And obviously you've been in the system

10   before, this is not your first rodeo, correct?

11   A    Yes, sir.

12   Q    And you know that if you testified for the

13   defendant, you're certainly not going to get any

14   reduction of sentence, correct?

15   A    Yes, sir.

16   Q    And you know that if what you can provide to

17   the government is not all that fantastic, it's not

18   going to be worth a whole lot, correct?

19   A    Yes, sir.

20   Q    But if you can tell them about drones and

21   about all these other things, that's something that

22   you believe will get you what you're after which is

23   a sentence reduction, correct?

24   A    No, sir.

25   Q    Well, and by the way, you said you were in the

1    pod with Mr. Michael Taylor, correct?

2    A      Yes, sir.

3    Q      How long were you in the pod together?

4    A      About four months.

5    Q      And you were in the pod after you had these

6    alleged conversations with Mr. Springer?

7    A      Could you repeat that?

8    Q      You were in the pod with Mr. Taylor after you

9    say that Mr. Springer said these things to you,

10   correct?

11   A      Yes, sir.

12   Q      So you and Mr. Taylor certainly had plenty of

13   time to chat and talk about it, right?

14   A      No, sir.

15   Q      Okay, so how long were you in the pod with

16   Mr. Taylor after Mr. Springer said these things to

17   you?

18   A      We was in the pod about 20 half months.

19   Q      Say it again?

20   A      Twenty half months.

21   Q      Two and a half months?

22   A      Yes, sir.

23   Q      And you're saying that you and Mr. Taylor both

24   decided to cooperate against Mr. Springer but you

25   and Mr. Taylor never chatted about this, that's your

1    testimony?

2    A       Yes, sir.

3    Q       You said that Mr. Springer indicated that he

4    had gone this one time to a shooting range in order

5    to practice to go to Turkey and Jordan?

6    A       Yes, sir.

7    Q       And that one attempt or that one time at the

8    shooting range was going to somehow make him a

9    master instructor of shooting, is that what you're

10   saying?

11   A       Yes, sir.

12   Q       And you were interviewed by law enforcement

13   before you came here today, correct?

14   A       No, sir.

15   Q       Are you saying that you have never been

16   interviewed by any detective or any law enforcement

17   officer before you came in here today?

18   A       Yes, sir.

19   Q       Your answer is you didn't talk to -- make sure

20   I understand your question.  You didn't talk to

21   Nance Wing Nichols with the FBI before you came in

22   here today?

23   A       I don't know what you're talking about, sir.

24   Q       I'll start again.  In fact, I'm going to

25   direct your attention to August 8th of 2017 which is

1    two weeks ago.

2    A       Uh-huh.

3    Q       Did you not speak with an FBI agent?

4    A       Yes, sir.

5    Q       And did you not tell the agent that

6    Mr. Springer and his old lady, I think is how you

7    phrased it, were waiting on their child to turn 18

8    before going to Jordan or Turkey?

9    A       Yes, sir.

10   Q       And are you aware that Mr. Springer's child is

11   one year old?

12   A       No, sir.

13   Q       And you would agree with me that if his

14   mission was to execute -- to get to Jordan and

15   Turkey to execute some kind of mission for 2021 to

16   2025, it would be very difficult if he had to wait

17   another 17 years for his child to turn 18, correct?

18   A       Yes, sir.

19          MR. HERNANDEZ:  That's all I have, Your Honor.

20          THE COURT:  Any redirect?

21          MR. GAMMONS:  Yes, Your Honor.

22                    REDIRECT EXAMINATION

23   BY MR. GAMMONS:

24   Q       Mr. Anderson, did Mr. Springer ever talk to

25   you about his wife?

1    A        Yes, sir.

2    Q        What did he tell you about her?

3    A        He was saying that she was in the Navy or

4    something like that and she was supposed to -- she

5    was in the Navy and they supposed to have been going

6    to Turkey to do something to teach the people in

7    either Turkey or Jordan the moves that she had

8    learned.

9    Q        So to your understanding his wife was planning

10   to travel with him?

11           MR. HERNANDEZ:  Objection; leading.

12           THE COURT:  Don't lead the witness, please.

13   Sustained.

14   BY MR. GAMMONS:

15   Q        What was your understanding on -- let me ask

16   you this question.  Did you know if she was at the

17   shooting range the day Mr. Springer went?

18   A        No, sir.

19   Q        And do you know -- you've never met any of

20   Mr. Springer's children?

21   A        No, sir.

22   Q        Do you know how many children he has?

23   A        No, sir.

24   Q        Do you know what ages they are?

25   A        No, sir, not -- I wanted to say 18 or

1    something or they were waiting until he turn 18 or

2    something like that, I don't know, I'm not for sure.

3    Q      And you were housed with Mr. Taylor for a

4    time?

5    A      Yes, sir.

6    Q      Did you and Mr. Taylor devise a scheme to

7    testify against Mr. Springer in this case?

8    A      No, sir.

9    Q      Do you have a plea agreement with the United

10   States?

11   A      Sir?

12   Q      You have a plea agreement with the United

13   States?

14   A      Yes, sir.

15   Q      What can happen to you if you testify falsely

16   in this matter?

17   A      My plea agreement can be snatched from me.

18   Q      Do you understand you could face new criminal

19   charges as well?

20   A      Yes, sir.

21          MR. GAMMON:  I have no further questions, Your

22   Honor.

23          THE COURT:  Thank you, sir, you may step down.

24   Watch your step when you climb out of there.

25          Call your next witness, please.

 1          MR. GAMMONS:  The United States calls Daniel

 2     White.  He's an in-custody witness as well, Your

 3     Honor.

 4                    [Witness sworn]

 5          COURTROOM DEPUTY CLERK:  Please be seated.

 6     Please state your name and spell your last name for

 7     the record.

 8          THE WITNESS:  Daniel White, W-h-i-t-e.

 9                    DIRECT EXAMINATION

10     BY MR. GAMMONS:

11     Q     Good afternoon, Mr. White.

12     A     Good afternoon, how are you doing?

13     Q     Make sure you get close to that and speak

14     clearly in the microphone.  Thank you.

15          Where are you currently being housed?

16     A     Orient Jail Road.

17     Q     And why are you currently incarcerated?

18     A     For state or --

19     Q     Are you incarcerated on state charges?

20     A     Yes.

21     Q     What are those charges?

22     A     Dealing in stolen property, false information

23     to a pawn broker, and occupied dwelling.

24     Q     Dealing in stealing property, false

25     information to a pawnbroker --

1    A    Yes.

2    Q    -- and burglary occupied dwelling?

3    A    Yes.

4    Q    And how long of a state sentence did you

5    receive on those matters?

6    A    Two years and 10 months, 34 months.

7    Q    Two years and 10 months?

8    A    Yes.

9    Q    When you complete your state sentence are you

10   also be serving a federal sentence?

11   A    Yes.

12   Q    And are those charges consecutive?

13   A    Yes.

14   Q    Meaning you have to finish your state charge

15   and then you'll begin your federal sentence.

16   A    Yes.

17   Q    And how long were you sentenced in your

18   federal matter?

19   A    Seven years.

20   Q    So that's a total of about 10 years and

21   10 months?

22   A    Yes.

23   Q    Sorry, about 9 years and 10 months?

24   A    Yes, 9 years and 10 months.

25   Q    And what is your federal charge that you have

1     not yet begun to serve for?

2     A     It's wire fraud and tax fraud.

3     Q     Did you plead guilty with a plea agreement to

4     your federal charges?

5     A     Yes.

6     Q     As part of that agreement has the government

7     agreed to consider the cooperation that you've

8     provided?

9     A     Yes.

10    Q     Prior to this date has anybody from the

11    government or any law enforcement agency promised

12    you anything -- made you any promises regarding your

13    sentence?

14    A     No.

15    Q     And you are in fact serving a sentence

16    currently?

17    A     Yes.

18    Q     Other than the state charges and the federal

19    charges that we've just discussed, have you ever

20    been convicted of another felony?

21    A     Yes.

22    Q     How many?

23    A     One.

24    Q     Prior to being moved to the Orient Road Jail

25    were you housed at the Pinellas County Jail?

1    A        Yes.

2    Q        And do you know Jason Jerome Springer?

3    A        Yes.

4    Q        Do you see him today?

5    A        Yes.

6    Q        Can you identify him by indicating where he's

7    sitting and an article of clothing that he's

8    wearing?

9    A        He's wearing gray or like a tan -- dark tan

10   shirt.

11   Q        Where is he sitting?

12   A        To my left.

13            MR. GAMMONS:  Your Honor, may the record

14   reflect he's identified the defendant?

15            THE COURT:  Yes, sir, the record may so

16   reflect.

17   BY MR. GAMMONS:

18   Q        Mr. White, how long were you housed in total

19   with Mr. Springer at Pinellas County Jail?

20   A        I don't know exactly when he came in, but I

21   want to say about three months.

22   Q        I'm showing you Government Exhibit 31.  Do you

23   recognize the person in that photograph?

24   A        It's Mr. Anderson.

25   Q        You can look at the screen right in front of

```
 1      you, sir.  It's Mr. Anderson?

 2      A      Yes.

 3      Q      Did you know him by any nicknames?

 4      A      Chop.

 5      Q      And how do you know him?

 6      A      We was in the same dorm.

 7      Q      Where?

 8      A      62.  In Pinellas County.

 9      Q      At the Pinellas County Jail?

10      A      Yes.

11      Q      I'm going to show you Government Exhibit 32.

12      Do you recognize that photograph?

13      A      Yes.

14      Q      Who is that?

15      A      Christopher Barton.

16      Q      Did Mr. Barton go by any nicknames?

17      A      Dub and Penny.

18      Q      How do you know Mr. Barton?

19      A      We were in the same dorm, 62, Pinellas County.

20      Q      I'm showing you Government Exhibit 33.  Do you

21      recognize that person?

22      A      Yes.

23      Q      Who is it?

24      A      DeMario Sleigh.

25      Q      Do you know Mr. Sleigh by any nicknames?
```

1     A      Rio.

2     Q      And how do you know Mr. Sleigh?

3     A      He slept in the same cell block I did.

4     Q      He was in your same cell at the Pinellas

5     County Jail?

6     A      Yes.

7     Q      I'm showing you Government Exhibit 34.  Do you

8     recognize that individual?

9     A      Yes.

10    Q      Who is it?

11    A      Michael Taylor.

12    Q      Did Mr. Taylor go by any nicknames?

13    A      Worm.

14    Q      Worm?

15    A      Yes.

16    Q      And how do you know Mr. Taylor?

17    A      He also slept in the same cell block I did in

18    62 at Pinellas County.

19    Q      And I'm showing you Government Exhibit 35.  Do

20    you recognize who that is?

21    A      Yes.

22    Q      Who is that?

23    A      That's me.

24    Q      Did you have any nicknames at the time?

25    A      Yes, they call me D.

1    Q    How did you first begin speaking to

2    Mr. Springer?

3    A    It was an altercation that occurred between an

4    inmate and one of the officers there.  And like

5    after that confrontation they all gathered around by

6    my cell which is closer by the phone and we began to

7    talk and later on it conspired after that.

8    Q    So there was an altercation unrelated to

9    either of you at the jail?

10   A    Yes, unrelated to none of us.

11   Q    And that's the first time you spoke to him?

12   A    Yes.

13   Q    What did you and Mr. Springer generally talk

14   about?

15   A    It started from what was seen on TV in the TV

16   room one day.

17   Q    What was on in the TV room?

18   A    It was something about an attack I think in

19   another country.

20   Q    And tell me more about that conversation.

21   A    It started like I guess it was about Muslims

22   and we end up talking about it because my ex-wife's

23   mother was a Muslim so that's how we got into that

24   conversation.

25   Q    So you guys talked about faith together?

1    A      Yes.

2    Q      While you were housed with Mr. Springer did

3    you see him often?

4    A      Yeah.  I see him every day.

5    Q      Did you speak to him often?

6    A      Yeah, we will speak even if it's just hi, how

7    you doing.

8    Q      And was Mr. Springer -- did he talk to a lot

9    of the inmates in the pod?

10   A      No.

11   Q      He kept to himself to some extent?

12   A      Yes.

13   Q      Did Mr. Springer ever talk to you about his

14   the reason why he was in jail?

15   A      Yes.

16   Q      What did he tell you about that?

17   A      Gun charge.

18   Q      Did he tell you about any specifics of the gun

19   charge?

20   A      He asked me about do I know anything about the

21   law dealing with guns, which I didn't.

22   Q      So he sought your advice on the gun charge?

23   A      Yes.

24   Q      Did you provide him any advice?

25   A      No, because I didn't know any of it.

1    Q    Did Mr. Springer ever tell you who his judge

2    was?

3    A    He did, but he didn't know how to pronounce it

4    and I end up finding from another inmate the name of

5    the judge.

6    Q    What did Mr. Springer ask you?

7    A    Did I know anything about that judge.

8    Q    And what was that judge's name?

9    A    Kovachevich.

10   Q    Did Mr. Springer ever have a conversation with

11   you about his bond situation?

12   A    Yes.

13   Q    Tell me about -- where did that conversation

14   occur?

15   A    In my cell block.

16   Q    Was there anybody else present during that

17   conversation?

18   A    I think it was a few others.  I don't know.

19   Probably was Sleigh and probably Taylor, if I'm not

20   mistaken.

21   Q    And during that -- what time -- what year and

22   month did that occur?

23   A    I want to say that was like end of January of

24   2017, beginning of February.

25   Q    And how did the conversation begin?

1    A    I guess when he came back he was upset.

2    Q    Who is he?

3    A    Jason Springer.  He came back from court, he

4    was upset, it was sometime that evening and he was

5    saying it had got denied.

6    Q    What got denied?

7    A    His bond.

8    Q    Okay.  What else did he say?

9    A    He was saying something about a flag or

10   something, they found a flag out of like 800 pages

11   off his Facebook page.

12   Q    Let me ask you this.  What did he say about --

13   what was his reaction to what had happened in court?

14   A    I knew he was upset.

15   Q    Specifically what did he say?

16   A    Like probably before that he was saying

17   something about he had a dream about the judge,

18   about killing or the judge dying.

19   Q    Let me ask this.  Prior to the conversation

20   about bond in late January, early February, he had

21   talked to you about his judge on another occasion?

22   A    Yes.

23   Q    And what did he say during that occasion?

24   A    That's when he say he had a dream about the

25   judge -- killing his judge.

1    Q      So fast forward to in your cell with

2    Mr. Springer the day of his bond hearing.  What did

3    he tell you on that day?

4    A      That he was upset because he didn't get no

5    bond.  Then later on, later on in the afternoon

6    that's when he say he wanted his judge to be killed.

7    Q      What did he specifically say about that?

8    A      He didn't say how he wanted the judge to be

9    killed, but that was the words that was told to me

10   from him, from Jason Springer.

11   Q      Had Mr. Springer talked to you about

12   explosives on other occasions?

13   A      Yes.

14   Q      What did he tell you about them?

15   A      It was an incident where he was saying if they

16   go through it he'll strap himself with bombs and if

17   he runs out of ammunition, he will kill himself and

18   kill everybody around him.

19   Q      When Mr. Springer said these things to you

20   about his judge or bombs or anything of that sort,

21   did you think that he was joking?

22   A      No, not at that point.

23   Q      Did you think that he was serious about these

24   claims?

25   A      Yes.

1    Q    And at some point did you report these

2    conversations to somebody?

3    A    Yes.

4    Q    Why did you do that?

5    A    Because I figured at that point like find out

6    the area he's from, I have family in that area, so

7    like it was that serious -- at first I didn't think

8    it was that serious until the judge part and then

9    about strapping himself with a bomb because there is

10   so much stuff going on it's kind of like hard to

11   like bypass that.  So I took into consideration that

12   thing and that was a threat, so I went and reported

13   it to a higher authority.

14        MR. GAMMONS:  I have no further questions,

15   Your Honor.

16        THE COURT:  Cross-examination, Mr. Hernandez?

17                CROSS EXAMINATION

18   BY MR. HERNANDEZ:

19   Q    Mr. White, you said you have two prior

20   convictions before all this stuff, correct?

21   A    Yes.

22   Q    Two prior felony convictions before the

23   charges that you're serving sentences for.

24   A    As far as my state charges or federal?

25   Q    State and federal.

1    A       Yes.

2    Q       Okay.  And as you've indicated, you're serving

3    a state sentence first and then you're serving a

4    longer federal sentence, correct?

5    A       Yes.

6    Q       And it appears that all of the cases that you

7    are now serving sentences for pretty much deal with

8    dishonesty, correct?

9    A       I don't want to say that because --

10   Q       Well, you wouldn't say that dealing in stolen

11   property is a dishonest act?

12   A       Not when I admit to it.

13   Q       Pardon?

14   A       Not when I admitted to the crime, I'm not

15   being dishonest.

16   Q       Committing the crime of dealing in stolen

17   property is a dishonest crime, is it not?

18   A       Yes, I guess.

19   Q       And you would agree with me that wire fraud is

20   a dishonest criminal act, correct?

21   A       Criminal act.  I don't know about dishonest,

22   but it's a criminal act.

23   Q       And it's dishonest to commit tax fraud,

24   correct?

25   A       Yes.

1   Q      And in addition I think you mentioned that you

2   made a false claim to who now?

3   A      It was tax -- false tax claims.

4   Q      And also burglary of an occupied dwelling, a

5   house.

6   A      Yes.

7   Q      You broke into some house.

8   A      Yes.

9   Q      And you're serving a two-year 10-month

10  sentence in state court?

11  A      Yes.

12  Q      And that's to be followed directly by a

13  consecutive, what is it, seven years prison on the

14  federal case?

15  A      Yes.

16  Q      Now, you've been sentenced, correct?

17  A      Yes.

18  Q      But are you aware of a rule called Rule 35?

19  A      Somewhat.

20  Q      Well, do you recall ever being told by your

21  attorney or by anyone else that there is a vehicle

22  in federal court that after sentencing -- it's

23  called Rule 35 --

24  A      Oh, yes, yes, yes.

25  Q      Okay.  And that again the prosecutor would

1    make a decision as to whether or not they want to

2    file a motion on your behalf to get a sentence

3    reduction, correct?

4    A    Yes.

5    Q    So your motivation here today is to try to

6    impress the prosecutor so that you can get a

7    sentence reduction.

8    A    No, my motivation is to tell the truth.

9    Q    Well, you have a history of being dishonest,

10   correct?

11   A    If that's what you want to call it.

12   Q    And you have previously testified as a jail

13   informant, correct?

14   A    This is my first time.

15   Q    Okay.  You've never previously testified in

16   court before?

17   A    Let me see, I think, yes, I did, I have on

18   behalf of a case back in 2009.

19   Q    Okay.  So you were not telling the truth when

20   you said this was your first time, correct?

21   A    No, I had to think.

22   Q    You had to think.

23   A    It's been a while ago.

24   Q    2009?

25   A    Yes.

1    Q      It's eight years ago.

2    A      Yes, probably eight years ago.

3    Q      You couldn't remember having testified when I

4    asked you that question.

5    A      No, because it's been a lot been going on

6    between that time.

7    Q      And despite the fact that after you testified

8    you committed a bunch of more dishonest acts, you

9    are now coming in as a government witness, correct?

10   A      I committed more crimes, but I don't know

11   about being dishonest.

12   Q      Well, I don't want to belabor the point, but

13   you will agree that tax fraud, wire fraud, dealing

14   in stolen property, false report --

15          MR. GEORGE:  Asked and answered.

16          THE COURT:  Overruled.

17   BY MR. HERNANDEZ:

18   Q      -- are dishonest acts, correct?

19   A      Yes, it's a crime.

20   Q      They're crimes, dishonest crimes.

21   A      Yes, crimes.  I don't know about dishonest.

22   Q      And you indicated that you know Mr. Anderson,

23   Chop, I think it's Traveous Anderson, that you were

24   in jail with him, correct?

25   A      Yes, I know him from -- from being in jail

1     with him.

2     Q       Oh, you were friends before you went to jail?

3     A       No, no.

4     Q       Okay.  But you know him from being at the

5     Pinellas County Jail.

6     A       Yes.

7     Q       You were in the same pod with him.

8     A       Yes.

9     Q       How long were you in the same pod with him?

10    A       I think he came in in November of 2016.

11    Q       So how long were you with him?

12    A       Approximately four months.

13    Q       And you also know Worm or Michael Taylor,

14    correct?

15    A       Yes.

16    Q       And you were also in the same pod with him,

17    correct?

18    A       Yes.

19    Q       And you discussed your testimony with these

20    guys, correct?

21    A       No, I never discussed anything with them.

22    Q       So your testimony is in all this time several

23    months with Worm and Chop, you never discussed your

24    testimony or the fact that you were providing

25    information on Jason Springer, that's your

1     testimony?

2     A       My testimony, first of all, it wasn't several

3     months, it was four months that I was with them.

4     And as far as it wasn't just Michael Taylor and

5     Mr. Anderson, it was -- I can't think of his name,

6     Timothy, go by Dream.

7     Q       My question, sir, is it your testimony that at

8     no time you discussed your testimony or your story

9     with Chop and Worm.

10    A       No.

11    Q       Never did.

12    A       No.

13    Q       You're certain of that.

14    A       I'm positive of that.

15            MR. HERNANDEZ:  That's all I have, Your Honor.

16            THE COURT:  Any redirect?

17                      REDIRECT EXAMINATION

18    BY MR. GAMMONS:

19    Q       Mr. White, you do have a plea agreement with

20    the United States?

21    A       Yes.

22    Q       And what is your understanding of what can

23    happen pursuant to that plea agreement if you

24    testify falsely in this matter?

25    A       Yes.

```
 1    Q      What is your understanding of what could
 2    happen?
 3    A      Oh, if it's false?
 4    Q      Correct.
 5    A      It's perjury.
 6    Q      And could you be charged with that?
 7    A      Yes.
 8           MR. GAMMONS:  I have no further questions,
 9    Your Honor.
10           THE COURT:  Thank you, sir, you may step down.
11    Watch your step when you climb out of there.
12           Call your next witness, please.
13           MR. GAMMONS:  United States calls Marc
14    Cognetti.
15           [Witness sworn]
16           COURTROOM DEPUTY CLERK:  Please be seated.
17    Please state your name and spell your last name for
18    the record.
19           THE WITNESS:  Marc Cognetti, C-o-g-n-e-t-t-i.
20                      DIRECT EXAMINATION
21    BY MR. GAMMONS:
22    Q      Good afternoon, Mr. Cognetti.
23    A      Good afternoon.
24    Q      Who are you currently employed by?
25    A      Pinellas County Sheriff's Office.
```

1    Q    How long have you been employed by the

2    Pinellas County Sheriff's Office?

3    A    Going on 17 years, November.

4    Q    When you first began with the Pinellas County

5    Sheriff's Office what was your job description?

6    A    A criminal justice specialist.

7    Q    And what are the duties and responsibilities

8    of a criminal justice specialist?

9    A    A criminal justice specialist their job duties

10    are working the control rooms which basically

11    control inner and outer doors of the facility and

12    monitoring cameras.

13    Q    And when you moved on from being a -- working

14    in the control room, what was your next job

15    assignment?

16    A    A classification specialist.

17    Q    And can you explain for the jury what

18    classifications is?

19    A    Yes, classifications basically we're in charge

20    of all the housing throughout the facility,

21    interviewing the inmates when they first come in,

22    and any other movement throughout the jail during

23    their stay.

24    Q    And tell me again what was your title when you

25    first joined the classification section?

1    A        Classification specialist.

2    Q        What are the duties and responsibilities of a

3    classification specialist?

4    A        What we do is we're in charge of the actual

5    physical interviews when the inmate first comes into

6    the facility and we assign them their housing.

7    After that -- everything else after that is done via

8    telephone from detention staff, medical, and we do

9    review files, inmate history and then movement also.

10   Q        And how long were you a classification

11   specialist?

12   A        2007, I believe.

13   Q        What was your next assignment?

14   A        Shift supervisor.

15   Q        What were your duties and responsibilities at

16   that point?

17   A        At that point I oversaw a shift of about six

18   or seven members in the actual department and ran

19   the shift.  We were also 8-hour shifts, 24 hours a

20   day.

21   Q        And how long did you remain in that same

22   position?

23   A        Until 2011.

24   Q        In 2011 how did your job responsibilities

25   change?

1      A       I was promoted to assistant supervisor of

2      classification, so I oversee the daily operation of

3      classification.

4      Q       And that's what your current title is?

5      A       Correct.

6      Q       How many individuals are in classifications

7      other than you?

8      A       It's a total of 30.  We have two sworn, a

9      lieutenant and a sergeant, and then we have three

10     shift supervisors and then the rest are specialists

11     and six administrative assistants which are clerks.

12     Q       To be clear, you are not a sworn law

13     enforcement officer?

14     A       No, sir.

15     Q       How did you become involved in the instant

16     investigation?

17     A       The current?

18     Q       Yes, sir.

19     A       We're in charge of the housing, it was a

20     request that I pulled all the files on.

21     Q       And you mentioned that there were two law

22     enforcement officers in the classification section.

23     What are their names?

24     A       Lt. Christina Kateda and Sergeant Adam Kenzel.

25     Q       And specifically what information were you

1      requested to follow up on in this investigation?

2      A      I was given names for housing and dates of

3      when the inmates were housed together.

4      Q      And did you do that?

5      A      Yes, I did.

6      Q      What records did you have to access to

7      determine that information?

8      A      I pulled the inmate visitation movement from

9      our jail management system and the housing history

10     also from the jail management.

11     Q      The inmate and visitor movement, is that a

12     query that you conduct regularly in your duties and

13     responsibilities?

14     A      Yes, we can.

15     Q      And what sorts of information does that query

16     provide?

17     A      On the visitation one?

18     Q      Yes, sir.

19     A      What that is, that's a date range, we can

20     enter date range and docket number.  A docket number

21     is what the inmate is assigned to when they come

22     into the facility and it will give us a date range

23     of when they went into a certain housing unit at

24     that time.

25     Q      And you also talked about the housing history.

1     Explain that to me a little bit more.

2     A     A housing history is based a little bit more

3     detailed, it breaks it down.  The inmate, when they

4     come into the facility, is assigned to housing and

5     if they're relocated at any time it just starts a

6     log of where they were, the date they went in, the

7     time they went in, and a generalized comment of why

8     they were assigned to that area.  If then they're

9     relocated after that, it will be just a repeat,

10    date, time, housing unit, and then an actual comment

11    of why they were relocated.

12    Q     And did you conduct these queries that you've

13    just explained relating to inmates and visitor

14    movement and housing history in relation to Jason

15    Springer?

16    A     Yes, I did.

17         MR. GAMMONS:  May I approach the witness, Your

18    Honor?

19         THE COURT:  Yes, sir.

20    BY MR. GAMMONS:

21    Q     Mr. Cognetti, I've handed you what has been

22    premarked for identification as Government

23    Exhibit 30.  Take a look at that and let me know

24    when you're ready to answer some questions about it.

25    A     Yes, sir, I'm ready.

1    Q       What is that document?

2    A       That's just basically a generalized form of

3    the inmates' housing or visitation log.

4    Q       The names on that document, are they the

5    names -- what are the names on that document, how

6    are you familiar with them?

7    A       They are all inmates that have currently or

8    been at the Pinellas County Jail.

9    Q       And did you run queries on those inmates?

10   A       Yes.

11   Q       What sort of queries?

12   A       Mainly the housing history.  I run the inmate

13   and visitor log and then I go over to the housing

14   history on each inmate.

15   Q       And are those the names that were given to you

16   in relation to this investigation?

17   A       Yes, it was.

18   Q       And does that summary chart represent the

19   information that you pulled from your database from

20   the housing history?

21   A       Yes, it does.

22           MR. GAMMONS:  Your Honor, at this time the

23   government requests to move into evidence Government

24   Exhibit 30.

25           THE COURT:  Is there any objection?

1          MR. HERNANDEZ:  No objection.

2          THE COURT:  Exhibit 30 is received.

3          MR. GAMMONS:  May I retrieve the exhibit, Your

4     Honor?

5          THE COURT:  Yes, sir.

6          MR. GAMMONS:  Permission to publish, Your

7     Honor?

8          THE COURT:  Yes, sir.

9     BY MR. GAMMONS:

10    Q     Showing you Government Exhibit 30.  I want to

11    start at the very top line underneath "Inmate, Jason

12    Springer."  Can you tell me what dates are

13    represented on this summary chart?

14    A     The first day is November 22, 2016, to

15    January 22nd of 2017, he was housed in housing unit

16    6C2.

17    Q     And what is 6C2?

18    A     It's a housing unit within Central Division.

19    Q     After that?

20    A     After that would have been January 22nd of

21    2017 to February 10th of 2017, in 2C2 housing unit,

22    Central Division.

23    Q     And are both of those at the Pinellas County

24    Jail?

25    A     Yes.

1    Q    Can you read the information for Inmate

2    Michael Taylor?

3    A    Yes.  Michael Taylor, October 19th of 2016 to

4    January 22nd of 2017, he was housed in 6C2, Central.

5    And then January 22, 2017, through February 10,

6    2017, 2C2, Central Division.

7    Q    Can you read the information for Traveous

8    Anderson?

9    A    Yes.  Traveous Anderson, November 10, 2016, to

10   January 22, 2017, he was housed in 6C2, Central

11   Division.  January 22, 2017, through February 10th

12   of 2017 he was housed in 2C2, Central Division.

13   Q    And what about the housing history for DeMario

14   Sleigh?

15   A    DeMario Sleigh.  November 1st, 2016, to

16   January 22nd, 2017, he was housed in 6C2, Central

17   Division.  And then January 22nd, 2017, through

18   February 10th, 2017, he was housed in 2C2, Central

19   Division.

20   Q    Can you read the housing history for

21   Christopher Barton?

22   A    Christopher Barton, April 23, 2016, through

23   January 22, 2017, he was housed in 6C2 Central.

24   January 22, 2017, through January 25, 2017, he was

25   housed in 2C2, Central Division.

1    Q       And finally can you recite the housing history

2    for Daniel White?

3    A       Daniel White, August 22nd, 2016, to

4    January 22nd, 2017, he was housed in 6C2 Central

5    Division.  January 22, 2017, through February 10,

6    2017, he was housed in 2C2 Central Division.

7    Q       After conducting these queries did you have

8    any other further involvement with this

9    investigation?

10   A       No.

11           MR. GAMMONS:  I have no further questions,

12   Your Honor.

13           THE COURT:  Cross-examination?

14                    CROSS EXAMINATION

15   BY MR. HERNANDEZ:

16   Q       So the chart that we've just seen, sir, would

17   indicate that Michael Taylor, Traveous Anderson,

18   Daniel White, all were in the same pod together for

19   several months?

20   A       Correct.

21   Q       And there are no restrictions as far as

22   inmates are allowed to talk to each other, correct?

23   A       Yeah, it's an open dorm.

24   Q       Thank you.

25           THE COURT:  Any redirect?

1          MR. GAMMONS:  No, Your Honor.

2          THE COURT:  Thank you, sir, you may step down.

3     Watch your step.

4          Call your next witness.

5          MR. GAMMONS:  The United States calls Phillip

6     Antonio.

7          [Witness sworn]

8          COURTROOM DEPUTY CLERK:  Please be seated.

9     Please state your name and spell your last name for

10    the record.

11         THE WITNESS:  Phillip Antonio, A-n-t-o-n-i-o.

12                    DIRECT EXAMINATION

13    BY MR. GAMMONS:

14    Q     Good afternoon, sir.

15    A     Good afternoon.

16    Q     How are you currently employed?

17    A     I work for the Pinellas County Sheriff's

18    Office.

19    Q     And how long have you been employed with the

20    Pinellas County Sheriff's Office?

21    A     Approximately five and a half years.

22    Q     When you began with the Pinellas County

23    Sheriff's Office what was your job description?

24    A     I was a part-time bailiff in the courthouse.

25    Q     What are the duties and responsibilities of a

1    bailiff?

2    A      To administer security within the facility and

3    also assure security inside the courtrooms.

4    Q      And at some point did your job description

5    change with the Pinellas County Sheriff's Office?

6    A      Yes, approximately a year and three months

7    later.

8    Q      And what was your next assignment?

9    A      I was assigned to the Patrol Operations

10   Bureau.

11   Q      What were your duties and responsibilities in

12   that capacity?

13   A      Responding to calls for service on the patrol

14   level.

15   Q      How long did you do that for?

16   A      Approximately three and a half years.

17   Q      And what was your next assignment after the

18   patrol division?

19   A      I was assigned as a detective in the Detention

20   Investigation Unit.

21   Q      What does the Detention Investigation Unit do?

22   A      We are assigned to the jail and what we do is

23   we investigate crimes that happen inside of the

24   facility.

25   Q      Are there any other -- well, how many folks

1    are in the same unit as you?

2    A       Six people total.

3    Q       And where do you physically sit, are you in

4    the jail?

5    A       Yes, we have an office inside of the facility.

6    Q       Are you aware of the investigation of Jason

7    Jerome Springer?

8    A       Yes, I am.

9    Q       How did you first become familiar with that

10   case?

11   A       It was assigned to -- the agent came into our

12   office and notified our corporal of the

13   investigation and that he was being housed in our

14   facility.

15   Q       And what was your specific role with regard to

16   that investigation?

17   A       I was assigned with Detective Belvis and

18   Corporal Linder to administer a search of the

19   inmate's cell.

20   Q       And that's Jason Springer's cell?

21   A       Yes, sir.

22   Q       And who are those other two law enforcement

23   officers you just mentioned?

24   A       They are detectives within the detention

25   investigation unit.

```
1    Q      And what are their names, for the record?

2    A      Edwin Belvis and paul Linder.

3    Q      Did you in fact search the cell of

4    Mr. Springer?

5    A      Yes, I did.

6    Q      Who were you accompanied by on that occasion?

7    A      Detective Belvis and Detective Linder.

8    Q      And how did you know what sorts of information

9    you were searching for on that day?

10   A      We were just notified to search for anything

11   that pertains to threats against a judge.

12   Q      Generally speaking was there any evidence

13   collected on that occasion?

14   A      Yes, there was.

15   Q      Once you collected the evidence, what did you

16   do with it?

17   A      We walked the evidence back to our office and

18   it was provided to Corporal Linder which I believe

19   then provided it to Agent Self.

20   Q      And were photographs taken on that occasion of

21   the evidence?

22   A      Yes, they were.

23           MR. GAMMONS:  May I approach the witness, Your

24   Honor?

25           THE COURT:  Yes, sir.
```

1    BY MR. GAMMONS:

2    Q     I've handed you what has been premarked for

3    identification as Government Exhibit 16.  Can you

4    take a look at that and let me know when you're

5    ready to answer some questions about it.

6    A     I'm ready.

7    Q     Without describing what's in the photograph,

8    do you recognize the photograph?

9    A     Yes, I do.

10   Q     How do you recognize it?

11   A     It's evidence that was taken on the day of

12   searching the cell.

13   Q     And does that photograph fairly and accurately

14   depict the actual piece of evidence as it appeared

15   on the day of the search?

16   A     Yes, it does.

17         MR. GAMMONS:  Your Honor, at this time the

18   government would request to move into evidence

19   Government Exhibit 16.

20         MR. HERNANDEZ:  No objection.

21         THE COURT:  16 is now received, thank you.

22         MR. GAMMONS:  Your Honor, may I retrieve the

23   exhibit?

24         THE COURT:  Yes, sir.

25         MR. GAMMONS:  Your Honor, may I have

1    permission to publish?

2        THE COURT:  Yes, sir.

3    BY MR. GAMMONS:

4    Q    Showing you page 1 of Government Exhibit 16.

5    Do you recognize Government Exhibit 16?

6    A    Yes.

7    Q    What is it?

8    A    It's a picture of a Quran.

9    Q    And where did you find the Quran depicted on

10   page 1 of Government Exhibit 16?

11   A    It was underneath the mattress inside of the

12   cell.

13   Q    Inside of whose cell?

14   A    Inmate Springer.

15   Q    I'm showing you page 2 of Government

16   Exhibit 16.  What does that photo depict?

17   A    It depicts the judge's name.  And that was

18   located in the back of the Quran that was taken from

19   underneath the bunk.

20   Q    Sorry, go ahead.

21   A    It was taken from underneath the bed.

22   Q    Is the page depicted in page 2 of Government

23   Exhibit 16 written in the Quran?

24   A    Yes.

25   Q    And why specifically did you collect this

1    piece of evidence?

2    A       Because we were informed that if we found

3    anything pertaining to the threats or the judge's

4    name or anything of nature of threats, then we would

5    take it in and provide it to Agent Self.

6    Q       And after you took the photographs of the

7    things that you thought may be of evidentiary value,

8    what did you do with the actual physical evidence?

9    A       It was returned to the inmate.

10   Q       And other than this search did you have any

11   other involvement in this investigation?

12   A       No, sir.

13           MR. GAMMONS:  I have no further questions,

14   Your Honor.

15           THE COURT:  Cross-examination?

16                    CROSS EXAMINATION

17   BY MR. HERNANDEZ:

18   Q       Sir, you testified that you seized evidence

19   that was evidence of a threat to a federal judge,

20   correct?

21   A       Yes, sir.

22   Q       And you would agree with me that a picture of

23   the Quran is not a threat, correct?

24   A       Yes, sir.

25   Q       And the fact that the -- was this the back of

1       the Quran where there was the words "Elizabeth

2       Kovachevich," "U.S. attorney," and "circuit court

3       clerk," that was in the back of the Quran?

4       A       I believe so.

5       Q       Okay.  And you would agree with me that there

6       was nothing threatening about those three lines,

7       "Elizabeth Kovachevich," "U.S. attorney," and

8       "circuit court clerk."

9       A       Yes, sir.

10      Q       That's all I have, thank you.

11              THE COURT:  Any redirect?

12              MR. GAMMONS:  No, Your Honor.

13              THE COURT:  Thank you, sir, you may step down.

14      Watch your step.

15              Call your next witness.

16              MR. GEORGE:  Your Honor, may I approach?

17              THE COURT:  Yes, sir.

18              (At which time the following sidebar

19      discussion was held:)

20              MR. GEORGE:  Your Honor, at this point we're

21      getting to the portion of the evidence where the--

22      evidence that's subject of the motion in limine is

23      going to become more relevant and we're going to

24      seek to admit it as well as the judge's testimony.

25      I don't know if there is a good place to break and

1    potentially finish that conversation with Your Honor

2    if you want to have it outside the presence of the

3    jury.

4         THE COURT:  Let's do that.

5         (At which time the sidebar discussion was

6    concluded and the proceedings resumed as follows:)

7         THE COURT:  Members of the jury, I'm going to

8    take an earlier break than we ordinarily do, so we

9    can have a discussion about some procedures.  Let's

10   take 15 minutes for a comfort break, please.  Please

11   don't discuss the case among yourselves.

12        (The jury retired to the jury room.)

13        THE COURT:  Be seated, please.  Let me have

14   Mr. George proffer what it is you want to delve into

15   now.

16        MR. GEORGE:  Thank you, Your Honor.  We are

17   getting to the portion of the trial where the

18   evidence that was described in the motion in limine,

19   the government's motion in limine regarding ISIS

20   specifically and that evidence is four pictures from

21   the defendant's cell phone, three Facebook posts, as

22   well as one phone call that the defendant placed

23   from the Pinellas County Jail, the executive order

24   that was President Trump's -- what's referred to as

25   the travel ban, the country report from the State

1          Department, and then the judge's testimony --

2                THE COURT:  Sorry, what was that one?

3                MR. GEORGE:  The country report, it's from the

4          State Department and it's two very brief

5          paragraphs --

6                THE COURT:  What does that have to do with

7          this case?

8                MR. GEORGE:  Your Honor, that is a public

9          record.

10               THE COURT:  I know it's a public record.  What

11         does it have to do with this case?

12               MR. GEORGE:  It says that ISIS is turning

13         drones into weapons and that's really the extent of

14         it.  And I'd be happy to read that to you, it's very

15         brief.

16               THE COURT:  What is it dated?

17               MR. GAMMONS:  July 2017.

18               THE COURT:  After the alleged threats were

19         made?

20               MR. GAMMONS:  That's correct.  It's a country

21         report that the State Department issues every year

22         and this year -- when it was published it covered

23         the year before.

24               THE COURT:  What was the last item?

25               MR. GEORGE:  Judge Kovachevich's testimony,

1     Your Honor.

2          THE COURT:  Take that up in a moment

3     separately.

4          The four pictures on his cell phone, are they

5     dated?

6          MR. GEORGE:  They are according to the

7     forensic report from the defendant's cell phone that

8     the FBI conducted.

9          THE COURT:  What were they taken?

10          MR. GEORGE:  The pictures were stored in July

11     of 2016 which was -- he was arrested in November of

12     2016 and they were on the phone that he had at the

13     time of his arrest.

14          THE COURT:  What do they depict generally?

15          MR. GEORGE:  I can show them, Your Honor.

16          THE COURT:  I don't need to see them.  Just

17     tell me.  I trust you.

18          MR. GEORGE:  One is the ISIS flag, just a

19     picture of that.  One is a picture of a person with

20     the circular logo that's found on the ISIS flag in

21     the top right-hand corner with the comment that says

22     "sometimes the worst people create the best futures"

23     or something to that effect.

24          THE DEFENDANT: [Inaudible words].

25          THE COURT:  Mr. Springer, if you need to talk

1    to Mr. Hernandez, hit your mute button, but don't

2    just start talking out loud, okay?  That doesn't

3    help.

4         Go ahead, Mr. George.

5         MR. GEORGE:  I believe it says, "Sometimes

6    people with the worst past create the best futures,"

7    Your Honor.  It's a picture of -- like an

8    illustration of a person with an assault rifle slung

9    across his back, dressed in black, and then with

10   that logo from the ISIS flag on the top right-hand

11   corner.

12        THE COURT:  Those are the four pictures?

13        MR. GEORGE:  That's correct.  There is a

14   statement on that photo found on his phone and it

15   discusses Jihad, Your Honor, but that same photo is

16   cropped to remove that statement about Jihad and was

17   found on his Facebook.

18        THE COURT:  Well, let's go to the three

19   Facebook posts that you just referenced.  What do

20   they depict?

21        MR. GEORGE:  Sure.  One is that picture from

22   Mr. Springer's cell phone, cropped to remove that

23   top portion about Jihad, and it was posted on his

24   Facebook account and it's got that small ISIS

25   circular logo that's found on the ISIS flag in the

1    top right-hand corner.

2         THE COURT:  What else?

3         MR. GEORGE:  One of them is just a very brief

4    comment made by the defendant which says that ISIS

5    came from the Iraqi Army freedom fighters, if

6    anything.

7         THE COURT:  What else?

8         MR. GEORGE:  One is a series of statements not

9    specifically related to ISIS but talking about death

10    and that death is the best teacher.

11         THE COURT:  What are the dates of those posts?

12         MR. GEORGE:  The posts are all from November

13    of 2017, the month that Mr. Springer was arrested.

14    2016, I'm sorry.

15         THE COURT:  I was going to say, there's

16    something wrong here.  2016?

17         MR. GEORGE:  That's correct, Your Honor.

18         THE COURT:  The telephone call, when did that

19    occur?

20         MR. GEORGE:  That occurred from the Pinellas

21    County Jail in December, December 19, 2016.

22         THE COURT:  To who?

23         MR. GEORGE:  To his -- whom he refers to as

24    his wife, Ms. Tokatlioglu.  And the context for that

25    call, Your Honor, is that was the day they're

1      talking about the assassination of the Russian

2      ambassador in Turkey where he was shot inside of a

3      museum, I believe.  And when the news coverage of

4      that came on, Mr. Springer was on the phone and then

5      there was a reference apparently to ISIS or

6      something about ISIS because Mr. Springer, in what I

7      would characterize as a very excited fashion, says,

8      "There they go, the boys with the black flag, I

9      can't help it."  Which is entirely consistent with

10     the testimony from the inmates who were saying that

11     Mr. Springer would get excited when he saw reports

12     about attacks and the like on the news.  And that

13     was, like I said, at a time when he was in jail with

14     those inmates.

15          THE COURT:  That's it, that's a short clip

16     from that conversation, I take it?

17          MR. GEORGE:  The whole phone call will be

18     offered as the evidence, but we'll play just a very

19     beginning clip where Ms. Tokatlioglu informs

20     Mr. Springer about the assassination, and then we'll

21     fast forward to play a short clip where Mr. Springer

22     has that reaction.

23          THE COURT:  All right.  Mr. Hernandez, let's

24     address these five items first, please, not the

25     testimony of the judge.

1          MR. HERNANDEZ:  Judge, I'm objecting to all of

2     it coming in because I would argue that it's

3     irrelevant.  The fact that Mr.  -- you know, the

4     testimony about drones and the testimony about ISIS

5     has nothing to do with the crime that is alleged.

6     Anybody can be upset with a judge or a court's

7     decision and have hatred or get angry and say things

8     whether they mean it or not.  You don't have to be a

9     member of ISIS or an ISIS sympathizer to make those

10     kinds of threats.

11          And the business about the drones, first of

12     all, the whole thing sounds like a fantasy that

13     something like that could be actually executed, but

14     there is no evidence being presented that there was

15     ever any plan hatched and there is nothing unique

16     about ISIS and drones.  Anybody that wants to commit

17     a violent act that has some capabilities of working

18     with drones can use drones.  So to inject the ISIS

19     thing into it just is simply to inflame the jury and

20     I would submit it has no probative value whatsoever.

21          But any type of probative value is far

22     outweighed by the unfair prejudice because whether

23     or not -- the jury has to decide whether or not

24     these were true threats or not, that has nothing to

25     do with whether or not -- whatever my client's

1    political views are.

2         THE COURT:  Do you agree that the inquiry

3    concerning whether or not the threats were real or

4    true is an objective one as opposed to subjective?

5    Objective from the standpoint of those who heard the

6    threats.  That seems to be what Alaboud -- what is

7    it, Mr. George?

8         MR. GEORGE:  I say Alaboud, but I could be

9    wrong.

10        THE COURT:  I believe that's what Alaboud said

11   although it's dealing with a different statute, it's

12   the same subject matter, a threat being

13   communicated.

14        MR. HERNANDEZ:  Well, answer to your question

15   is I think a threat can be interpreted as a true

16   threat depending on whoever is making the

17   allegations, whether it's any -- whether it's a hate

18   group or just an angry person.

19        I can understand being allowed the jail

20   informants to say what his demeanor was because

21   certainly if he was joking and laughing, that would

22   be something that could be evaluated.  But whether

23   or not he was saying that I'm an ISIS sympathizer if

24   that's what he was allegedly saying, I don't think

25   it makes any difference, it's just unfairly

1    prejudicial.

2         THE COURT:  Thank you.  Mr. George, what is

3    the strongest authority that you believe supports

4    the admissibility of this evidence?  What case?

5         MR. GEORGE:  Are you referring to a specific

6    piece of evidence or just all of it collectively?

7         THE COURT:  Well, I think it can all be

8    considered collectively.  All the ISIS evidence that

9    you want to put in.

10         MR. GEORGE:  With respect to the phone call,

11    that's something that happened in jail and

12    corroborates --

13         THE COURT:  Now what was my question?

14         MR. GEORGE:  The strongest evidence, Your

15    Honor.

16         THE COURT:  The strongest case.

17         MR. GEORGE:  Excuse me, the strongest case

18    would be in the Eleventh Circuit the Alaboud case

19    which says that the context and the nature of the

20    threat is relevant to the analysis.

21         So knowing and presenting to the jury, having

22    the evidence from Mr. Springer's cell phone himself,

23    the unbiased evidence that corroborates the inmates

24    and shows that Mr. Springer does have in fact or at

25    least the jury could conclude that there are

1    sympathies, like the inmates are saying, goes to

2    that nature and that context that Alaboud considers

3    and contemplates.

4         THE COURT:  Do you think that's a stronger

5    case than the Lehder-Rivas case?

6         MR. GEORGE:  That case, if I'm not mistaken,

7    that's where the Nazi-related evidence was admitted

8    to show -- I believe that was a drug case.

9         THE COURT:  Yes, sir.

10        MR. GEORGE:  Your Honor, I would rely on that

11   case as well.

12        THE COURT:  Well, same general proposition

13   that the motives of the defendant can be explained

14   by admitting essentially extraneous or --  that's

15   the wrong word.  Extrinsic evidence of beliefs or

16   motives or things of that nature?

17        MR. GEORGE:  That's right, Your Honor, and I

18   think they all ultimately explain the pattern of

19   conduct here and what ultimately led to this

20   criminal charge.  They explain how Mr. Springer got

21   from A to B.  They corroborate that testimony and

22   they show that while the intent is a specific intent

23   in the statute -- and I use that only to say that we

24   have to prove something specifically.  But there are

25   many motivations that could cause Mr. Springer to

1    make these threats.  And also it goes to the fact

2    that he meant what he said.  I think that gives the

3    jury the ability to reasonably interpret that, that

4    this was not just some flip comment by somebody in

5    the heat of passion or heat of anger or heat of

6    frustration, that this is thought out.

7         And I would just add, Your Honor, that in

8    Mr. Hernandez's opening he previewed this idea and I

9    think he said specifically that there is going to be

10   no evidence that Mr. Springer had any sympathies

11   with ISIS.  And this completely addresses that.

12        THE COURT:  So you're going to prove up your

13   case by anticipating a defense argument?

14        MR. GEORGE:  Not necessarily in anticipation,

15   but now that the jury has heard about it, it's just

16   incorrect.  Or at least there is evidence that --

17        THE COURT:  The only reason they have heard

18   about it is that I indicated that I thought it was

19   coming into evidence.  I can't blame Mr. Hernandez

20   for pointing out what he believes the evidence will

21   show or not show.  Give me just a minute.

22        (Brief pause)

23        THE COURT:  All right.  I have given serious

24   consideration to this subject matter.  It is clearly

25   inflammatory and prejudicial, as the Eleventh

1    Circuit recognized in United States vs. Lehder-Rivas

2    at 955 F.2d 1510, pinpoint 1518.  In that case,

3    however, the court found that there was at least

4    enough probative value to outweigh the unfair

5    prejudice when the testimony of Lehder-Rivas

6    imitating Hitler's organizational genius, et cetera,

7    as explaining or establishing his motives in

8    smuggling cocaine and bringing down the United

9    States even after he'd made millions of dollars.

10        It looks like a pretty classic 403 analysis,

11   although 404(b) is the rule cited by the court.

12        But for Michael Taylor's testimony, I would

13   keep this evidence out.  Michael Taylor testified

14   that -- I'm paraphrasing of course -- in the

15   conversation he had with the defendant the defendant

16   was complaining about the judge being too old and

17   she shouldn't have been giving out the sentences

18   that she did, that he was going to kill her, and

19   when he came back from Jordan he was going to make a

20   bomb and run it into the courthouse and if other

21   inmates died, that would be a sacrifice for Allah.

22   He was angry, mad, really wanted to do it, and

23   Taylor thought he was serious because he had

24   expressed sympathies and followed ISIS.

25        That could explain the defendant's motivations

1      in threatening a constitutional officer of the

2      United States.

3            Traveous Anderson's testimony was not nearly

4      as compelling, although he indicated, as did one of

5      the other witnesses, that the defendant prayed every

6      day that his judge would die.  He mentioned running

7      the drone into her office, talked about future

8      missions in 2021 or 2025 when drones were going to

9      be used.  And the defendant professed a belief that

10     he needed to kill who he could and he would be saved

11     for it.

12           His conversations with Daniel White, discussed

13     the defendant's Muslim beliefs.  After being denied

14     his bond, strapping himself with a bomb, killing

15     himself if he ran out of ammo.

16           There is therefore at least some probative

17     value to this evidence.  It explains his motives,

18     the context in which these threats were made, if the

19     jury believes them.  And under the analysis of

20     Lehder-Rivas and Alaboud, the context in which the

21     communication is made is something that the fact

22     finder should consider.

23           So with respect to the items on his cell phone

24     that were stored in July of 2016, which predates the

25     threats, the defendant's objections are overruled.

1          With respect to the Facebook posts, also dated

2     prior to the threats, the defendant's objections are

3     overruled.  Telephone conversation occurred in

4     December of 2016, roughly a month before one of the

5     threats was made which is the subject of Count One.

6     The defense objections will therefore be overruled.

7          The travel ban -- that's dated, is it not,

8     Mr. George?

9          MR. GEORGE:  It is, Your Honor, it's dated

10    January 27th.

11         THE COURT:  That will be allowed in.  The

12    country reports dated July 2017, the objection to

13    that is sustained; that cannot have probative value

14    to something which occurred six months before.

15         I think this is a very close call, but guided

16    by Lehder-Rivas and the other decision I've cited,

17    the Alaboud, 347 F.3d, pinpoint 1297-1298 area,

18    discussion in that 1297-1298 area, instruct me to

19    allow this evidence in, but with a cautionary

20    instruction similar to what the parties have at

21    least proposed.

22         It's tantamount to a 404(b) similar act

23    instruction, but these are not necessarily bad acts

24    or other crimes and I would think that the proposed

25    instruction, which I intend to give as soon as any

1          of this comes out or at least after it's come out,

2          is sufficient to instruct the jury that in a

3          evidence alone is not sufficient to find the

4          defendant guilty, but could be used for the limited

5          purpose of considering whether he made a true threat

6          in light of the other evidence that you will see and

7          hear in the trial.

8               There is a distinct absence of any reference

9          to motive, opportunity, intent, preparation, plan,

10         knowledge, et cetera, under 404(b), Mr. George.  I

11         don't want to give a cautionary instruction that's

12         not adequate.  If it's offered by the government to

13         prove context and motive, the jury should be told

14         that's how they should consider it.  Would you not

15         agree?

16              MR. GEORGE:  Your Honor, that is one purpose

17         for admitting it.  I agree with Your Honor's

18         previous statement though that this doesn't real

19         feel like 404(b) evidence necessarily, which is why

20         that proposed instruction was drafted the way it was

21         so as to limit how the jury can consider it with

22         respect to the true threat which is the issue in the

23         case as opposed to kind of wedged into the 404(b)

24         analysis.

25              THE COURT:  Well, would it be admissible to

1      show context?

2              MR. GEORGE:  Your Honor, I think as far as --

3              THE COURT:  It's yes or no.

4              MR. GEORGE:  Yes.

5              THE COURT:  How about motive?

6              MR. GEORGE:  I agree.

7              THE COURT:  How about intent?

8              MR. GEORGE:  The intent in this case, Your

9      Honor, we have to prove specifically is intent to

10     retaliate, so it goes -- to the extent that motive

11     and intent are different, I think it would go to

12     motive more appropriately than intent.

13             THE COURT:  How about plan?

14             MR. GEORGE:  Yes, Your Honor.

15             THE COURT:  You think it's an intent to

16     retaliate as opposed to just general intent?  I

17     shouldn't say general intent, I don't mean that

18     general versus specific.  You're saying it's a

19     specific intent offense.

20             MR. GEORGE:  Yes, Your Honor, by statute one

21     of the elements is the intent to retaliate.

22             THE COURT:  So it would seem to me that the

23     jury should have that guidance, it should be

24     considered by them for the limited purpose of

25     considering the context in which the statements were

1    made, the defendant's motive, his intent to

2    retaliate, and his plan.  Would you object to that?

3         MR. GEORGE:  No, Your Honor.

4         THE COURT:  Mr. Hernandez, without waiving

5    your prior objections, does that sound --

6         MR. HERNANDEZ:  Yes, sir, without waiving the

7    objections.

8         THE COURT:  All right.  Now, what is it that

9    Judge Kovachevich will be testifying about?

10        MR. GEORGE:  Your Honor, the subject of Judge

11   Kovachevich's testimony is kind of multifold.  The

12   first is we have to establish that she's a judge

13   so --

14        THE COURT:  That I understand.  I'm talking

15   about the problematic evidence.

16        MR. GEORGE:  Understood, Your Honor.  The

17   initial plan was to have the judge talk about why

18   she recused herself from Mr. Springer's case, which

19   was that she received information from the marshals

20   about the threat.  And then ultimately have her

21   testify about the specific threat to her office,

22   meaning this drone threat, without getting into any

23   other --

24        THE COURT:  How does she know anything about

25   that?

1          MR. GEORGE:  Through the information provided

2     by the marshals during their investigation.

3          THE COURT:  When did they communicate that to

4     her?

5          MR. GEORGE:  After they were doing interviews

6     with the inmates.  I believe Deputy Self testified

7     earlier when they were doing the interviews they

8     would report the results of those interviews to the

9     judge.

10          THE COURT:  How much time would have passed

11     from when the threats were made, approximately?

12          MR. GEORGE:  Oh, when the threat -- the

13     alleged threats in this case were made on or about

14     the 27th of January.  I believe the investigation,

15     once it was first reported, was end of February,

16     early March when the bulk of the initial round of

17     interviews were done and the information was getting

18     back.

19          THE COURT:  What do you think she's going to

20     say about the threat and drones being flown into the

21     building?

22          MR. GEORGE:  I expect Judge Kovachevich to

23     testify that she learned that the defendant

24     threatened to use an explosives packed drone to fly

25     into her office.

1          THE COURT:  Mr. Hernandez, are you going to

2     object to any of that?

3          MR. HERNANDEZ:  Yes, sir.

4          THE COURT:  On what grounds, please?

5          MR. HERNANDEZ:  Hearsay, that all of this

6     information was relayed to her.

7          THE COURT:  Well, the threat itself is a

8     crime, so I don't know how that's hearsay.  But

9     attributing it to someone, Mr. George, seems like

10    hearsay to me because that would be offered for the

11    truth of the matter.

12         MR. GEORGE:  Your Honor, I think there is --

13    my response would be there is two levels of hearsay

14    here.  First, from Mr. Springer to the defendant,

15    and the defendant's reporting that, so that is the

16    statement --

17         THE COURT:  You better say that again.

18         MR. GEORGE:  Sure.  The first level of hearsay

19    would be what the inmates told Deputy Self that

20    Mr. Springer had said and that is a statement by the

21    defendant.  The next level of hearsay --

22         THE COURT:  I would think a statement

23    threatening a federal judge is not hearsay because

24    it's the crime.

25         MR. GEORGE:  It is a threat, Your Honor,

1    that's correct.

2         THE COURT:  So we already have evidence that

3    he made these threats to these inmates and they

4    relayed them to law enforcement.  That's in

5    evidence.

6         MR. GEORGE:  Right.

7         THE COURT:  We have evidence that the deputy

8    communicated that to Judge Kovachevich that a threat

9    had been made.  What more can she say?

10        MR. GEORGE:  Her reaction.  So that's the

11   basis for her reaction and how she reacted to this

12   threat, what she did and whether she takes it

13   seriously.

14        THE COURT:  Well, you know and I know that

15   she's not going to be modest in her description of

16   what she did or reacted to.  What is she going to

17   say?

18        MR. GEORGE:  I expect that she's going to say

19   that she has been in contact with the marshals, that

20   she hasn't actually sought any kind of security

21   detail, that she has taken other steps, but because

22   she's fearful she doesn't want to tell the public

23   what those steps are, but that she takes the threats

24   seriously.  And that in her career as a judge for

25   over 40 years she's received lots of threats but

1    this one to her is different.

2         THE COURT:  But how is she going to testify to

3    the jury about who made the threats without there

4    being a hearsay objection?

5         MR. GEORGE:  To the extent that it could be

6    argued it's not coming from the defendant, I think

7    the jury would be allowed to make a conclusion based

8    on the evidence they have heard.  And of course --

9         THE COURT:  Well, I mean, is there a way that

10    you can present the testimony so she doesn't

11    attribute the threat to a particular individual?

12         MR. GEORGE:  Given the whole context of her

13    testimony, Your Honor, I don't think so because she

14    recused herself from Mr. Springer's case and I think

15    the natural inference, fairly to your point, is that

16    the threat is coming from him.  And I don't think

17    there is a way -- just candidly, I don't know that

18    there would be a way to disguise that or --

19         THE COURT:  You may have a point.  But other

20    than explaining why she recused, the jury can

21    certainly infer it's because the deputy

22    communicated, appropriately, the nature of the

23    threat and the source that the investigation

24    suggested.  What next?

25         MR. GEORGE:  That she took it seriously, Your

1      Honor.  What the threat was, so the jury at least

2      knows that it's consistent with the testimony that's

3      come out, that it was a threat to use a drone, and

4      then that she took it seriously and she's taken it

5      seriously because of the explosives, explosives are

6      something that's -- that had been used at least in

7      the past to kill judges even here in the Eleventh

8      Circuit.

9           THE COURT:  You're going to ask that from her?

10           MR. GEORGE:  That's a reason that she's taking

11      this seriously, Your Honor, that she has told us.

12           THE COURT:  Well, we are in on in my view at

13      least very thin ice here because those have nothing

14      to do with this case.

15           MR. GEORGE:  Your Honor, I'm happy to stop at

16      the point with her of recusal if Your Honor is not

17      inclined to let this in.

18           THE COURT:  It's not that I'm inclined not to

19      let the recipient indirectly of a threat explain why

20      it concerned her; that is appropriate evidence under

21      Alaboud, although in that case the threat was made

22      directly to the attorney and the efforts and

23      precautions that he took as a result of the threat.

24           But starting to bring in other extrinsic

25      evidence of other explosives and shootings of

1    judges, state and federal, how am I to ensure that

2    the jury doesn't -- unless it's explained to the

3    jury by the judge that she is aware of other

4    situations unrelated to this case where judges have

5    been shot or explosives have been used to

6    assassinate or injure judges.  That's common

7    knowledge if one is interested in that subject, it's

8    in the public domain.  I guess what I'm concerned

9    about is just how far that your witness intends to

10   go with this.

11         MR. GEORGE:  I understand, Your Honor.  I

12   think the testimony will be limited to what I had

13   just mentioned.  Knowing the questions I'm going to

14   ask and knowing Your Honor's concerns, I would

15   certainly be willing to not necessarily lead the

16   witness but focus questions in such a way that are

17   going to require narrow responses.

18         THE COURT:  Let me hear from Mr. Hernandez.

19   Maybe this will put things in a different context.

20         MR. HERNANDEZ:  Judge, I'm not sure how to

21   address it because obviously my first position is

22   that anything that was told to her by the marshall

23   or someone else is hearsay and should not be

24   admitted to.  Obviously that's what I want.  If the

25   court is going to limit -- obviously the more

1    limited the better because I can certainly see the

2    increasing problem if the judge is going to -- Judge

3    Kovachevich is going to testify about other events

4    that have nothing to do with this case.

5         THE COURT:  Well, I think the context which I

6    would expect it will be in explaining why she took

7    the threatened serious, she could rely on her

8    experience as a federal judge and her knowledge of

9    other instances in which judges, state and federal,

10   have been attacked.  That would be a reasonable

11   basis on which she would take that threat or these

12   threats seriously.

13        If she starts getting into details about a

14   federal judge in a certain district receiving a

15   package of explosives, we're getting into a

16   dangerous area and I would agree with you.  But

17   that's close to all of us, including the lawyers in

18   this courtroom, even though it happened 20-some-odd

19   years ago.  But I would expect that that would be

20   tempered to simply explain the basis on which she

21   took the threat seriously.

22        So beyond that, what are your thoughts?

23   Anything else?

24        MR. HERNANDEZ:  Not as to that point.  I have

25   another matter I wanted to briefly address the

1     court.

2          THE COURT:  Let me take care of this first.

3     Well, first thing, Mr. George, Mr. Hernandez is

4     sharing with us, as I would if I was defending the

5     case, that anything told to Judge Kovachevich would

6     necessarily constitute hearsay.  Do you have any

7     guidance, any cause law for me?  This would be what

8     the deputy marshall told her.

9          MR. GEORGE:  Your Honor, on the specific

10    question of -- in a threat context of relating

11    information to a third party, then asking that third

12    party how they felt about it at trial, the

13    government wasn't able to find any cases

14    specifically on point.  The closest thing would be

15    effect on the listener case law that shows that

16    information conveyed by one party to the other in

17    order to show at trial the effect on the listener --

18         THE COURT:  That's Alaboud, where the

19    recipient actually received it on the telephone.

20         MR. GEORGE:  That's exactly right, Your Honor.

21    And all the case law that I had seen in researching

22    this were -- at least the implication was the person

23    either saw the threat directly if it was posted

24    online and not given directly to the judge, but it

25    was publicly available so that the judge could see

1     or the threat victim could see those words as they

2     existed out of the mouth or out of the fingers of

3     the defendant in those cases.

4          THE COURT:  But we don't have any of that

5     evidence in this case, right?

6          MR. GEORGE:  That's exactly right, Your Honor.

7          THE COURT:  So the source of whatever

8     knowledge she has necessarily came from the

9     investigating deputy marshall.

10          MR. GEORGE:  Correct, Your Honor.  And others

11    working with him.

12          THE COURT:  I'm sorry?

13          MR. GEORGE:  And others working with the

14    investigating deputy marshall.  But the deputy

15    marshall did convey the drone threat specifically.

16          THE COURT:  Well, what is your response then

17    if Mr. Hernandez objects that that calls for

18    hearsay?

19          MR. GEORGE:  I would say, Your Honor, that the

20    first level of hearsay is -- well, it's a threat so

21    there is no truth of matter being asserted, it is

22    what it is, so that covers both levels.  To the

23    extent that it could be considered hearsay, the

24    first level from the defendant --

25          THE COURT:  Well, don't worry about the first

1      level, it's what -- the agent has to repeat what

2      another declarant said, which in this instance would

3      be the other inmates, right?

4           MR. GEORGE:  Correct.  That would be to show

5      the effect on the listener.

6           THE COURT:  Where do you find that in an

7      exception or exclusion under the hearsay rule?

8           MR. GEORGE:  Your Honor, that's based on the

9      definition of hearsay itself and I do have case law

10     on that.

11          THE COURT:  I've got a definition right in the

12     rule.

13          MR. GEORGE:  Because it's going to show the

14     effect on the listeners, that purpose, by definition

15     not being admitted for the truth of the matter.

16     It's not to show that -- I mean, the thing I always

17     think of, "Is the stop light green when the guy went

18     through it?"  It's not being shown for that purpose,

19     that yes, in fact the light was green; this is going

20     to show some other purpose.  It's not being admitted

21     for that truth.  And in this case the statement is

22     not being admitted to show that the defendant meant

23     the words -- or said the words he said and that

24     there is some truth in those words, it's just that

25     this is a threat and that threat is being conveyed

1    to show at trial here the effect on Judge

2    Kovachevich.

3         THE COURT:  Isn't identifying -- or

4    attributing the threat to the defendant indeed

5    offered to show the truth of who asserted the

6    statement, who made the threat?

7         MR. GEORGE:  Your Honor, I would submit that

8    that's not necessarily the question.  The question

9    is the statement, the out-of-court statement, the

10   truth of that statement that matters, not

11   necessarily who it's attributable to.  It's just the

12   truth of that statement that the light was green,

13   the car was red.

14        THE COURT:  So you're not going to bring out

15   that Mr. Springer made the threat?

16        MR. GEORGE:  To my earlier point, Your Honor,

17   I don't think that's going to be possible, just

18   given the evidence in this case that she recused

19   herself because of she received a threat from the

20   defendant's case.  I don't think there is any way we

21   can get around that.

22        Your Honor, if it helps, we could stop our

23   testimony -- or Judge Kovachevich's testimony at

24   that point of recusal without saying that the threat

25   came from --

1              THE COURT:  I don't want to be in a proactive

2       situation, Mr. George, where I'm instructing the

3       executive branch how to try their cases.  All I'm

4       trying to do is apply the rules of evidence and I

5       would rather do it now in the sanitized setting in

6       which we sit without a jury and a witness, than

7       having a witness on the stand and objections being

8       made and delay in the proceedings.  So it's not a

9       matter of what it's easy for you, it's a matter of

10      correctly applying the rules of evidence.

11             Let me take a short recess and I'll be back in

12      in just a moment.

13              (Recess was taken from 3:12 until 3:28 p.m.)

14             THE COURT:  All right.  We're all assembled.

15      Any additional thoughts or comments, Mr. George?

16             MR. GEORGE:  No, Your Honor.

17             THE COURT:  Mr. Hernandez?

18             MR. HERNANDEZ:  No, sir.

19             THE COURT:  All right.  Well, I don't have

20      clear guidance by any of the cases that I've read.

21      I looked at a number of things, assuming hearsay

22      doesn't fall within the residual exception Rule 807.

23      I don't know if the government gave notice under

24      that rule, but I don't think I could find that what

25      inmates told an investigating law enforcement

1      officer has a circumstantial guarantee of

2      trustworthiness.

3          I looked at the official report, public

4      records report, exception to the hearsay rule under

5      803(8), just like a traffic citation what an

6      investigating officer here's from an eye witness is

7      hearsay.  Although the report itself might come

8      under the exception, hearsay within that is

9      excluded.

10         So it boils down to whether or not what the

11     deputy marshals told Judge Kovachevich constitutes

12     hearsay and that is whether what they said was

13     offered to prove the truth of the matter asserted.

14         On the one hand, they have a duty to report a

15     threat, whether perceived or otherwise, without

16     regard to whether the threat is actually made.

17         So I think Mr. George had a good point

18     yesterday, although at first glance I disagreed,

19     that the fact that a threat was communicated to the

20     investigating deputies is not communicated to the

21     judge to prove that it happened or was said, it's

22     simply to communicate to her that a statement was

23     made.

24         The second component of that is that that

25     statement is attributed to Mr. Springer.  We already

1    have in evidence that the judge recused herself as a

2    result of what was told to her by at least one,

3    Deputy Zach, one of the deputy marshals.  An

4    objection after the fact that that calls for

5    hearsay, direction that the government establish a

6    foundation, which really can only be established

7    through Judge Kovachevich.  Only she knows why she

8    recused herself.

9         I find that what the deputy marshall

10   communicated to Judge Kovachevich does not

11   constitute hearsay because it is not being offered

12   for the truth of the matter asserted, simply the

13   fact that it was said.  And then Judge Kovachevich

14   is free to explain what she did in reaction to that

15   information; presumably she recused herself.  That

16   is my ruling.  I will overrule the objection.

17        Is that your next witness, Mr. George?

18        MR. GEORGE:  Your Honor, may I have one moment

19   just on that question?

20        MR. HERNANDEZ:  Judge, may I ask the court

21   something?

22        THE COURT:  Just a second.

23        MR. GEORGE:  Yes, Your Honor, can we contact

24   chambers to have her come while the jury -- before

25   the jury comes?

1          THE COURT:  It's up to you, not us.  We don't

2     do that; you guys take care of that.

3          MR. GEORGE:  Yes, Your Honor.

4          THE COURT:  That's your next witness?

5          MR. GEORGE:  Correct.

6          THE COURT:  Not all the ISIS stuff?

7          MR. GEORGE:  Correct.  That will be after.

8          THE COURT:  Mr. Hernandez, what else you got?

9          MR. HERNANDEZ:  Judge, I thought the next

10    witness --

11         THE COURT:  Let me just say I don't know if

12    that was her law clerk back there in the back, but

13    she better not be telling her what I just said.

14         MR. GAMMONS:  Your Honor, that's AUSA Adams.

15         THE COURT:  Or her.  I don't want anybody

16    communicating to a witness a ruling that I've just

17    made.

18         MR. GAMMONS:  Yes, Your Honor.

19         THE COURT:  Better not happen.  Go ahead,

20    Mr. Hernandez.

21         MR. HERNANDEZ:  Judge, I thought the next

22    witness was going to be Marshall Self, that I was

23    going to have something marked as Defendant's

24    Exhibit Number 1.  Even though it's marked up, it's

25    not with the intention to introduce it as evidence,

1    but it was something that I was going to be asking

2    him when there is testimony regarding Facebook.

3         THE COURT:  Apparently it's going to be Judge

4    Kovachevich, not Marshall Self.

5         MR. HERNANDEZ:  Right.  So it's not a timely

6    issue right now.

7         THE COURT:  Okay.  When are we going to be

8    ready?

9         MR. GEORGE:  I believe Judge Kovachevich is on

10   her way, Your Honor.

11        THE COURT:  Where are we, Mr. George?  You can

12   tell us better than anybody.

13        MR. GEORGE:  Your Honor, after Judge

14   Kovachevich testifies, the government expects four

15   more witnesses.

16        THE COURT:  And finishing up, if we start at

17   10 in the morning, when?  Before or after lunch?

18        MR. GEORGE:  Starting at 10 -- I forgot about

19   that when I was speaking to Ms. Black -- I think it

20   will be probably be after lunch, before the end of

21   the day would be my expectation.

22        THE COURT:  So do you think we would be

23   arguing the case Thursday morning?

24        MR. GEORGE:  I think that's fair.

25        THE COURT:  Mr. Hernandez?

1          MR. HERNANDEZ: That sounds correct, Judge. I

2     did want to speak with Mr. Springer --

3          THE COURT: Oh, absolutely, I'm not presuming

4     anything, I just was trying to give you a timetable

5     to --

6          MR. HERNANDEZ: I think Thursday morning is

7     accurate. I just -- I know that when the government

8     rests, assuming we proceed beyond that, I'm going to

9     need to have a little bit of time with Mr. Springer

10    to evaluate the situation and decide about

11    testifying or not.

12         THE COURT: Well, one of the things I want you

13    guys to do is, if you haven't already, is go through

14    your proposed jury instructions and see where you

15    disagree. Very important that you go through the

16    patterns independent of your packet to make sure

17    nothing has been overlooked. And there may not be

18    any disagreement, I don't know. But I would rather

19    that get that out of the way tomorrow so that you

20    guys are free to construct your arguments and make

21    them on Thursday without any uncertainty about what

22    the law will be.

23         MR. HERNANDEZ: Judge, I also -- it's early,

24    but would you consider Thursday starting at 9:30

25    instead of 9:00? I have a matter in state court

1    that I can get coverage but --

2         THE COURT:  If we're finished tomorrow, that

3    would be fine because that would give us time to --

4         MR. HERNANDEZ:  It would help me with a

5    particular client that I have in state court.

6         THE COURT:  Since we're bargaining, if you

7    guys will promise to go through these instructions

8    to make sure we narrow it down to any disagreements

9    so our charge conference is relatively short.

10        MR. GEORGE:  I'll do that, Your Honor.

11        THE COURT:  Just have her right there.  Bring

12   the jury in, please.

13        (The jury returned to the courtroom.)

14        THE COURT:  Thank you and be seated.  Call

15   your next witness, please.

16        MR. GEORGE:  Your Honor, the government calls

17   Elizabeth Kovachevich to the stand.

18        [Witness sworn]

19        COURTROOM DEPUTY CLERK:  Please be seated.

20   Please state your name and spell your last name for

21   the record.

22        THE WITNESS:  Elizabeth A. Kovachevich,

23   K-o-v-a-c-h-e-v-i-c-h.

24                    DIRECT EXAMINATION

25   BY MR. GEORGE:

1    Q       Good afternoon.

2    A       Good afternoon.

3    Q       What do you do for a living?

4    A       I'm a United States district judge.

5    Q       Is that your official title?

6    A       Yes.

7    Q       And how did you become a district court judge?

8    A       In 1981 there was a vacancy in the Orlando

9    Division of the Middle District of Florida.  I made

10   application for it, went through a screening

11   process.  The United States senators recommended me

12   for the position to President Reagan.  He nominated

13   me in January of 1982.  I went through the

14   confirmation proceedings in February of '82 and I

15   was sworn in in March of 1982.

16   Q       And going back even farther, I hate to ask,

17   but how old are you?

18   A       Last year I turned 80.

19   Q       Where were you born?

20   A       In Illinois.  1936.

21   Q       Did you go to college?

22   A       I did.

23   Q       Did you go to law school?

24   A       Yes.

25   Q       Where did you go to law school?

1    A       In St. Petersburg, Florida.

2    Q       And what did you do briefly after law school?

3    A       After law school I went to work for two

4    lawyers for a year.  After they determined that they

5    were going to go into other pursuits, one of the

6    clients that we had wanted to hire me as house

7    counsel to continue the representation.  I did that

8    for over a year.  That was invaluable experience.

9    And subsequent to that I opened up my own office.

10   Q       And had you served as a judge before your

11   current job?

12   A       Yes.

13   Q       Where was that?

14   A       In the Sixth Judicial Circuit, the State of

15   Florida, which encompasses Pasco and Pinellas

16   County.

17   Q       Now, for the benefit of the jury what's a

18   United States district court?

19   A       United States district court is an inferior

20   court created by Article III of the United States

21   Constitution which created the United States Supreme

22   Court and such other inferior courts as Congress

23   would determine to establish from time to time.

24           The inferior courts include the district

25   courts in this country, which is basically the trial

1    court, and circuit courts.

2    Q    And do district courts hear criminal cases?

3    A    Yes.

4    Q    Are you as a judge assigned to perform any

5    specific duties in criminal cases?

6    A    Technically speaking from the time that the

7    cases are filed by complaint or information or

8    indictment we are assigned the cases randomly so we

9    become the judge to try the case.

10   Q    What are some of the things you do as a judge

11   in the criminal case?

12   A    If the individual -- and there is a plea, the

13   defendant enters a plea of not guilty, we go forward

14   setting up the trial procedure.  Magistrate judges

15   become involved who assist the trial judge.  And the

16   magistrate judge usually takes care of the initial

17   appearances, takes care of preliminary matters, and

18   the district court judge primarily is going to deal

19   with certain motions and the actual trial itself.

20   Q    And after trial for somebody who has been

21   found guilty of a crime, do you have any

22   responsibilities?

23   A    Yes.  Following the trial if there is a

24   conviction the assigned judge to the case who has

25   tried the case will be the one who will sentence the

1    individual.

2    Q    And is sentencing like punishment or could you

3    explain that?

4    A    The sentencing can involve everything from

5    probation to confinement in a prison.  The

6    individual would serve a certain percentage of time

7    depending upon the circumstances, but usually

8    speaking they serve about 85 percent of a sentence.

9    Q    Now, where do you work?

10   A    In the Tampa Division of the United States

11   District Court, Middle District of Florida.

12   Q    And where is your office location?

13   A    My office is located in this building, one

14   floor above.

15   Q    Do you have a courtroom?

16   A    I have a courtroom, yes.

17   Q    Is that where you do most of your work?

18   A    Whenever we're in trial or have hearings,

19   criminal or civil, it will be in the courtroom.  But

20   there is a lot of work that's done in chambers by

21   myself and the personnel assigned to me.  I have

22   three law clerks, a courtroom deputy clerk, and a

23   court reporter.

24   Q    When you say chambers, is that --

25   A    That's an office.  And all five of those

1     people are located in the office that I occupy.

2     Q     Now, talking about the layout of your office,

3     does your office have windows?

4     A     Oh, yes.

5     Q     Could you describe them?

6     A     Well, the windows are quite expansive.  The

7     building is so designed that there are windows

8     comparable to the windows that you see on this floor

9     and the windows go up in some of the rooms 12 feet;

10    in others, 20 feet.

11    Q     And do those rooms face the street or an

12    interior part of the building?

13    A     They face a street on all sides.  We have two

14    sides and they face the street.

15    Q     And under normal circumstances as far as

16    security do you have bodyguards?

17    A     In the courthouse, no.

18    Q     And under normal circumstances is there any

19    other law enforcement agency that specifically

20    provides you as a district court judge with personal

21    protection?

22    A     No.

23    Q     Is that by choice or the way it's done under

24    normal circumstances?

25    A     Under normal circumstances that's the way it's

1    done for judges.

2    Q    You're not like the president, Secret Service

3    protection?

4    A    None of that.

5    Q    Now, I want to talk to you about a specific

6    case.  Are you familiar with a case known as United

7    States vs. Nathaniel Harris, et al?

8    A    Yes.

9    Q    How are you familiar with that case?

10   A    I was the trial judge for that case.

11   Q    And very generally, without getting into

12   specifics, what was it about?

13   A    The trial of that case basically commenced in

14   January of last year with the jury venire pool of

15   500 jurors.  It took approximately five months to

16   reduce that jury pool down to groups of

17   approximately 50 people each and they were brought

18   in the courtroom in sequence of days to pick a jury

19   starting the 6th of June.  After a period of time

20   and going through the jurors, we wound up with just

21   five jurors left out of the 500.  We commenced

22   trial.

23   Q    And what was the trial about, what were --

24   just the general topic?

25   A    The trial that we commenced involved

1    racketeering, conspiracy with regard to many things

2    including drugs, but most importantly, murder for

3    hire.

4    Q    Is that case still going on?

5    A    No.

6    Q    Was there in fact a trial in that case?

7    A    There was a trial in that case that went on

8    for over three months and the jury returned verdicts

9    September 8t, 2016.

10   Q    How many defendants went to trial in that

11   case?

12   A    Six.

13   Q    And what was the result of that trial?

14   A    They were all convicted.

15   Q    I'm going to show you what has been previously

16   admitted as Government Exhibit Number 17.  I'll blow

17   up the top portion of this.  Do you recognize what

18   that is?

19   A    Those are the minutes that were taken by the

20   clerk in that case and they have been filed in the

21   court records in that case.

22   Q    What case is that in?

23   A    United States of America vs. Nathaniel Harris.

24   Q    Is this related to the Harris trial you just

25   talked about?

1    A       It is.

2    Q       I'm looking at the proceedings.  What type of

3    hearing was this?

4    A       This was a sentencing.

5    Q       And what sentence, summarizing it, did you

6    give to Mr. Harris?

7    A       To summarize it, he received life without

8    parole.

9    Q       Looking at page 3 of the same exhibit,

10   Government's Exhibit Number 17, what is this?

11   A       These are the sentencing minutes for another

12   defendant in the case, Deonte Jamal Martin.

13   Q       And summarizing the sentence here, what did

14   you give to Mr. Martin?

15   A       Life without parole.

16   Q       And are the two sentences that we just looked

17   at and reflected in that exhibit, are they similar

18   to other sentences for the other defendants in that

19   case?

20   A       Yes.

21   Q       Is sentencing a duty that you are required to

22   perform as a district court judge?

23   A       Yes, it is.

24   Q       Now, do you know what a cooperator is in the

25   context of criminal trials?

1    A    I do.

2    Q    Can you explain that?

3    A    Cooperator is an individual who provides

4    testimony with regard to evidence to be submitted in

5    a trial.  And after that individual cooperates with

6    testimony, that person may be entitled to an

7    appropriate motion by the government for

8    consideration for his or her cooperation.

9    Q    And were there any cooperators who testified

10   in the Harris trial?

11   A    Yes, there were.

12   Q    Are you familiar with the criminal case

13   involving defendant Christopher Barton?

14   A    I am.

15   Q    Who is Christopher Barton?

16   A    He was one of the cooperators who testified in

17   the Harris case.

18   Q    And what was your role in Christopher Barton's

19   criminal case, if any?

20   A    I considered the appropriate motion for

21   determining what sentence he should receive after he

22   provided the testimony he provided in the Harris

23   case.

24   Q    So were you also assigned to Mr. Barton's

25   case?

1    A       Yes, I was.

2    Q       And did you in fact sentence Mr. Barton?

3    A       Yes, I did.

4    Q       Looking at what has been admitted as

5    Government Exhibit Number 27, specifically page 3,

6    do you recognize that?

7    A       Yes, I do.

8    Q       What is that?

9    A       It's the judgment in the criminal case

10   involving Mr. Barton.

11   Q       Is the judgment the formal way you sentence

12   someone?

13   A       Yes, it is.

14   Q       Looking at your signature block and the date,

15   can you tell when you sentenced Mr. Barton?

16   A       January 25, 2017.

17   Q       Looking at page 4 of the same exhibit, can you

18   tell the jury what you sentenced Mr. Barton to on

19   January 25, 2017?

20   A       I sentenced him to the time that he had

21   already served on Count One of the indictment in

22   that case.

23   Q       And when somebody is sentenced to time served,

24   does that mean they're free to go, they're no longer

25   sentenced to prison?

1    A        In essence, yes.

2    Q        Are you familiar with a person named Jason

3    Jerome Springer?

4    A        Yes, I am.

5    Q        When did you first learn about him?

6    A        He was assigned to me by random draw on

7    December 20th of 2016.

8    Q        Is that the first time you were assigned to

9    his case?

10   A        To my knowledge that's the first time I ever

11   had any case with him.

12   Q        Looking at what has been admitted as

13   Government Exhibit 7C, what is that?

14   A        That's an information which the United States

15   Attorney's Office is permitted to file against Jason

16   Jerome Springer.

17   Q        And was this the document that caused you to

18   be assigned to Mr. Springer's case?

19   A        Yes, it was.  If you look at the top you see

20   the case number for Mr. Springer's case and you'll

21   see the 17 at the end of that, followed by the

22   initials TGW; "17" indicates my case number and

23   "TGW" indicates the magistrate judge, Judge Thomas

24   Wilson.

25   Q        Are you still assigned to Mr. Springer's case?

1    A      No, I'm not.

2    Q      Looking at Government Exhibit 7A, specifically

3    page 9, starting with entry 67, do you recognize

4    that?

5    A      Yes, I do.

6    Q      And what is that?

7    A      That's the date and the order reference for

8    the docket number 67 in which I recused myself as

9    the judge in this case and referred it to the clerk

10   for random assignment to another judge.

11   Q      Judge, generally speaking, what happened that

12   made you recuse yourself in that case?

13   A      Circumstances were brought to my attention by

14   the United States Marshal Service in the month of

15   February that indicated to me that the appearance of

16   fairness towards Mr. Springer might be compromised

17   if I remained on the case.  So in an abundance of

18   caution I determined that I should recuse myself

19   from dealing with his case and did so in March of

20   2017, this year.

21   Q      And why?  Generally.

22   A      It came to my attention that Mr. Springer had

23   made threats against me and my life.

24   Q      And you said you learned that from the Marshal

25   Service?

1    A       Yes, I did.

2    Q       Is it normal for the Marshal Service to inform

3    judges about threats?

4    A       Yes, it is, along with other people.

5    Q       Is that information important to you as a

6    judge?

7    A       Absolutely.

8    Q       In the information you received did you

9    receive information about a threat to you and your

10   office specifically?

11   A       Yes, I did.

12   Q       And can you please explain what you learned

13   about that threat specifically?

14   A       Specifically I was informed that there was a

15   threat towards me and my office whereby a drone

16   equipped with explosives would be directed towards

17   my office, my staff, imperiling the lives of the

18   people therein.

19   Q       Now, Judge, after learning about that threat,

20   did you ask the Marshal Service to assign you a

21   security detail?

22   A       I discussed it with them and I determined we

23   would do other things.

24   Q       And did you in fact take other steps to

25   protect yourself?

1     A       I took steps to protect myself, yes, I did,

2     and discussed it with the Marshal Service.

3     Q       Did the threats or the threat stop you from

4     doing your job as a judge?

5     A       No, it didn't stop me from doing my job, but

6     it certainly made me more aware of the threat that

7     that imposed upon me and my office.

8     Q       And does the fact that you had to continue

9     doing your job as a judge make that threat any less

10    meaningful to you?

11    A       No, it didn't make it less meaningful at all.

12    I took that threat very seriously.

13    Q       In your 44 years as a judge have you been

14    threatened before?

15    A       Yes.

16    Q       Can you estimate how many times?

17    A       I would say on the average once a week -- once

18    a year for a period of 44 years.

19    Q       So maybe about 44 threats?

20    A       About 44 threats and that's both state court

21    and federal court on the average that I would

22    consider threats.

23    Q       And of those threats did you take each of them

24    seriously?

25    A       No, because some of them involved threats by

1    mail which were investigated by the Marshal Service.

2    Some of them were by people who had certain mental

3    disturbances, some were by people who were

4    disgruntled at the moment and after investigation

5    nothing further was done with regard to them.  You

6    exercise some judgment about the people that you

7    consider are making a genuine threat and people who

8    are not.

9    Q       In light of that and what you've just

10   explained was this threat different to you, did you

11   take this seriously?

12   A       I took this very seriously.

13   Q       Was there something about this threat or the

14   nature of this threat that made you take it

15   seriously?

16   A       The utilization of explosives and the lethal

17   impact indiscriminate that they can do is a threat

18   about which I have great awareness.  As a United

19   States district judge, late '80s, early '90s, into

20   the mid '90s, I went to Fort Myers, Florida.  Even

21   before I went to Fort Myers, Florida, in 1988 I

22   tried a case from the Fort Myers division here in

23   Tampa in which a pipe bomb was used in a mailbox to

24   try to kill two people.  They went out to the

25   mailbox and the bomb went off.  By some miracle they

1    weren't killed, but it destroyed everything around.

2    That was my first introduction to explosives.

3         Down in Fort Myers we were confronted with

4    dealing with a lot of dangerous cases.  I had a

5    cooperating witness, I'd be prepared to come to

6    court one day, it was a cold day, his father went

7    out to start the car, the car blew up, killed the

8    father.  We had to put the son into the witness

9    protection program.

10         In another case the individual entered a plea

11   in Tampa from the Fort Myers division.  We brought

12   him up so that nobody would know he's entering a

13   plea.  His lawyer came from Miami.  It was on a

14   Friday.  I had come up from my duties in Fort Myers

15   to take that plea.  The next Friday that lawyer in

16   Miami started his car, it blew up, he lost his right

17   arm.

18   Q    Your Honor, I'll just interrupt you very

19   briefly, but did those experiences that you've had

20   in those circumstances affect how you interpret and

21   understand and consider this explosive-specific

22   threat?

23   A    It certainly does.  And the last two

24   situations involved the drug enforcement building in

25   Fort Myers which contained all the evidence that we

1    had in the case.  And an individual by the name of

2    Jeffrey Matthews on St. Patrick's Day, I forget the

3    year offhand but early '90s, blew the building up

4    with explosives.  Nobody could get anywhere near it.

5    As a result of that, Mr. Matthews put together

6    explosives in a van and visited four of our district

7    courthouses and put the device in Gainesville,

8    unbeknownst to us.  He was arrested by the FBI.  I

9    wound up taking his plea, for which I gave him life

10   without parole.  He was facing the death penalty and

11   he bargained that away and entered a plea in front

12   of me for the life without parole.

13        When you're dealing with explosives there is

14   just no coming back from them.  So that was my

15   actual experience with the use of explosives in my

16   career.

17   Q    Thank you, Your Honor.  Nothing further at

18   this time.

19        THE COURT:  Any cross-examination?

20                    CROSS EXAMINATION

21   BY MR. HERNANDEZ:

22   Q    Good afternoon, Your Honor.

23   A    Good afternoon, Mr. Hernandez.

24   Q    As you indicated, you have been on the bench

25   for quite a few years, correct?

1    A       I'm in my thirty-sixth year of federal.  I've

2    got 44 years behind me.

3    Q       And at least -- well, on the federal bench

4    it's been entirely handling criminal cases, correct?

5    A       No.  I've had civil trials.

6    Q       Okay.

7    A       Quite a few of them, as a matter of fact.

8    Q       I'm sorry?

9    A       Quite a few of them.

10   Q       But primarily your responsibilities are

11   handling criminal cases, isn't that correct?

12   A       As are most of the district judges in the

13   Middle District of Florida, including His Honor.

14   Q       On the state bench before you were handling

15   federal cases were you assigned to the criminal

16   division?

17   A       We rotated in and out of criminal, civil,

18   juvenile, probate, and did that in both the

19   counties.

20   Q       How many -- of the time that you were on the

21   state bench can you estimate that you were actually

22   handling criminal cases?

23   A       That would be difficult to estimate because

24   often we would be brought in to substitute.  On one

25   particular occasion I picked five criminal juries in

1     one day.  Took the last one to trial at 8:00 at

2     night, got a verdict at 1:00 in the morning.  So I

3     can't estimate how many criminal trials I did.

4     Q    Yes, Your Honor.  And would it be -- in fact,

5     I think you gave us some examples of where you

6     didn't take a particular threat seriously, correct?

7     A    Yes.

8     Q    And you would agree with me that especially in

9     a criminal trial situation, people do tend to get

10    emotional, correct?

11    A    I would say that has to apply to both criminal

12    and civil.  I've seen some pretty emotionally

13    sensitive civil cases in which people get really

14    upset.

15    Q    And nerves get frayed?

16    A    Oh, sure.

17    Q    And it's certainly not uncommon in your

18    experience that a defendant can say something stupid

19    in anger, correct, and not really mean it.

20    A    They say something stupid in anger,

21    absolutely.

22    Q    And that can apply to a defendant whether he's

23    in jail or not in jail, correct?

24    A    Sure.

25    Q    People in jail, you would agree, obviously

1    have more restrictions than people that are out on

2    the street, correct?

3    A     I think that's a fair estimate.

4    Q     It's much -- unless you have some outside

5    help, it's much more difficult to plot an evil plan

6    if you're in custody, would you not agree with that?

7    A     I would disagree with that.  Based upon my

8    experience and my knowledge about plots, there are

9    ways that people can implement plots from inside

10   prison.

11   Q     Well, first of all, you would agree that to

12   your knowledge that in jail all communications,

13   unless they are attorney communications, visits or

14   telephone calls, they're all recorded and listened

15   to, correct?

16   A     Not the conversation between inmates.

17   Q     I understand, but --

18   A     Do you?

19   Q     Well, what I'm suggesting is that if you are

20   plotting something from jail, you might want to get

21   assistance from someone on the outside, would that

22   be a fair statement?

23   A     Mr. Hernandez, you're going to tread into

24   waters that I don't think you want me to answer.

25   Q     Well, what I'm saying is that if you're in

1    jail, unless you're talking to somebody -- if you're

2    talking to somebody on the outside --

3    A        No, no, no.

4    Q        No, my question is if in fact you are in jail

5    trying to communicate to someone on the outside,

6    unless it's an attorney that you're talking to,

7    those conversations are recorded; would that be a

8    fair statement?

9    A        If you're talking to somebody on the outside

10   and you're using devices on the outside to

11   communicate, yes.

12   Q        Okay.

13   A        If you're talking to somebody inside the jail

14   who is an inmate and you're plotting something,

15   you're asking me about my awareness in any case?

16   Q        My question was specifically directed to

17   individuals that are in jail making communications

18   to people outside the jail.

19   A        Usually that's going to be recorded, whether

20   that's on the phone or they're coming in person.

21   Q        And defendants -- I'm sure you haven't been

22   inside the jail, but you know that inmates are

23   noticed -- there's notices that say that their

24   conversations and their visits with family members

25   or friends or whatever are all recorded, correct?

1    A    Yes.

2    Q    So you would agree with me that it would be --

3    would you not agree with me that it would be

4    difficult to plan something by yourself, correct?

5    If you're in custody and your communications with

6    limited, it's much more difficult than someone on

7    the street; would you agree with me?

8    A    Mr. Hernandez, if you're aware of information

9    communicated between inmates and the inmate gets out

10   of jail, the other inmate gets out of jail, then he

11   or she is out and able to do whatever has been

12   discussed in the jail.

13   Q    If there was evidence that a defendant had

14   directed somebody to do something out of the jail,

15   correct?

16   A    Yes.

17   Q    And in this case -- I'll get to that in a

18   minute.  You have had, in your times as a judge, I

19   think you've already made reference to the fact that

20   you have had cases -- presided over cases where jail

21   informants testify, correct?

22   A    Yes indeed.

23   Q    And usually they have pending criminal charges

24   against them, correct?  And in some cases they

25   actually -- I would say that's usually the case,

1      would that be a fair statement?

2      A      They usually have criminal charges pending or,

3      depending upon where they are incarcerated, the

4      charges are no longer pending, they're fulfilling a

5      sentence at that time and they could be back in the

6      local jail facilities on that sentence they're

7      fulfilling for the purpose of being a cooperator.

8      Q      So in some cases they are facing pending

9      charges, facing time in prison, and they're

10     testifying in hopes of getting some kind of

11     consideration, correct?

12     A      That would be the general case.

13     Q      Then as you said there are some times when a

14     person is already serving a sentence and they're

15     being brought to testify and that testifier is

16     hoping that he's going to get a reduction of the

17     sentence he already has, correct?

18     A      Sure.

19     Q      Would you agree with me that the only way to

20     get a sentence reduction is to cooperate and testify

21     for the government or at least in some way cooperate

22     with the government?

23     A      If you're cooperating with the government,

24     that can mean testimony or that can mean information

25     you are providing to the government for purposes

1          that are helpful to the government, whatever that

2          might be, including historical information.

3          Q      So to be clear, there are times when you don't

4          have to testify to get a reduction if you're an

5          informant that simply provides information to the

6          government, correct?

7          A      Correct.

8          Q      Would you agree with me that testifying in a

9          case against a defendant accused of threatening a

10         federal judge should potentially be worth a big

11         reduction?

12         A      I don't know what size it would mean, but

13         there would certainly be something that may, may, be

14         provided to that defendant.

15         Q      And would you agree with me that if an

16         informant simply said that well, a defendant made

17         some kind of idle comment but didn't seem serious

18         about it, that that would probably not be very

19         valuable to the government; would you agree with

20         that?

21         A      It depends upon the way that was interpreted

22         by the government.

23         Q      Well, if the government is prosecuting a case

24         against somebody accused of threatening a federal

25         judge, if the informant says, you know, I talked to

1    the defendant and he made a couple of silly comments

2    but it didn't seem serious, if that was the case

3    would you agree with me that it's unlikely the

4    government would call that witness to testify?

5         MR. GEORGE:  Objection, Your Honor, calls for

6    speculation.

7         THE COURT:  I'm going to allow it.  Overruled.

8         THE WITNESS:  It would seem to me that if it

9    is not seriously made, the government would then

10   have to evaluate whether or not they want to put

11   that witness on the stand and whether or not it's

12   worth anything to the government to consider,

13   considering the veracity of the individual, whether

14   or not they want to put that witness on the stand.

15   I don't know because I don't represent the

16   government.

17   BY MR. HERNANDEZ:

18   Q    I understand.  But would you agree with me

19   from the standpoint of an informant, if he says that

20   the defendant made a couple of idle comments but

21   didn't seem very serious about it, would it not be

22   logical that that informant would think that that's

23   not going to get me many points with the government?

24   A    Probably.

25   Q    But would you agree with me that a stupid idle

1    comment by a defendant can be converted into a big

2    deal through huge exaggeration or embellishment by

3    an informant?

4    A      If that is in fact the truth of the matter, I

5    wouldn't disagree with you.

6    Q      Would you agree with me that when an informant

7    says that he's in jail with a defendant and the

8    defendant said A, B, C, D, E, that it's very

9    difficult to prove the untruthfulness of the

10   informant's testimony because it's a he said/he said

11   kind of situation; would you agree with that?

12   A      I think that's for the jury to decide.

13   Q      I understand, but would you agree with me that

14   when an informant is accused of lying or

15   embellishing, there is really no accurate way to

16   prove that because it's just his word and nothing

17   else.

18   A      You're talking about one person's word against

19   another.

20   Q      Correct.

21   A      If that is the situation, then the jury again

22   has to decide who do they believe.

23   Q      Of course, unless it's not recorded.  We're

24   talking a different situation if it's a recorded

25   conversation, but I'm referring just two jail -- a

1    defendant and another jail inmate having a

2    conversation.

3    A      Is it possible to tell from that type of

4    circumstance who is telling the truth in the

5    situation?  Again, I would say it's for the jury to

6    decide the demeanor of the witness when that witness

7    is testifying and what he or she has to say.

8    Q      And would it be accurate -- of course the

9    court is well aware of Rule 5K1.1 and Rule 35,

10   correct?

11   A      Yes.

12   Q      5K1.1 is a procedure where the government can

13   file a motion asking the court for a sentence

14   reduction before sentencing, correct?

15   A      Yes.

16   Q      And Rule 35 is after a person has been

17   sentenced, if the government so chooses, they could

18   file a motion under Rule 35 asking for that person

19   to receive a sentence reduction, correct?

20   A      Yes.

21   Q      And the only person that can make that

22   decision, the only -- not person, the only agency

23   that can file such a motion, either 5K1.1 or

24   Rule 35, is the government, the prosecutor in this

25   case, correct?

1    A    Yes.

2    Q    In all the years that you have been on the

3    bench, both on state and federal, do you know of any

4    case where a jail informant has testified against

5    the government or for the defendant and gotten a

6    sentence reduction?

7    A    Off the top of my head I can't recall one, but

8    that doesn't mean it doesn't exist.

9    Q    But you would agree that even if it ever has

10   happened, that it would be extremely rare, correct?

11   A    It would be a rare occurrence.  In an

12   appropriate situation, application can be made to

13   the court.

14   Q    Now, jail informants are generally -- would it

15   be fair to say that most jail informants have been

16   in -- are familiar with how the system works for

17   getting a reduction?

18        MR. GEORGE:  Objection, Your Honor, calls for

19   speculation.

20        THE COURT:  Sustained.

21   BY MR. HERNANDEZ:

22   Q    But in any event they have to satisfy the

23   government before there is any chance of reduction

24   under any of the rules that we've discussed,

25   correct?

1    A       Under normal circumstances, yes.

2    Q       Would it be accurate to say that based on your

3    previous testimony that I understand it wouldn't be

4    pleasing to you, but if you simply heard that an

5    inmate in a moment of anger or frustration wished

6    you harm, that -- I assume that would not please

7    you, but it would not cause you great alarm,

8    correct?

9    A       It wouldn't be the first time that ever

10   happened.

11   Q       But if you're told that inmates, informants,

12   are saying the defendant is making specific plans

13   about drones with explosives, that gets your

14   attention, correct?

15   A       Sir, when I served in 1989 in Fort Myers, the

16   way I described it to you, United States Circuit

17   Judge Robert Vance on a Saturday received a package

18   from one of the people in the Fort Myers division

19   and it exploded in his kitchen.  He didn't have a

20   chance.  That was lethal.

21   Q       And in these examples that you've provided,

22   Your Honor, there actually were explosives, correct?

23   A       Yes.

24   Q       There actually was a plan, correct?

25   A       Well, I don't know about if there was a plan,

1       I wasn't privy to the plan.  All I know is he got

2       the package and it exploded when he opened it up.

3       Q       Thank you very much, Your Honor.

4               THE COURT:  Redirect?

5                       REDIRECT EXAMINATION

6       BY MR. GEORGE:

7       Q       In a he said/she said situation, is it

8       possible to corroborate what one of the people was

9       saying?

10      A       Not unless you've got a third person around

11      that's going to contribute to the conversation.

12      Q       So could you corroborate with a third person?

13      A       It depends.  It's not for me to decide that.

14              MR. GEORGE:  Thank you, Your Honor, nothing

15      further.

16              THE COURT:  May this witness be excused?

17              MR. GEORGE:  Yes, Your Honor.

18              THE COURT:  Thank you, ma'am, you may step

19      down.  Please watch your step.

20              THE WITNESS:  Discharged from the --

21              THE COURT:  Yes, ma'am.

22              Call your next witness, please.

23              MR. GEORGE:  Your Honor, the United States

24      calls Brett Velicovich.

25              THE COURT:  Tomorrow morning, members of the

1    jury, we're going to start at 10.  I have a visit

2    with a physician as earlier as I could schedule it,

3    at 7:30.  I'm sure I'll be done by 9:00 or so and I

4    want to make sure I give myself travel time.  So

5    10:00 tomorrow.

6            [Witness sworn]

7            COURTROOM DEPUTY CLERK:  Please be seated.

8    Please state your name and spell your last name for

9    the record.

10           THE WITNESS:  Brett Velicovich,

11   V-e-l-i-c-o-v-i-c-h.

12                   DIRECT EXAMINATION

13   BY MR. GEORGE:

14   Q      Good afternoon, Mr. Velicovich.

15   A      Good afternoon.

16   Q      What do you do for a living?

17   A      I work within the drone community, so I'm the

18   founder and CEO of Expert Drones, which is a brick

19   and mortar consumer drone company that sells drones,

20   repairs them, trains people on how to actually use

21   them, and also consults with organizations that are

22   looking to use them for their businesses.

23   Q      And very generally what is a drone?

24   A      A drone is a unmanned aerial vehicle or, what

25   we like to refer to it, a remotely piloted aircraft.

1    So it's essentially a pilotless aircraft you can

2    control with a remote.

3    Q    How long have you been in this line of work?

4    A    Since 2004.

5    Q    And what did you do before you started the

6    business ventures that you just described?

7    A    I was in military intelligence and so I used

8    drones as part of my job.

9    Q    When did you first use a drone?

10    A    The first time I used a drone was in the Army,

11    2004, out in Afghanistan.

12    Q    Have you been in the drone field ever since?

13    A    Yes.

14    Q    When did you leave the military?

15    A    2010.

16    Q    Is that when you started the businesses or the

17    business ventures you've described?

18    A    Yeah.

19    Q    I want to specifically talk about your

20    nonmilitary experience here.  Starting first with I

21    believe you mentioned humanitarian organization?

22    A    Yeah, we have two or three companies

23    essentially we started.  One was a humanitarian

24    organization where we take drone technology and we

25    use it for things like wildlife conservation so we

1    modify drones to be used to go after poachers and

2    individuals that are out there hurting endangered

3    species.

4         And then we also use it for other types of

5    humanitarian projects like training organizations

6    that can't necessarily afford the type of technology

7    that they might need to be able to save lives.  So

8    that's one of the companies we have.

9         And then Expert Drones is more of the

10   customer-facing drone business where we actually

11   have physical retail stores where people can walk in

12   and buy a drone off the street, talk to experts in

13   the field.

14   Q    That humanitarian project, do you use

15   commercially available drones for that?

16   A    Yes, we use all off-the-shelf drone

17   technology.

18   Q    All right.  And Expert Drones, your business,

19   it offers drones for sale?

20   A    Yes.

21   Q    You also mentioned a consulting business.  Can

22   you briefly describe how you use drones in that

23   business?

24   A    Yes.  So companies will come to us, they'll

25   ask us to basically take drones and modify them in

1    ways that might help their organization.  So we have

2    large scale clients like Pepsi or Microsoft or

3    Vonage and they'll come to us and they'll say hey,

4    we want to give drones a voice in this particular

5    industry, how can we do it.  And so we'll talk to

6    them about what are the different types of drones

7    that might be best suited to their needs, whether

8    that's something that they need to fly really high

9    in the air or something that might need to carry a

10   payload or something that might need to video a

11   building or an event.  So our whole entire job is

12   essentially to tell them what is the best technology

13   that's on the market to use in that certain

14   situation.

15   Q     Now, going back to your Expert Drones, the

16   brick and mortar business, about how many different

17   types of drones do you offer for sale through that?

18   A     Anywhere from 40 to 50 at least.

19   Q     And who selects the drones to offer for sale,

20   do you?

21   A     Myself or my employees will, depending on the

22   customers that come in, but typically a customer

23   will walk in and they might want a drone for their

24   kids or they might want a drone for industrial work

25   and then we'll show them the ones that are available

1    and we'll come to a conclusion what's best suited

2    for their needs.

3    Q      Have you flown all the drones that Expert

4    Drones offers for sale?

5    A      Yes.

6    Q      Are you familiar with their capabilities?

7    A      Yes.

8    Q      Have you tested or flown other drones as well,

9    not just the ones you offer for sale?

10   A      Yes, we regularly test drones from

11   manufacturers that will send us -- they will send us

12   drones that they want us to sell in their stores so

13   we'll test them to make sure we've got the right

14   ones for their customers.  But we don't sell every

15   single drone that's on the market, but we do

16   regularly test a variety of different drones to

17   ensure we're smart on all the newest latest and

18   greatest technology.

19          MR. HERNANDEZ:  Judge, may we approach?

20          THE COURT:  Yes, sir.

21          (At which time the following sidebar

22   discussion was held:)

23          MR. HERNANDEZ:  Judge, I just want to

24   reiterate my objections to all of this.  I think we

25   had talked about me having -- asking -- me asking

1      for a standing objection.  I believe all of this

2      testimony is totally irrelevant, there is nothing --

3      no evidence that's going to be presented that

4      Mr. Springer or anyone else was scheduling or

5      planning some kind of drone attack.  So all of this

6      information I submit is irrelevant.  But if the

7      court is going to allow it, I just wanted to

8      maintain my objections.

9          THE COURT:  Where are we going with this,

10     Mr. George?

11         MR. GEORGE:  Just to show briefly to establish

12     that he has experience with drones and very basic

13     capabilities of them, which goes to the nature of

14     the threat.  The fact that the defendant made a

15     somewhat unique threat as opposed to a shooting --

16         THE COURT:  What does this witness have to do

17     with this defendant?

18         MR. GEORGE:  Just to be able to show that

19     drones are capable of being operated and capable of

20     carrying a payload.

21         THE COURT:  Get through that, that's not -- we

22     don't need to spend a lot of time on this.

23         (At which time the sidebar discussion was

24     concluded and the proceedings resumed as follows:)

25         THE COURT:  Thank you, counsel, go ahead.

1    BY MR. GEORGE:

2    Q       I believe you mentioned you're familiar with

3    the capabilities of different types of drones.

4    A       Yes.

5    Q       And I think you also mentioned that in your

6    consulting business you're familiar with different

7    payloads that drones can carry.  Can you talk a

8    little bit about that, can drones carry payloads?

9    A       Yeah, absolutely.  It depends on what type of

10   drone it is, but most drones have the ability to

11   carry an additional payload, depending on their size

12   and speed and battery life.

13   Q       And are you familiar with any specific types

14   of drones that can carry more payload than any

15   others?

16   A       Yeah, we use larger drones in certain cases

17   when, for instance, maybe a Hollywood movie

18   production company wants to carry a very expensive

19   camera, very heavy camera, we'll use an atypical

20   drone because we know that it can carry a larger

21   amount of weight.

22           There's all kind of drones out there.  I've

23   seen some that can even carry something as big as a

24   person before.  So it just really depends what

25   you're trying to lift with that, how high you're

1    trying to lift it, and what the particular device or

2    sensor or item you're trying to lift with the drone.

3    Q    And you're referring to commercially available

4    drones?

5    A    Yes.

6    Q    Approximately how far away on average can you

7    operate a commercially available drone from?

8    A    It depends.  I would say the one that most

9    people purchase right now, there is a drone made by

10   a manufacturer called DJI, it's maybe 80 to

11   90 percent of the drones in the U.S. are made by

12   this manufacturer.  They typically average anywhere

13   from one to two miles away from the remote.

14        You can extend that range if you have to.  A

15   lot of people use range extenders on their remotes

16   to push that distance even further, but if you're

17   asking specifically about the average distance

18   you're looking at about a mile for some of the

19   better drones on the market.

20   Q    And on average how high can they fly?

21   A    So if we're talking specifically DJI drones,

22   they have -- typically they have what's called geo

23   fencing on them, so it will limit the altitude to

24   1500 feet high.  That's not to say they can't go

25   higher than that, they do have a capability of going

1    that high, but they actually have software in it

2    that will restrict it to 1500 feet vertical.

3    Q    Can you buy drones from your company online?

4    Not you, but can a person?

5    A    Yes, they can come into the store and buy them

6    online.

7    Q    If it's something you have in stock, how long

8    would it take to get to that person?

9    A    We could overnight it if it's in stock.

10   Q    Do you know if they sell drones on Amazon?

11   A    Yes, they do.

12        MR. GEORGE:  No further questions at this

13   time, Your Honor.

14        THE COURT:  Any cross?

15        MR. HERNANDEZ:  No, sir.

16        THE COURT:  Thank you, sir, you may step down,

17   please watch your step.

18        Good stopping point, Mr. George?

19        MR. GEORGE:  I think so, Your Honor.

20        THE COURT:  I will share with the jury that

21   lawyers and I have been discussing from time to time

22   our schedule and it does look as if we will finish

23   the evidence sometime tomorrow.  So we're on

24   schedule.

25        Have a safe evening.  Don't discuss the case

1      among yourselves or allow it to be discussed in your

2      presence.  One final caution.  There may or may not

3      be media attention to this case.  Please be very

4      careful.  Use your common sense to avoid being

5      exposed to any newspaper, radio, or television

6      commentary or internet commentary about this or any

7      other trial in progress so that you're not exposed

8      to outside information.  Thank you and we'll see you

9      in the morning at 10:00.

10              (The jury retired to the jury room.)

11              THE COURT:  The objection based on relevance

12      is overruled.  I find that the testimony is relevant

13      to the extent that it demonstrates that these things

14      are commercially available.

15              Anything else, guys?

16              MR. GEORGE:  Not from the government.

17              THE COURT:  We'll see you in the morning at

18      10:00.  Thank you.

19              (The proceedings adjourned at 4:32 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    STATE OF FLORIDA           )

4    COUNTY OF HILLSBOROUGH     )

5        I, Lynann Nicely, RMR, CRR, Official Court

6    Reporter for the United States District Court, Middle

7    District, Tampa Division,

8        DO HEREBY CERTIFY, that I was authorized to and

9    did, through use of Computer Aided Transcription,

10   report in machine shorthand the proceedings and

11   evidence in the above-styled cause, as stated in the

12   caption hereto, and that the foregoing pages,

13   numbered 1 through 227, inclusive, constitute a true

14   and correct transcription of my machine shorthand

15   report of said proceedings and evidence.

16       IN WITNESS WHEREOF, I have hereunto set my hand in

17   the City of Tampa, County of Hillsborough, State of

18   Florida, January 3, 2018.

19

20

21       _____/s/ Lynann Nicely_____
             Lynann Nicely, RPR, RMR, CRR, CRC
22           Official Court Reporter

23

24

25